DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA and <br> PEOPLE OF THE VIRGIN ISLANDS, <br> <br> v. <br> <br> ELVIN WRENSFORD and <br> CRAIG MULLER, <br> <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) Criminal Action No. 2013-0003 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**Attorneys:**
**Alphonso G. Andrews, Jr., Esq.,**
St. Croix, U.S.V.I.
    *For the Government*

**Martial A. Webster, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant Craig Muller*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER is before the Court on Defendant Craig Muller's Motion to Suppress Identification Evidence. (Dkt. No. 36). The Government filed its Response to the Motion (Dkt. No. 39), and the Court held an evidentiary hearing. For the reasons discussed below, the Court will deny Defendant's Motion.

### I. BACKGROUND[1]

On June 11, 2012, Defendant Craig Muller ("Muller") was charged in an Information filed in the District Court of the Virgin Islands with Possession of a Firearm in a School Zone, in violation of 18 U.S.C. § 922(q)(2)(A); Unauthorized Possession of a Firearm, in violation of 14

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purpose of this pretrial motion, ever mindful that Defendant Muller is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

V.I.C. § 2253(a); and Murder in the First Degree, in violation of 14 V.I.C. § 922(a)(1). (Dkt. No. 1 in 12-cr-12). On January 29, 2013, Muller was indicted on these three charges, as well as on the charge of Using a Firearm during a Violent Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). (Dkt. No. 1 in 13-cr-3). On September 3, 2013, Muller filed the instant "Motion to Suppress Identification Evidence and Request for Evidentiary Hearing with Points and Authorities." (Dkt. No. 36). The Government filed its Opposition on October 4, 2013. (Dkt. No. 39). The Court granted Muller's "Motion for Continuance of Suppression Hearing Scheduled for November 20, 2013" (Dkt. No. 48), and the hearing was held on December 19, 2013. (Dkt. No. 54)

At the suppression hearing, one witness testified—Virgin Islands Police Department ("VIPD") Detective Kirk Fieulleteau, an Investigator in the Major Crimes Unit. Det. Fieulleteau stated that he was called to the scene of a shooting incident in the vicinity of Food Town supermarket in Christiansted, Virgin Islands, on May 10, 2012. He arrived between 8:30 and 9:00 p.m. and talked briefly with one eyewitness, known as Witness Two ("W2"). He asked W2 if s/he was willing to talk with him further. W2 agreed and they arranged to meet later that evening at the police station closest to the crime scene—the Marshall Command in Christiansted. After W2 arrived at the police station, Det. Fieulleteau took W2's statement. W2 signed the "Statement Narrative" on May 10, 2012 at 9:55 p.m. (Ex. 1, p. 184).

W2 told Det. Fieulleteau that s/he was sitting on the passenger side of a truck that was parked in the Food Town parking lot facing the store. While W2 was in the vehicle, s/he heard gunshots coming from the direction of Ben's Car Wash down the road, across the street from Food Town. W2 looked through the truck's back window and saw a male running up the road from the Car Wash in W2's direction. Shortly thereafter, W2 saw a red pick-up truck come from

the area of the Car Wash and follow the individual who was running. W2 told Det. Fieulleteau that the passenger in the red truck was firing shots at the person running. The truck turned right on a side street and cut the man off. The passenger in the truck continued firing gunshots until the man fell.

When questioned at the crime scene, W2 stated that s/he could see both the driver of the truck and the shooter. W2 described the driver as clean shaven, having black skin "a little darker" than W2, a black shirt, and a black stocking cap on his head. In the Statement Narrative, Det. Fieulleteau asked W2 whether s/he recognized the driver of the red truck during the shooting incident. W2 responded "no." (Ex. 1, pp. 192-93).

Det. Fieulleteau testified that he asked W2 during the interview if s/he had seen the shooter after the incident. W2 responded that when s/he stopped at the traffic light in front of the Marshall Command, en route to the interview, s/he looked to the right and saw the shooter being escorted to the police car.[2] In the Statement Narrative, W2 stated that "the guy the police put in the car is the guy I saw shooting from the front passenger window of the red truck earlier during the shooting incident in front of Food Town grocery." (Ex. 1, p. 195). W2 further stated that "[t]he first time I ever saw [the shooter] was earlier during the shooting incident at Food Town grocery. He was shooting at the guy on the grass." *Id.* p. 196.

Det. Fieulleteau testified that he interviewed W2 again on May 13, 2012 for the purpose of showing W2 a photo array. The VIPD Forensics Unit had compiled a photo array of six males set out in two rows of three photographs each. (Ex. 2, p. 204). A photograph of Defendant Muller

---

[2] Det. Fieulleteau added that co-Defendant Elvin Wrensford had been apprehended before W2 had arrived at Marshall Command (about 30-45 minutes after the Detective had arranged to meet W2 there). Once Wrensford arrived at the police station, Det. Fieulleteau immediately arranged to have him transported to the Frederiksted police station because he did not want W2 to encounter Wrensford. Nonetheless, W2 saw Wrensford.

had been included in the array because Detective Richard Matthews, who was also working on the case, had received credible information that Muller was the driver of the truck. Det. Fieulleteau explained to W2 that he had a photo array to present to him/her, and told W2 if s/he recognized anyone, to let him know. Det. Fieulleteau testified that W2 looked at the photo array for a few minutes and indicated s/he recognized one photograph—photo #4—which was a photograph of Defendant Muller. According to Det. Fieulleteau, W2 was "very positive" in recognizing the person in photo #4 as the driver of the truck.

Det. Fieulleteau asked W2 how s/he knew the person in photo #4. In the Statement Narrative, s/he answered that s/he saw him in La Grande Princesse

> with the guy that I saw shoot the guy Thursday night in front of Food Town Grocery in the red truck. I [unintelligible] always see them [redacted] together. The guy in photo number four (4) was driving the red truck Thursday night, May 10, 2012 during the shooting incident in front of Food Town grocery. The guy in photo number four (4) is friends with the shooter.

(Ex. 2, p. 201).

## II. DISCUSSION

### A. Applicable Legal Principles

In *United States v. Lawrence*, 349 F.3d 109 (3d Cir. 2003), the Third Circuit explained the constitutional ramifications when a witness to a crime identifies a suspect. "A due process violation can result when an identification procedure is so suggestive that it undermines the reliability of the resulting identification. Allowing a jury to consider an identification that is tainted by such a procedure can constitute reversible error entitling the defendant to a new trial." *Id.* at 115. The Court went on to say that "showing a witness a photographic array can constitute a denial of due process when police attempt to emphasize the photograph of a given suspect, or

4

when the circumstances surrounding the array unduly suggest who an identifying witness should select." *Id.* (citing *Simmons v. United States*, 390 U.S. 377, 383 (1968)).

In *United States v. Foote*, 432 F. App'x 151 (3d Cir. 2011), the Third Circuit set forth a two-step analysis that is instructive when determining whether a photo array should be suppressed:

> First, we ask whether the photo identification procedure was "unnecessarily or impermissibly suggestive." *Id.* (internal quotation marks omitted.) To answer that, we determine the actual suggestiveness of the identification and whether there was a good reason for the failure to utilize less suggestive procedures. *Id.* If the photo array is unnecessarily suggestive, we then determine under the totality of the circumstances whether it was so much so that it gave rise to a substantial likelihood of misidentification amounting to a violation of due process. *Id.* "[R]eliability is the linchpin in determining the admissibility of identification testimony...." *Id.* at 1391 (internal quotation marks omitted). . . . In sum, "we must determine (1) whether the identification process was unduly suggestive and, if so, (2) whether the totality of the circumstances nonetheless renders the identification reliable." *Thomas v. Varner,* 428 F.3d 491, 503 (3d Cir. 2005). The defendant has the burden of proving that the out-of-court identification was the product of unduly suggestive procedures. *Lawrence,* 349 F.3d at 115.

*Id.* at 154. Similarly, in *Perry v. New Hampshire*, __ U.S. __, 132 S. Ct. 716 (2012), the Supreme Court held that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id*. at 730. In other words, only if a court determines that the identification process was unduly suggestive will it perform a reliability analysis, examining under the totality of the circumstances whether other indicia of reliability "'outweigh[ ] . . . the corrupting effect' of law enforcement suggestion." *Id.* at 725 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977))..

As discussed below, the Court finds that Muller's challenge fails at step one of the analysis, because W2's identification of Muller in the photo array did not result from an unnecessarily suggestive procedure employed by the police.

B. Analysis

Defendant Muller contends that the photo array was unduly suggestive; therefore, W2's identification of him should be suppressed. At the suppression hearing, counsel argued, *inter alia*, that the other individuals whose photographs were included in the photo array did not look like Muller in that they had more or less hair on their heads or facial hair than he did, different sized or shaped heads, darker complexions, different colored T-shirts, and reflected different attitudes.

It is axiomatic, however, that differences in appearance will occur among any group of six people and do not, *per se*, make an identification unduly suggestive. *See United States v. Sanders*, 275 F. App'x 121, 124 (3d Cir. 2008) ("Each photo shows a man with unique characteristics. That does not make unduly suggestive the characteristics unique to [defendant's] photo."); *United States v. Rogers*, 491 F. Supp. 2d 530, 536 (M.D. Pa. 2007) (opining that the "'primary question is whether the suspect's picture is so different from the others that it suggests culpability.'") (quoting *Reese v. Fulcomer*, 946 F.2d 247, 260 (3d Cir. 1991)). In other words, the photographs in an array do not have to be identical with respect to a particular characteristic in order to pass muster under the Constitution. *United States v. Depass*, 2010 WL 3239178, at *5 (E.D. Pa. Aug. 13, 2010).

Minor differences such as fullness of face, size of head, or complexion, are not indicia of suggestiveness, much less undue suggestiveness that implicates constitutional violations in the identification process. *See United States v. Mathis*, 264 F.3d 321, 333 (3d Cir. 2001) (noting differences in clothing and age of individuals in the photo array, and that at least three of the other photographs appeared slightly dark, but finding that these differences did not make the array unnecessarily suggestive); *see also Foote*, 432 F. App'x at 154 (rejecting defendant's

B. Analysis

Defendant Muller contends that the photo array was unduly suggestive; therefore, W2's identification of him should be suppressed. At the suppression hearing, counsel argued, *inter alia*, that the other individuals whose photographs were included in the photo array did not look like Muller in that they had more or less hair on their heads or facial hair than he did, different sized or shaped heads, darker complexions, different colored T-shirts, and reflected different attitudes.

It is axiomatic, however, that differences in appearance will occur among any group of six people and do not, *per se*, make an identification unduly suggestive. *See United States v. Sanders*, 275 F. App'x 121, 124 (3d Cir. 2008) ("Each photo shows a man with unique characteristics. That does not make unduly suggestive the characteristics unique to [defendant's] photo."); *United States v. Rogers*, 491 F. Supp. 2d 530, 536 (M.D. Pa. 2007) (opining that the "'primary question is whether the suspect's picture is so different from the others that it suggests culpability.'") (quoting *Reese v. Fulcomer*, 946 F.2d 247, 260 (3d Cir. 1991)). In other words, the photographs in an array do not have to be identical with respect to a particular characteristic in order to pass muster under the Constitution. *United States v. Depass*, 2010 WL 3239178, at *5 (E.D. Pa. Aug. 13, 2010).

Minor differences such as fullness of face, size of head, or complexion, are not indicia of suggestiveness, much less undue suggestiveness that implicates constitutional violations in the identification process. *See United States v. Mathis*, 264 F.3d 321, 333 (3d Cir. 2001) (noting differences in clothing and age of individuals in the photo array, and that at least three of the other photographs appeared slightly dark, but finding that these differences did not make the array unnecessarily suggestive); *see also Foote*, 432 F. App'x at 154 (rejecting defendant's

contention that photo array was unnecessarily suggestive because other persons pictured either had more or less facial hair than he did); *United States v. Williams*, 446 F. App'x 527, 529 (3d Cir. 2011) (finding photo array was not unnecessarily suggestive even though the background of defendant's photograph appeared to be darker than other photographs). Such rulings make sense, because to allow "minor differences to vitiate an otherwise valid pretrial identification procedure would place an undue burden on law enforcement officers to 'search for identical twins in age, height, weight, or facial features' when administering such procedures." *Rogers*, 491 F. Supp. 2d at 536 (quoting *United States v. Traeger*, 289 F.3d 461, 474 (7th Cir. 2002)).

The Court has examined the photo array shown to W2 to determine whether the identification process was unduly or unnecessarily suggestive, and concludes that it was not. The differences among the six young men pictured in the photo array are minor, and Defendant's arguments to the contrary are wholly unpersuasive.

Further, Defendant's assertions that Muller had a different look in his eyes and a different "attitude" are exceedingly vague and subjective. Similar to the photo array described in *United States v. Donzo*, 2007 WL 2173396, at *6 (E.D. Pa. July 26, 2007), the young men depicted "are all of the same race and share remarkably similar facial features to the Defendant[.]" *See Barkley v. Ortiz*, 209 F. App'x 120, 123-24 (3d Cir. 2006) (holding photo array was not suggestive when police presented witness with photos of individuals of same race, similar skin color, similar facial composition and similar clothing). Moreover, there are no appreciable differences in size, shading, and backgrounds of the photographs. *Donzo*, 2007 WL 2173396, at *6.

In sum, the Court finds the similarities in the photographs in the photo array to be rather striking. The alleged differences cited by Defendant are inconsequential and fail to render the

7

photo array suggestive, much less "unnecessarily or impermissibly suggestive." *Foote*, 432 F. App'x at 153 (quoting *Stevens*, 935 F.2d at 1389).

On a procedural level, the testimony showed that the circumstances under which Det. Fieulleteau presented the array to W2 did nothing to suggest Muller's identity. The array displayed all of the photos at once. *Cf Lawrence,* 349 F.3d at 115 ("[I]t appears to us that showing all of the photographs at once can be a very fair way to proceed depending on all circumstances surrounding the identification."). There is no evidence that Det. Fieulleteau emphasized a particular photograph or suggested a photograph that W2 should identify. *Rogers*, 491 F. Supp. 2d at 535-36. Instead, he pursued an open-ended inquiry—asking W2 to let him know if s/he recognized anyone in the array. Defendant argued at the suppression hearing that Det. Fieulleteau's failure to inform W2 that the suspect may or may not be in the photo array actually suggested to W2 that s/he would find the person in the array. The Court rejects this non sequitur, and concludes that the manner that the photo array was presented was not unduly suggestive.

Defendant also argued at the suppression hearing that the identification procedure was unduly suggestive because W2: (1) saw Wrensford at the police station in the company of law enforcement officers; and (2) tied W2's identification of Muller to the fact that s/he identified Wrensford as the shooter and knew that Muller and Wrensford were friends whom s/he always sees together. While acknowledging that "it was not an intentional conduct on the part of the law enforcement" that W2 happened to see Wrensford when he was being escorted to the police vehicle outside the police station, counsel maintained that W2 "automatically associating" the photo of Muller with Wrensford was problematic and, under the totality of the circumstances, unduly suggestive.

8

Muller's argument misses the mark. A "primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances. . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place." *Perry*, 132 S. Ct. at 726. Thus, the Supreme Court has made clear that due process concerns are implicated only when "the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Id.* at 720.

The fact that W2 happened to observe Wrensford outside the police station does not make W2's identification of Muller from a photo array three days later unduly suggestive. In essence, Muller asks the Court to speculate that, based on W2's statement that Wrensford and Muller are friends, and that s/he always sees them together, that s/he picked Muller because of his association with Wrensford—whom s/he had seen with the police. Noticeably absent from Muller's speculative theory, however, is any evidence of "improper police influence," "police-arranged suggestive circumstances," "improper law enforcement activity," "manipulation or intentional orchestration by the police," or other police-initiated impropriety that is crucial to a legitimate due process challenge. *Id.* at 720, 721, 725. Indeed, the Supreme Court "has linked the due process check, not to suspicion of eyewitness testimony generally, but only to improper police arrangement of the circumstances surrounding an identification." *Id.* at 726. Such improper police conduct—which the exclusion of identification evidence seeks to deter, *see id.*—has not been demonstrated here, and Muller's speculative theory cannot serve as a viable substitute for this critical element.

In *Perry*, the defendant was arrested after a witness looked outside her window and said that "the person she saw breaking into [her neighbor's] car was standing in the parking lot, next to the police officer." *Id.* at 722. In response to a due process challenge to the eyewitness

identification, the Supreme Court affirmed the lower courts' rejection of the challenge on the grounds that the "corrupting effect of police-arranged suggestive circumstances" was not involved in the identification. *Id.* at 720. The Supreme Court expressly rejected the assertion that eyewitness evidence should be prescreened for reliability "any time an identification is made under suggestive circumstances," *id.* at 725, and declined to extend "pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers." *Id.* at 720-21. It thus follows here that the absence of any improper police conduct renders Muller's due process argument unavailing.

Finally, Muller's counsel argued at the suppression hearing that W2's statement on May 13, 2012 that s/he always sees Wrensford and Muller together, and that they are friends, was inconsistent with W2's statement on May 10, 2012 that s/he did not recognize Muller (the driver of the red truck).[3] However, as the Supreme Court has confirmed, in the absence of police impropriety, such perceived challenges to the reliability of the identification are subject to cross-examination and other safeguards in our adversary system, but do not implicate the Due Process Clause. *See id.* at 721 (discussing how reliability could be tested through "vigorous cross-examination, protective rules of evidence, and jury instructions on both the reliability of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.");[4]

---

[3] This alleged inconsistency is analogous to the situation in *Perry* where the eyewitness was unable to identify the defendant in a subsequent photo array. *Perry,* 132 S. Ct. at 722. Indeed, the trial court in Perry had "recognized that there were reasons to question the accuracy of [the eyewitness's] identification," including that "Perry was standing next to a police officer; Perry was the only African-American man in the vicinity; and [the eyewitness] was unable, later, to pick Perry out of a photographic array." *Id.* Nonetheless, as confirmed by the Supreme Court, the absence of unnecessarily suggestive police procedures was dispositive of the due process challenge.

[4] As the Supreme Court in *Perry* noted, constitutional safeguards, statutes and rules that govern the admissibility of evidence, and juries tasked with determining the reliability of evidence are

*cf. Colorado v. Connelly*, 479 U.S. 157, 163, 167 (1986) ("Where the "crucial element of police overreaching" is missing, the admissibility of an allegedly unreliable confession is "a matter to be governed by the evidentiary laws of the forum, . . . and not by the Due Process Clause."). Thus, Muller's argument does not alter the Court's conclusion that his due process challenge must be rejected.

In sum, Defendant Muller has failed to carry his burden of proving that W2's out-of-court identification was the product of unduly suggestive procedures. *Lawrence,* 349 F.3d at 115. Accordingly, Muller's Motion to Suppress will be denied.

### III. CONCLUSION

For the reasons stated above, the Court denies Defendant Muller's Motion to Suppress Identification Evidence. (Dkt. No. 36). An appropriate Order accompanies this Memorandum Opinion.

Date: March 24, 2014 _____/s/_____
WILMA A. LEWIS
Chief Judge

---

avenues through which the reliability of evidence can be tested. *Perry,* 132 S. Ct. at 723. In reflecting on its earlier rulings, the Court concluded that "only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice' have we imposed a constraint tied to the Due Process Clause." *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).