## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and<br>PEOPLE OF THE VIRGIN ISLANDS, | )<br>)<br>) | |
| v. | )<br>) | |
| ELVIN WRENSFORD and<br>CRAIG MULLER, | )<br>)<br>)<br>) | **Criminal Action No. 2013-0003** |
| Defendants. | )<br>) | |
| _____ | ) | |

**Attorneys:**

**Alphonso G. Andrews, Jr., Esq.,**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
     *For the United States and the Virgin Islands*

**Omodare Jupiter, Esq.,**
St. Croix, U.S.V.I.
     *For Defendant Elvin Wrensford*

**Martial A. Webster, Esq.,**
St. Croix, U.S.V.I.
     *For Defendant Craig Muller*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER is before the Court on Defendant Elvin Wrensford's Motion to Suppress "all incriminating evidence collected in this matter"—including evidence seized from his person (a knife, keys, wallet, and insurance card), an "alleged statement he made to law enforcement," a DNA buccal swab, and identifications of him made by eyewitnesses—as violative of the Fourth and Fifth Amendments to the United States Constitution. (Dkt. No. 53 at 1). Co-Defendant Craig Muller joined in the Motion to Suppress. (Dkt. No. 66). The Court held evidentiary hearings on January 17, 2014 and June 26, 2014.

For the reasons discussed below, the Court will grant in part and deny in part Defendant's Motion. Specifically, the Court will suppress the keys, wallet and insurance card, and will not suppress the knife, statements, DNA buccal swab, and witness identifications.

## I.  BACKGROUND[1]

On January 29, 2013, Defendant Elvin Wrensford ("Wrensford") was indicted in the District Court of the Virgin Islands on the following charges: Possession of a Firearm in a School Zone, in violation of 18 U.S.C. § 922(q)(2)(A); Possession of a Firearm with Obliterated Serial Number, in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B); Using a Firearm during a Violent Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); Unauthorized Possession of a Firearm, in violation of 14 V.I.C. § 2253(a); and Murder in the First Degree, in violation of 14 V.I.C. § 922(a)(1) and 923(a). (Dkt. No. 1). On November 22, 2013, Wrensford filed the instant Motion to Suppress. (Dkt. No. 53). Co-Defendant Craig Muller filed a Notice of Joinder in Wrensford's Suppression Motion on December 16, 2013. (Dkt. No. 66). The Government filed its Opposition on December 30, 2013 (Dkt. No. 71), and Wrensford filed a Reply on January 7, 2014. (Dkt. No. 72). The initial suppression hearing was held on January 17, 2014. Pursuant to this Court's Order (Dkt. No. 78), the parties filed supplemental briefing in late January and early February, 2014. (Dkt. Nos. 81, 85, 89).

In Wrensford's Post-Hearing Memorandum, he raised the argument for the first time that his identification by two witnesses on the evening of the shooting was "unnecessarily suggestive." (Dkt. No. 81 at 3). The Government disputed that characterization and requested an

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearings. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant Wrensford is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

opportunity to present evidence on the issue. (Dkt. No. 85 at 6). The Court held a reconvened suppression hearing on June 26, 2014 to take testimony on the identification issue. Based on the briefing by the parties, and the evidence and arguments presented at both hearings, the Court now renders its ruling.

### A.  January 17, 2014 Suppression Hearing

At the January 17, 2014 suppression hearing, four witnesses testified—former Virgin Islands Police Department ("VIPD") Officer Julio Mendez, Officer Leon Cruz, Sergeant Richard Matthews, and Corporal Luis Encarnacion.

Officer Mendez testified that, on the evening of May 10, 2012, he heard a call on his car radio from 911 emergency dispatch that shots had been fired in the vicinity of Food Town Supermarket in Christiansted, St. Croix, U.S. Virgin Islands. He was in Estate La Grande Princesse at the time and drove immediately to Food Town. On his way there, he heard a radio report at 8:08 p.m. that there was a possible gunshot victim across the street from Food Town. Transcript of 1/17/14 Suppression Hearing ("Tr.") at 235-36 (Dkt. No. 106); 911 Call History, Gov't Ex. 12.

Mendez was the first VIPD officer to arrive on the crime scene, and he observed St. Croix Rescue treating a person with a head injury. Tr. 236-38, 265. He heard witnesses at the scene saying that, after the shots were fired, a red truck left the area traveling north toward La Grande Princesse at a high rate of speed. Tr. 239. After a sufficient number of officers had arrived to preserve the crime scene, Mendez drove his marked Chevy Tahoe cruiser into the Princesse area in an effort to find the red truck. While he was driving on the road that leads to the St. C Condominiums, he saw two males walking on the road in his direction, about 100 feet

3

ahead of him. Tr. 240-242. His vehicle's spotlight and headlights were on, but not the flashing blue lights. Tr. 268.

Mendez stopped his car about eight to ten feet in front of the two men, and they stopped walking. He opened the door of his cruiser, and stood on the side step. Tr. 243. His lights were trained on them, and a light pole was "right there" as well. Tr. 242, 245. He described one of the individuals as wearing his hair in dreadlocks, "clear complexion[2]" wearing a white shirt and blue and white knee-length pants. The person "had what appeared to be like bush, or a green leafy substance on his dreadlocks and on his shirt." Tr. 243-44. The other individual was a "black male, he also had dreadlocks. He had on a white shirt, and a black short knee-length pants." Tr. 244. Mendez observed that the two men were "sweating profusely," which he found "unusual," "out of the norm," and "really bad" in that their shirts were all wet. Tr. 245-46.

Mendez asked the men where they were coming from. They did not answer immediately; instead, they looked at each other and looked around the area. This behavior raised Mendez's suspicions, and he called for back-up. Tr. 246, 270. Mendez asked them to place their hands on his vehicle, and repeated his command several times before they complied. Tr. 247. The person with the "darker skin" said they came from the basketball court. Tr. 248. As Mendez began to step down from his cruiser, both men took off running. The darker-skinned male ran into the bushes heading north toward Judith's Fancy, while the lighter-skinned male ran west, and made a left turn heading towards One Love Gas Station. Tr. 249-50.

At 8:45 p.m., Mendez radioed a description of the two males—described in the call history as "two black males slim buil[d]" and "both rasta males"—and the directions they were

---

[2] Officer Cruz used the term "clear" to denote a fair-skinned black person—one who did not have a "dark complexion." Tr. 129.

running. Tr. 271; Ex. 12. Shortly thereafter, another officer arrived with Mendez's police dog. They searched the bushes where the darker-skinned man had run, but could not find him. Mendez then drove to a nearby area—the vacant Nicasio Nico Housing Project—which was known as a place where people abandoned stolen vehicles. Mendez hoped that he would be able to find the vehicle allegedly used in the crime—a red or maroon pick-up truck. Tr. 251-52. At 9:07 p.m., he found a truck of that description partially hidden in some bushes, approximately one-quarter mile from where he first saw the men walking. Tr. 252, 257; Ex. 12. Mendez identified both Defendants in the Courtroom as the individuals he had stopped on the evening of May 10, 2012 on the road to the St. C Condos. Tr. 258-60.

Officer Leon Cruz, an eleven-year veteran of the VIPD assigned to the Criminal Investigation Bureau, testified that on the evening of May 10, 2012, he was in his office at the police station in Frederiksted when he heard the report of the shooting. Tr. 97. At 8:10 p.m., he reported to 911 that he was traveling to the crime scene. Tr. 99; Ex. 12. After he arrived and while stationed a short distance down the road, he heard that "two black males, slim built, left in a truck." Tr. 36. At 8:46 p.m., he heard the radio transmission from Mendez concerning the two men who had taken off running, with one of them heading in the direction of the One Love Service Station (in Estate St. John). Tr. 36, 37, 39, 111. Being familiar with the Princesse and Estate St. John areas, Cruz headed there in his unmarked police car. Tr. 36, 37, 39. While driving down the road by the One Love Service Station, he observed an individual in a white shirt running across the road. He drove in the direction the person was running and, shortly thereafter, saw a rasta male, wearing a black shirt and three-quarter jean pants, standing with his back towards him in the bush by the side of the road, two car-lengths away. Tr. 40-41. Cruz opened his car door, stood behind it, and ordered the man to show his hands. The man did not comply

but stood with his back toward Cruz for ten to fifteen seconds. He then looked over his left shoulder, and looked forward. Tr. 40-44, 148. Cruz was concerned that the man might have a gun in his hands and would try to shoot him. As a precaution, he drew his firearm, made a "right flank" move for protection, and again demanded that the man show his hands. The man turned around slowly. Tr. 43-47.

Cruz ordered the man to the ground. By that time, another officer had arrived and they both handcuffed the man. Tr. 44-47. Cruz saw a white shirt hanging from the bushes near where the man had stood. Tr. 47. After helping the man get back on his feet, Cruz asked if he had any weapons on him. Tr. 48. The man—who Cruz identified in the courtroom as Defendant Wrensford—responded that he had a knife in his front pocket, which Cruz removed. Tr. 48, 53. Cruz asked if he had anything else in his pockets. Wrensford responded that he had keys and a wallet. Tr. 48, 132. Cruz removed the keys—which he recognized were from a GMC truck—as well a vehicle insurance card from Wrensford's front pocket, and the wallet from his rear pocket. Tr. 49. Cruz patted him down after he removed these items. Tr. 48, 64-65, 133. The Call History shows that Wrensford was detained at 8:58 p.m. Ex. 12.

Wrensford asked Cruz what was going on; Cruz answered that there had been a shooting and Wrensford fit the description of a person who was reported as running. Tr. 130-31. Cruz also informed Wrensford that he was being detained. Tr. 53. He expected that Wrensford would be transported to the closest police station—C Command in Christiansted—and that Mendez would determine if Wrensford was the same person he had stopped earlier. Cruz also expected that the case agent—Sgt. Matthews—would question Wrensford. Tr. 52-54, 143, 146.

After Wrensford was transported to C Command at 9:06 p.m., Cruz heard Mendez's 911 report that the red truck had been found. Tr. 65; Ex. 12. Cruz drove over to the location and

observed spent rounds and casings in the rear of the truck. Tr. 66, 73. He and other officers returned to the spot where he had detained Wrensford to see if they might be able to locate a firearm. They found one close to the fence where Wrensford had been standing. Tr. 73-74.

Sergeant Richard Matthews, a nineteen-year VIPD veteran, testified that, in May 2012, he was working in the major crimes unit and was the case agent for the homicide that occurred on May 10, 2012 near Food Town. Tr. 150-51. After hearing a call over dispatch at approximately 8:15 p.m. reporting a shooting at Food Town, he traveled there from Frederiksted—a 20-25 minute drive. Tr. 152, 203, 211. Once he arrived, he spoke with his partner, Detective Fieulleteau, who "fill[ed him] in as to what happened." Tr. 152. Matthews understood from Fieulleteau that there were witnesses to the shooting, and that Fieulleteau believed the witnesses knew who the perpetrators were. Tr. 153, 208. Matthews told Fieulleteau to contact the witnesses and have them come to the C Command police station in Christiansted so their statements could be taken. Tr. 153, 214-15.

While he was still at the crime scene, Matthews heard a 911 transmission that someone had been detained and was being taken to C Command. Tr. 154. Matthews recalled that the witnesses had been asked to go to the same police station to give their statements. He contacted officers at the station and told them to move Wrensford to another facility in order to avoid the witnesses encountering Wrensford. Matthews thought there would be enough time to move Wrensford before the witnesses arrived, even though he did not know how far the witnesses had to travel to reach the station. Tr. 155, 215-17.

Once he arrived at the police station, Matthews took a written statement from Witness One ("W1"). Tr. 158. W1 told him that when he was arriving at the station to give his statement, he saw the person who was the passenger in the red truck involved in the shooting leaving the

7

station. Tr. 158-59. Fieulleteau interviewed a second witness ("W2") at the police station who also identified Wrensford as the shooter under similar circumstances. Tr. 160. After W2 made that statement to him, Fieulleteau showed W2 Wrensford's driver's license, and W2 positively identified Wrensford as

> the male individual that he/she saw shooting from the passenger side window of the pickup truck during the shooting incident . . . earlier that night. . . and also as the same male individual that he/she saw being taken out of the police station by the two police officer[s] as he/she was sitting in his/her father's truck at the traffic light [in front of the police station].

Ex. 7; Tr. 227.

W1 and W2 signed their statements, which included identifications of Wrensford as the shooter, at 9:56 p.m. and 9:55 p.m., respectively—approximately fifty minutes after Wrensford had been transported to the station. Tr. 202, Ex. 12.

Matthews stated that the investigation into the shooting began "[f]rom the time it happened" and was ongoing because "[t]here was another person at large. There were things to be found. There were a lot of things going on at the same time." Tr. 156. Matthews testified that, as case agent, he continued to gather information about the incident by speaking to individuals and officers. He added that officers were searching the Princesse area for the other individual who had run from Mendez and for the vehicle used in the shooting. Tr. 157-58.  Asked why he chose to talk to W1 before he talked to Wrensford, Matthews stated that it would "make more logical sense, to see what happened with a witness, and then go to speak to him." Tr. 184.

Matthews advised Wrensford of his *Miranda* rights by reading the advice of rights section of a "Warning and Consent to Speak" form while Wrensford followed along on another

copy of the form. Tr. 185; Ex. 8.[3] At the end of the Advice of Rights section, Wrensford indicated that he understood what his rights were and signed the form at 12:23 a.m. on May 11th. Ex. 8. Matthews then reviewed the second part of the form with him—a waiver of the right to counsel and indication of a willingness to make a statement and answer questions. Matthews testified that although Wrensford said he would not sign the waiver section, Wrensford stated that he would speak to the officers. Tr. 185-87, 222; Ex. 8. Wrensford told Matthews that he was in the Princesse area with a partner of his, and they were playing basketball. Wrensford refused to provide Matthews with the name of his partner. Tr. 187-88.

When Wrensford was being booked by Corporal Luis Encarnacion, Matthews asked Wrensford if he would consent to the VIPD obtaining a DNA sample from him. Matthews told him that either they could obtain his consent or Matthews would draft a warrant to get the DNA swab. Wrensford stated that he was going to get arrested anyway and consented. Tr. 191-92; Ex. 10.

Corporal Encarnacion, a twenty-year veteran with the VIPD forensic unit, testified that he took a buccal DNA swab from Wrensford shortly after Wrensford's arrest at 1:30 a.m. on May

---

[3] The form, entitled "Warning and Consent to Speak," contains two sections: "Advise of Rights" and "Waiver." The Advise of Rights section provides: "You must understand your rights before we ask you any questions. You have the right to remain silent. Anything you say can be used against you in court, or other proceedings. You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning. If you cannot afford a lawyer and want one, a lawyer will be appointed for you by the court. If you decide to answer questions now without a lawyer present, you will still have the right to stop the questioning at any time. You also have the right to stop the questioning at any time until you talk to a lawyer." Above the signature line, the form provides: "I have read this statement of my rights and it has been read to me, and I understand what my rights are." The Waiver section of the form provides: "I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kin[d] has been used against me. I hereby voluntarily and intentionally waive my rights and I am willing to make a statement and answer questions." Gov't Ex. 8.

11, 2012. Tr. 5, 6, 190, 193, 194. Encarnacion was present when Matthews asked Wrensford if he would provide the DNA sample and he orally consented. Tr. 8. Encarnacion stated that Wrensford also signed a biological evidence consent form. Tr. 6-8; Ex. 10.

Photographs of the Princesse/St. John area and the truck and keys, police reports concerning the investigation of the incident and the arrest, and the 911 call history were entered into evidence. Ex. 1-12. In his police report, Fieullteau wrote that, while he was at the scene of the shooting, he received information that the two people involved in the shooting were named Craig and Elvin; that they were both black rasta males; that they were best friends; that they got into an argument earlier that day with the victim; and that they told the victim they were coming back for him. Ex. 6b.

### B. June 26, 2014 Reconvened Suppression Hearing

At the June 26, 2014 Suppression Hearing, two VIPD Officers testified: Detective Kirk Fieullteau and Officer Lydia Figueroa.

Det. Fieullteau, employed by the VIPD for twelve and one-half years, testified that his duties encompassed investigating homicides. He arrived at the crime scene on May 10, 2012, shortly after 8:00 p.m., and left some time between 9:00 and 9:30 p.m. While he was there, Fieullteau was informed by Officer Cruz that a person of interest had been taken into custody. He told Cruz to take the person to C Command. At some point after that, Fieullteau spoke with Officer Figueroa and her partner, who were getting ready to leave the scene. He asked if they could travel to C Command and pick up the individual who was detained there and transport him to his office in Frederiksted. He wanted to question that individual about his possible involvement in the incident that evening.

Fieulleteau testified that, after speaking with Figueroa, he made a telephone call to the two witnesses who had told him that they could identify the participants in the crime and asked if they would meet him that evening at C Command. They agreed.[4] He arranged to meet them at C Command because it was more convenient for everybody to meet at the closest police station.

Because the person of interest was detained at C Command—the same place where he had told the witnesses to meet him—Fieulleteau called Figueroa and asked her to hurry up, pick up the person, and take him to Frederiksted because he was going to be meeting some witnesses at C Command and he did not want the witnesses and the person at C Command to see each other. When he arrived at C Command shortly thereafter—at almost the same time as Figueroa—he learned that the person of interest was still in his cell. Fieulleteau asked him his name; Wrensford told him. Wrensford was then advised that he would be transported to Fieulleteau's office in Frederiksted. Fieulleteau asked Figueroa to leave with Wrensford immediately because he did not want the witnesses to have any sort of "inadvertent interaction" with Wrensford.

Shortly thereafter, the witnesses arrived. Sgt. Matthews interviewed the man (W1) and Fieulleteau interviewed the lady (W2). Before the interview began, as Fieulleteau was preparing the paperwork, W2 blurted out, "That's the shooter." In explaining what she meant, W2 said that the guy that the police officers had just put in the police car was the shooter in the incident earlier that evening. Fieulleteau went to the room where Sgt. Matthews was interviewing W1, and told Matthews what W2 had said. Matthews told Fieulleteau that W1 had just told him the same thing. Fieulleteau returned to the interview and showed W2 Wrensford's driver's license

---

[4] Fieulleteau had initially told the witnesses, before they left the crime scene, that he would contact them the next day to arrange a time to speak with them. Because they were so cooperative and forthcoming, he changed his plan and decided to interview them that evening, while the information was fresh.

and asked her if she recognized the picture of the person. W2 answered that it was a photograph of the shooter from the earlier incident, who was the same person that she saw the officers put into the car while she was at the traffic light outside the police station on her way to the interview. Fieulleteau stated that W2 was "very, very positive" that the shooter was the person who was leaving the station with the officers.

Officer Figueroa, a twenty-seven and a half year veteran of the VIPD, who works with the School Security Bureau, testified that, on the night of the shooting, she and her partner responded to the crime scene. As they were leaving, Fieulleteau told them to go to C Command to escort an individual in the cell there to the police station in Frederiksted. When she arrived at C Command, she observed Fieulleteau—who had arrived at approximately the same time—ask the man his name and advise him that Figueroa would transport him to Frederiksted. After Figueroa handcuffed him, she and her partner escorted him through the door of the police station, down the stairs, and into the waiting police car. They then drove to Frederiksted.

## II.    DISCUSSION

Defendant Wrensford has raised several issues in his Motion to Suppress. He seeks to suppress: (1) the knife, keys, wallet, and insurance card that Officer Cruz removed after handcuffing him; (2) the statements that he made to the police officers; (3) the buccal swab; and (4) the identifications of him made by W1 and W2. (Dkt. No. 72 at 14).

### A.  *Terry* Stops by Officers Mendez and Cruz

Wrensford claims that the initial stop by Mendez was an illegal *Terry* stop because Mendez did not have reasonable suspicion to stop him. He also argues that Officer Cruz had neither reasonable suspicion nor probable cause when he stopped him a short time later. The Court finds that neither stop violated Wrensford's Fourth Amendment rights.

### 1.   Applicable Legal Principles

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. "[S]earches without a warrant are presumptively unreasonable." *United States v. Mathurin*, 561 F.3d 170, 173 (3d Cir. 2009). Where a search being challenged takes place without a warrant, the Government has the burden to "demonstrate that the warrantless search was conducted pursuant to one of the exceptions to the warrant requirement." *United States v. Williams*, 2014 WL 252101, at *2 (D.N.J. Jan. 23, 2014) (citing *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992)). Any evidence obtained as a result of an unconstitutional seizure "must be suppressed as 'fruit of the poisonous tree.'" *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

"[U]nder the exception to the warrant requirement established in *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court has held that 'police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.'" *Mathurin,* 561 F.3d at 173–74 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Such brief investigative stops are "seizures" subject to Fourth Amendment protection. *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (citing *Terry*, 392 U.S. at 21).

The reasonable suspicion necessary for a *Terry* stop "is a less demanding standard than probable cause[.]" *Alabama v. White,* 496 U.S. 325, 330 (1990). Under the reasonable suspicion standard,

> officers are required to have a particularized and objective basis to suspect illegal activity in order to conduct a search. The officers must be able to articulate

13

reasons that led to the search . . . that are indicative of behavior in which most innocent people do not engage. We consider the totality of the circumstances in determining whether reasonable suspicion existed at the time of the search. Accordingly, although each individual factor alone may be consistent with innocent behavior, it is sufficient if together they serve to eliminate a substantial portion of innocent [people].

*United States v. Whitted,* 541 F.3d 480, 489 (3d Cir. 2008) (internal quotations and citations omitted). The police officer must, however, demonstrate that the stop was based on something more than an '"inchoate and unparticularized suspicion or hunch."' *Sokolow,* 490 U.S. at 7 (quoting *Terry,* 392 U.S. at 27).

The constitutionality of a *Terry* stop involves a two-part assessment:

First, we examine 'whether the officer's action was justified at its inception'— that is, whether the stop was supported by reasonable suspicion at the outset. . . . Next, we determine whether the manner in which the stop was conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'

*United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010) (quoting *Terry*, 392 U.S. at 19–20). In assessing the totality of the circumstances as to whether reasonable suspicion existed at the time of a search, courts consider such factors as: (1) the presence of a suspect in a high crime area; (2) a suspect's presentence street at a late hour; (3) a suspect's "nervous, evasive behavior" or flight from police; and (4) a suspect's behavior that conforms to police officers' specialized knowledge of criminal activity. *Brown*, 448 F.3d at 251 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) and citing cases). Further, in determining whether a stop is '"so minimally intrusive as to be justifiable on reasonable suspicion,"' courts consider the duration of the stop; the law enforcement purposes justifying the stop; whether the police diligently sought to carry out those purposes given the circumstances; and alternative means by which the police could have served their purposes. *United States v. Sharpe,* 470 U.S. 675, 684–87 (1985) (citation omitted).

14

In contrast to reasonable suspicion, "'[p]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.'" *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)); *see also id.* at 789 ("If 'at the moment the arrest was made . . . the facts and circumstances within [a police officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [a person] had violated the law, probable cause is present.") (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)). Probable cause "is not required for investigatory detentions that fall short of an arrest." *Hopkins v. Vaughn*, 363 F. App'x 931, 936 (3d Cir. 2010) (citing *Terry*, 392 U.S. at 20.

### 2. Officer Mendez's Initial Stop

Wrensford argued at the January 2014 suppression hearing that Mendez did not have reasonable suspicion to stop him because Mendez had no description of the suspects involved, did not see the red truck, and had no information linking the two men with any crime. The Court disagrees.

When Mendez encountered the men on a secluded road in an area where suspects in a recent shooting were reported to have headed, they were sweating profusely and one man had leaves stuck in his clothes and hair. A rational inference from their appearance was that they had been running through the bushes—a highly unusual night-time behavior in which most innocent people do not engage. *Whitted,* 541 F.3d at 489. Moreover, the temporal and spatial proximity of the encounter to the crime—approximately forty minutes after the shooting and less than two

miles from the crime scene—provides a "relevant contextual consideration[] in a *Terry* analysis." *Wardlow*, 528 U.S. at 124.

In *United States v. Robertson*, 305 F.3d 164 (3d Cir. 2002), the Third Circuit found that a police officer had "a reasonable suspicion that the two suspects he viewed sprinting through the streets of Philadelphia, in close proximity to the scene of the armed robbery, had committed the crime." *Id.* at 168. In such circumstances, police officers—like Mendez here—have to rely on their "experience and training, indispensable to [their] evaluation of reasonable suspicion," particularly under "exigent circumstances requiring quick, decisive reactions." *Id.*

The Court finds that Mendez had both a "particularized" and "objective" basis to suspect that criminal activity involving the two men may have been afoot, based on their appearance, their location, and the temporal proximity to the crime—which provided the requisite reasonable suspicion to justify the stop.

### 3.    Officer Cruz's Subsequent Stop

Wrensford maintains that his seizure by Officer Cruz was unjustified for two reasons. First, he cites the 911 call history reporting that a black truck had been involved in the crime, and that people on bikes and on foot east of the crime scene had been spotted. He claims that "the fact that the police were checking on other 'suspects' who were very different from the two that were eventually arrested indicates that they did not have specific, articulable information that linked them to Mr. Wrensford, and that Officer Cruz was not justified in detaining him and searching him." (Dkt. No. 72 at 7). Second, he asserts that, at the time of the stop, all that Officer Cruz knew was that a shooting had occurred forty-five minutes earlier in an area that was approximately a mile and a half away, and that Mendez's 911 report that two people were running did not provide reasonable suspicion to justify the stop. *Id.*

The Court finds Wrensford's arguments unpersuasive. The 911 call history indicates that, at 8:07 p.m., a female from Mill Harbor reported "several males on bikes" and that it was "unknown if they discharged the shots from JFK Project." Ex. 12. It also indicated that, at 8:34 p.m., there was a "visual of a male at Churches Chicken" (in the Five Corners area, east of the crime scene). *Id.* However, the report of males on bikes explicitly linked them to another incident. Further, Cruz testified that he would not have stopped the individual walking by Five Corners because "[w]hat was transmitted was that two rasta guys in a pickup truck left the scene at a high rate of speed driving into LaGrande Princess. So no, I wouldn't have stopped that guy by Five Corners." Tr. 110. While some reports on the call history indicated that the getaway truck was red and others indicated it was black, the report to which Cruz responded concerned two men running from Mendez in Princesse, not men driving in a truck of a certain color. Accordingly, the Court finds that the reports concerning the color of the truck and the individuals at Mill Harbor and Five Corners had no bearing on whether Cruz had reasonable suspicion to stop the person he saw in the bushes in the Princesse/St. John area.

Indeed, Cruz had ample reason to stop Wrensford. While Cruz was at the crime scene, he heard a description of the suspects as black rasta males, slim build. At 8:46 p.m., he heard Mendez's transmission concerning two men who fit that description who had taken off running, with one heading into the bushes and the other toward the One Love Service Station in the Princesse/St. John area. Shortly thereafter, Cruz drove down the road next to that service station, and saw a "rasta guy" running across the road.[5] Not only did Cruz observe a person running in an area where suspected perpetrators of a recent crime had headed, but it was reasonable for Cruz to assume that the person he saw running was one of the men who had run away from

---

[5] Cruz reported seeing no other black males that night in that area. Tr. 108.

Mendez a short time before. Tr. 131. Officers confronted by the flight of a person under investigation during a *Terry* stop must be allowed "to stop the fugitive and investigate further." *Wardlow,* 528 U.S. at 125. Moreover, "[a] court may also consider the temporal and geographic proximity of the suspect to a crime scene and the similarity between the suspect's physical appearance and the details of the reported descriptions of the suspect." *United States v. Bennett*, 2010 WL 1427593, at *4 (E.D. Pa. Apr. 9, 2010) (citing *United States v. Harple*, 202 F.3d 194, 196 (3d Cir. 1999)); s*ee also Adams v. Williams*, 407 U.S. 143, 145 (1972) ("[T]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow. . . a criminal to escape.").

Wrensford matched both the description of the suspected perpetrator of the crime and the person who ran from Mendez, and he was apprehended in an area where the suspected perpetrators headed after the crime. All of these factors support the conclusion that Cruz had the requisite reasonable suspicion, supported by articulable facts, to justify the stop of Wrensford. *Terry,* 392 U.S. at 19-20.

### B.  Suppression of Seized Items

Wrensford argues that certain items seized from his person by Officer Cruz should be suppressed because the seizures violated his Fourth Amendment rights. The Court disagrees with regard to the seizure of the knife, but agrees as to the seizure of the keys, wallet, and insurance card.

### 1.  The Knife

"[T]he realities of law enforcement allow police officers to briefly detain an individual based upon 'articulable suspicion' and then to perform a limited protective 'patdown' for weapons during that detention 'where a police officer observes unusual conduct which leads him

reasonably to conclude in light of his experience that criminal activity may be afoot.'" *United States v. Navedo*, 694 F.3d 463, 467 (3d Cir. 2012) (quoting *Terry,* 392 U.S. at 30). A protective search or patdown is permissible if the officer has reasonable suspicion to believe that a suspect is "armed and dangerous." *Id.* (quoting *Terry*, 392 U.S. at 30). "The purpose of a *Terry* frisk for weapons 'is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.'" *United States v. Gatlin,* 613 F.3d 374, 378 (3d Cir. 2010) (quoting *Adams,* 407 U.S. at 146). The issue "is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of others [is] in danger." *Terry*, 392 U.S. at 27. The determination is based on the totality of the circumstances, recognizing that an officer may have more experience and training "to make inferences from and deductions about the cumulative information available" than an untrained person. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

In view of the description of the suspected perpetrators of the crime and the transmission from Mendez regarding the men who took off running, Cruz had not only reasonable suspicion to stop Wrensford, but also a reasonable belief that he was "dealing with an armed and dangerous individual" who had just committed a shooting. *Terry,* 392 U.S. at 27. Cruz was therefore justified in conducting "a reasonable search for weapons." *Id.* Cruz's removal of the knife from Wrensford's front pocket, after Wrensford stated that he had a knife there, was thus justified.[6] Accordingly, the knife will not be suppressed.

---

[6] The fact that the knife was removed by Cruz following its identification by Wrensford, rather than being discovered in a patdown, is of no moment. The objective of the patdown is to discover and seize weapons or other objects that may be used to harm the officer. The knife, however discovered, certainly qualifies as such.

19

### 2.    The Keys, Wallet, and Insurance Card

While a police officer may perform a protective patdown for weapons during a *Terry* stop, the scope of that search must be "carefully limited [to] the outer clothing of such persons in an attempt to discover weapons which might be used to assault" the officer. *Terry*, 392 U.S. at 30. "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *see also Terry*, 392 U.S. at 29 ("The sole justification of the search in [a *Terry* stop] is the protection of the police officer. . . , and it must therefore be confined to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.").

After he removed the knife, Cruz asked Wrensford if he had any other items in his pockets. Wrensford responded he had keys and a wallet, and Cruz removed them. Tr. 132-34. He also removed a vehicle insurance card from Wrensford's pocket and read it. Tr. 135-36. Cruz explained that he removed the keys and wallet because he wanted to ensure that the key ring did not contain a key that could open handcuffs, which could be a threat to police officers' safety. Tr. 49-51, 130-140. Cruz could provide no reason why he removed the insurance card. Tr. 50.

Cruz's seizure of the keys, the wallet, and the insurance card went beyond the parameters of a protective search for weapons allowed in a *Terry* stop. The Court rejects Cruz's explanation that his intrusive search was necessary to discover a handcuff key (or any item such as a piece of wire that could open a handcuff), as such a rationale would swallow the rule that only a limited weapons patdown is permissible with a *Terry* stop. In any event, handcuff keys are not weapons. Consequently, the Court will suppress the keys, wallet, and insurance card as fruits of an unconstitutional search as long as no exceptions to the exclusionary rule apply.

The Government asserts that such an exception applies here, arguing that these items are admissible under the inevitable discovery doctrine. This doctrine applies if the Government can prove, by a preponderance of the evidence, "that the police, following routine procedures, would inevitably have uncovered the evidence." *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) (opining that "'if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means. . . then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received.'") (quoting *Nix v. Williams,* 467 U.S. 431, 444 (1984)); *see also Herrold*, 962 F.2d at 1140 (the doctrine "considers what would have happened in the absence of the initial [illegal] search."). In other words, the Government must show that "the evidence would have been obtained inevitably, and therefore would have been admitted regardless of any overreaching by the police." *Nix*, 467 U.S. at 447.

Although it does not appear that the Third Circuit has specifically ruled that items improperly seized during a *Terry* stop can be admissible pursuant to a search incident to a lawful arrest, several other Circuits have so ruled. *See, e.g., United States v. Bailey*, 743 F.3d 322, 339 (2d Cir. 2014) (concluding that any Fourth Amendment error in retention of defendant's keys would be cured since the keys' seizure was inevitable upon a search incident to a lawful arrest); *United States v. Thomas*, 524 F.3d 855, 859 (8th Cir. 2008) (ruling item that was improperly removed from suspect's pocket admissible under inevitable discovery doctrine because it would have been found pursuant to search incident to later arrest); *see also United States v. Salter*, 255 F. App'x 355, 357 (11th Cir. 2007); *United States v. McGlown,* 150 F. App'x 462, 468 (6th Cir. 2005). The Court finds that the inevitable discovery doctrine could be used in this case to cure the illegality of Cruz's search which yielded the keys, wallet, and insurance card—if the

Government can show by a preponderance of the evidence that the items would inevitably have been discovered later, following routine police procedures, during a search incident to a lawful arrest.

While the Government claims in its written submission that "[p]olice officers routinely conduct searches and seize personal items (search incident to arrest) from arrestees at the time of arrest" (Dkt. No. 71 at 6-7), there was no testimony or other evidence introduced at the suppression hearings that the VIPD has an established procedure in place where, upon arrest of a suspect, an officer will routinely conduct a search of the person incident to that arrest. In fact, the only person who testified about searching Wrensford is Cruz, whose search went beyond the bounds of *Terry*. Tr. 141.

The lack of evidence on this point is significant. The Third Circuit has opined that "[i]nevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing the Fourth Amendment and the exclusionary rule, courts must take care to hold the government to its burden of proof." *Vasquez de Reyes*, 149 F.3d at 196 (internal quotation marks omitted). The record "must support a finding that the police had relevant procedures in place, that those procedures would have been followed, and that would have inevitably led to the discovery of the evidence in question." *United States v. Carrion-Soto*, 493 F. App'x 340, 342 (3d Cir. 2012). Further,

> [i]f the officers here had appropriate procedures that would have been followed absent the unconstitutional search . . . , it was the Government's burden to establish that during the hearing. It is not for a court to speculate about any such procedures unless the facts are so clear as to justify taking judicial notice of them.

*Id.* at 343 (internal quotation marks omitted).

The Court will not assume facts that are not in evidence, and finds that the Government has not met its burden of showing that the inevitable discovery doctrine applies here.

Accordingly, the Court will grant Defendant's motion to suppress the keys, wallet, and insurance card that Cruz improperly seized during the *Terry* stop.

### 3. *De Facto* Arrest

Wrensford contends that Cruz's actions in drawing his weapon, ordering Wrensford to the ground, and conducting an intrusive search were "much more akin to a full scale arrest from the very beginning, and it certainly blossomed into an arrest by the time the witnesses identified [him]" at the police station. (Dkt. No. 72 at 5). He also claims that "transporting a suspect to a police station for interrogation transforms the seizure to an arrest requiring probable cause," as established by *Dunaway v. New York,* 442 U.S. 200 (1979). *Id.* Wrensford concludes that because his "apprehension, detention, and compulsory transportation to the police station" constituted an arrest that required probable cause, and the police did not have probable cause at that time, "all of the evidence obtained as a result thereof should be suppressed." *Id.* at 8. In essence, Wrensford is claiming that "the manner in which the stop was conducted transformed the encounter into a formal arrest." *Johnson*, 592 F.3d at 447.

The Government responds that drawing a weapon and handcuffing Wrensford were necessary safety precautions, and transporting Wrensford to the police station for further questioning did not amount to a *de facto* arrest since such action was reasonably necessary in pursuit of the ongoing investigation. (Dkt. No. 85 at 1). The Court agrees with the Government's position.

The Supreme Court has observed that, in certain circumstances, it can be difficult to distinguish a *Terry* stop, requiring reasonable suspicion, from a *de facto* arrest, which must be supported by probable cause. *See Sharpe*, 470 U.S. at 685 (observing that case law "may in some instances create difficult line-drawing problems in distinguishing an investigative stop from a *de*

*facto* arrest."). Nonetheless, Wrensford is incorrect when he asserts that drawing a weapon on a suspect and ordering him to the ground necessarily constitute an arrest. The Third Circuit has held that pointing a gun at a suspect while securing a location or conducting an investigation did not "automatically transform an otherwise-valid *Terry* stop into a full-blown arrest." *Johnson*, 592 F.3d at 448, citing, *inter alia*, *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) ("There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest."); *see also United States v. Goode,* 486 F. App'x 261, 264 (3d Cir. 2012) (stating that the Third Circuit "has recognized that officers surrounding a car with their weapons drawn, shouting at the occupants, and later handcuffing them, does not constitute a de facto arrest") (citing *Johnson*, 592 F.3d at 447-48); *United States v. Pontoo*, 666 F.3d 20, 30 (1st Cir. 2011) (discussing that intrusiveness of measures taken "is only part of the equation" since "context matters" and in that case, stop at gunpoint, handcuffing, and forcing defendant to pavement were proper, as measures taken were "prophylactic and proportional to danger associated with stopping a suspected murderer."); *United States v. Nargi*, 732 F.2d 1102, 1106 (2d Cir. 1984) (police display of weapons "does not automatically convert a stop into an arrest" where crime being investigated was a serious felony, the stop was at night in an isolated area, and another suspect was unaccounted for).

The Third Circuit has clarified how an argument claiming that a police officer's conduct amounted to a *de facto* arrest during a *Terry* stop should be analyzed. It first explained that

> an excessively intrusive *Terry* stop is not unconstitutional because its overly broad scope necessarily places a suspect under *de facto* arrest without probable cause, as Johnson suggests here. Rather, an improperly executed *Terry* stop violates the Fourth Amendment because its scope is generally unreasonable under all of the circumstances.

*Johnson*, 592 F.3d at 452 (citations omitted). The Court then opined that

> complaints [of *de facto* arrest] are more properly considered during the second step of the *Terry* analysis, when we scrutinize the relative intrusiveness of the officers' conduct. . . . Thus, we review the manner in which the . . . police conducted the *Terry* stop at issue here to determine whether it was reasonably related in scope to the initial justification for the stop and the officers' legitimate concerns for the safety of themselves and the general public.

*Id.* As in all Fourth Amendment analyses, what is constitutionally "unreasonable" varies with the situation, and requires a balancing of the "nature and extent of the governmental interests" that justify the seizure, against the "nature and quality of the intrusion on individual rights" that the seizure imposes. *Terry,* 392 U.S. at 22, 24.

As indicated above, *Terry* permits a police officer conducting an investigative stop to insure that the person he is dealing with "is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry*, 392 U.S. at 23. The "use of guns and handcuffs must be justified by the circumstances" that authorized an investigative detention in the first place. *Baker,* 50 F.3d at 1193; *see also United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004) ("In effectuating a valid [*Terry*] stop, police officers are allowed to use a reasonable amount of force.").

Here, it is uncontested that Cruz—who was investigating a shooting—drew his gun on Wrensford, ordered him to the ground, and handcuffed him. Cruz was alone, at night, on a secluded road with a possible suspect to a shooting, and with another suspect unaccounted for. In order to ensure his own safety and to ensure that the possible suspect did not escape, his use of these intrusive measures was reasonable and proportional to the dangers confronting him. Viewed in context, and taking all these factors into consideration, Cruz's actions did not amount to a *de facto* arrest.

Wrensford also argues that being transported to the police station constituted a *de facto* arrest. He relies on a statement in *Dunaway* in which the Supreme Court stated that "detention

for custodial interrogation . . . intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Dunaway,* 442 U.S. at 216.[7]

While courts have looked carefully at whether a detention is, or becomes, an arrest if a person is transported to, and remains in, a police station, here, too, there is no per se rule. For example, in *Murphy v. Mifflin Cnty. Reg'l Police Dep't*, 548 F. App'x 778 (3d Cir. 2013), the Third Circuit held that placing a suspect in handcuffs for transport to the police station does not "necessarily transform an investigatory seizure into a formal arrest requiring probable cause," and "relocating Murphy to the police station to continue the investigation did not convert his detention into an arrest." *Id.* at 781 (citing, *inter alia, Florida v. Royer*, 460 U.S. 491, 504-05 (1983) ("[T]here are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area.")). The Court found in *Murphy* that defendant's forty-five minute wait at the police station for the canine unit to arrive to sniff his backpack for drugs did not convert the detention into an arrest, as the officers "acted diligently" in their investigation while the suspect was detained. *Id.*[8]

---

[7] This case is factually different from *Dunaway,* where the defendant was taken from a private dwelling, transported unwillingly to the police station, and subjected to custodial interrogation which resulted in the probable cause necessary to support his arrest. *Dunaway,* 442 U.S. at 203. Here, the Defendant was apprehended after being found running in an area where suspects to a shooting had been reported as heading. He was taken to the police station for questioning, and probable cause developed from an independent source—witnesses who identified him—before he was questioned.

[8] Wrensford attempts to distinguish *Murphy* from this case on the ground that *Murphy* involved a suspect being transported to a police station for a canine sniff, while here, Wrensford was being transported to the police station for questioning. The Court fails to understand why this should make a difference. Moreover, the *Murphy* Court did not focus on the particular rationale for transporting the handcuffed suspect to the police station; rather, it considered whether the

Whether it was reasonable to transport Wrensford to the police station for further investigation adds another element to be assessed under the reasonableness inquiry and must be considered under the totality of the circumstances. Cruz testified that the involvement of other officers—including knowledge that they possessed—was necessary to proceed further with the investigation. He stated that he wanted Mendez to determine whether Wrensford was the same person who had taken off running a few minutes earlier. He also wanted Matthews, the case agent—who knew much more about the fast-moving investigation than he did—to talk with Wrensford. Under these circumstances—including that neither Mendez nor Matthews was on the scene, and that Wrensford had been stopped on a secluded road at night at a time when another possibly armed suspect was on the loose—it was reasonable to transport Wrensford to the police station, a secure and safe area, for further investigation.

Wrensford mentions, in passing, that it was "not plausible" that the "hour and forty-five minute detention and relocation to the police station was all within the parameters of a *Terry* stop." (Dkt. No. 72 at 4). He appears to question whether the time between his detention by Cruz and his identification as the shooter in the statements signed by the witnesses at the police station—which included the time during which he was transported to the police station and detained there—was unreasonable under *Terry*.

As a preliminary matter, Wrensford is mistaken in his assertion that his detention and relocation to the police station, until the point he was identified by the witnesses, lasted one hour and forty-five minutes. In his written submission, he incorrectly indicates that the witnesses identified him at 10:45 p.m., *see* Dkt. No. 72 at 4, rather than at 9:55 and 9:56 p.m. when they

---

investigation proceeded diligently once the suspect was detained in determining that there was no *de facto* arrest. *Murphy,* 548 F. App'x at 782.

signed their statements. Tr. 202, Ex. 6b. Thus, the time between his detention by Cruz (8:58 p.m.) and his identification by the witnesses in their signed statements, was approximately one hour.[9]

In any event, while the amount of time that a potential suspect is detained cannot be ignored in a *Terry* analysis, the Supreme Court has declined to put a "rigid time limitation on *Terry* stops." *Sharpe*, 470 U.S. at 685. Instead, a court must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes," to determine whether a detention is unnecessarily prolonged. *Id.* In so doing, a court examines

> whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. . . . The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it.

*Id.* at 686-87 (citations omitted). The Court in *Sharpe* concluded that the police pursued their investigation in a diligent and reasonable manner, which did not "involve any delay unnecessary to the legitimate investigation of the law enforcement officers." *Id.* at 687; *see Michigan v. Summers*, 452 U.S. 692, 700, n.12 (1981) ("If the purpose underlying a *Terry* stop— investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* and *Adams*."); *United States v. Cherubin*, 2010 WL 924272, at *4 (D.V.I. Mar. 9, 2010) (noting that while "[b]revity is an important consideration, . . . authorities must be allowed to

---

[9] In reality, the period of detention prior to Wrensford's identification was actually less than an hour because the identifications occurred at the beginning of the witness interviews rather than at the end when the witness statements were signed. Ex. 7.

'graduate their responses to the demands of any particular situation.'") (quoting *United States v. Place*, 462 U.S. 696, 709-10 n.10 (1983)).[10]

During the time that Wrensford was detained before the witnesses identified him as the shooter, the police were acting in a "swiftly developing situation." *Sharpe*, 470 U.S. at 686. Matthews, the case agent and the person most knowledgeable about the case, testified that while he was on the scene of the shooting, he and Fieulleteau arranged to meet the eyewitnesses at the police station to give statements. He stated that he wanted to speak to the eyewitnesses before he spoke with Wrensford, as it made "more logical sense, to see what happened with a witness, and then go to speak to [Wrensford]." Tr. 184. Matthews recognized that he could have interviewed Wrensford first, but decided to interview the witnesses first in an effort to "confirm or dispel [his] suspicions" about Wrensford's role. *Sharpe*, 470 U.S. at 686. There was nothing unreasonable about that decision, and the Court will not engage in "unrealistic second-guessing" about Matthews' choice of how to best "confirm or dispel [his] suspicions." *Id.* At the same time, officers in the field were searching for, and found, a red truck which fit the description of the getaway truck, and they also discovered a firearm. In addition, officers were at the crime scene and at the hospital with the victim. Ex. 12. Matthews acted diligently in quickly arranging for the witness interviews, and Wrensford's detention of approximately one hour prior to his

---

[10] The Third Circuit has found that a suspect's detention at a police station was not unreasonable in situations involving police waiting for drug-sniffing dogs to arrive to search a suspect's items. *See, e.g., Murphy,* 548 F. App'x at 781 (forty-five minute detention not unreasonable); *United States v. Leal*, 235 F. App'x 937, 942 (3d Cir. 2007) (80-minute delay not unreasonable); *United States v. Frost*, 999 F.2d 737, 742 (3d Cir. 1993) (80-minute delay not unreasonable under *United States v. Place*, 462 U.S. 696 (1983)); *see also Cherubin,* 2010 WL 924272, at *5 (finding approximately four and one-half hour detention of suspects pursuant to a *Terry* stop not unreasonable and did not evolve into *de facto* arrest where police acted diligently in contacting INS officials after they detained suspects).

identification did not involve "delay unnecessary to the legitimate investigation of the law enforcement officers." *Sharpe*, 470 U.S. at 687.

Moreover, the duration of a stop is only one element to be weighed in the totality of the circumstances analysis. *Id.* at 684-87. The Court must also consider "the law enforcement purposes justifying the stop in the first place." *Id.* at 685. In this case, the law enforcement purposes justifying the detention were "officer safety, the safety of the community and the investigation of a person suspected of [shooting someone]." *United States v. Colon*, 654 F. Supp. 2d 326, 334 (E.D. Pa. 2009). The officers' diligence in pursuing the investigation while Wrensford was detained leads the Court to conclude that the "manner in which the stop was conducted"—the second prong of the *Terry* analysis—was reasonable under the totality of the circumstances, and that no *de facto* arrest occurred. *Johnson,* 592 F.3d at 452.[11]

## C.  Wrensford's Identification

### 1.  Applicable Legal Principles

In *United States v. Lawrence*, 349 F.3d 109 (3d Cir. 2003), the Third Circuit explained the constitutional ramifications when a witness to a crime identifies a suspect. "A due process violation can result when an identification procedure is so suggestive that it undermines the reliability of the resulting identification. Allowing a jury to consider an identification that is tainted by such a procedure can constitute reversible error entitling the defendant to a new trial." *Id.* at 115. A tainted procedure occurs when, for example, police attempt to emphasize the

---

[11] As the Third Circuit cautioned in *Leal*, the Court's holding in this regard "should not be interpreted as condoning a practice of requesting additional investigation without any concern for the length of the detention," because "[a]t some point, the detention required for additional investigation can become so restrictive or prolonged that it is tantamount to an arrest and must therefore be supported by probable cause if it is to withstand constitutional scrutiny." *Leal*, 235 F. App'x at 942 n.1. That is not the case here.

photograph of a given suspect, thereby improperly suggesting who the witness should select. *Id.*

(citing *Simmons v. United States*, 390 U.S. 377, 383 (1968)).

Identification-related due process concerns "are implicated only when 'the police have

arranged suggestive circumstances leading the witness to identify a particular person as the

perpetrator of a crime.'" *United States v. Wrensford*, 2014 WL 1218398, at *5 (D.V.I. Mar. 24,

2014) (quoting *Perry v. New Hampshire*, 132 S. Ct. 716, 720 (2012)). Indeed, the Supreme Court

"has linked the due process check, not to suspicion of eyewitness testimony generally, but only

to improper police arrangement of the circumstances surrounding an identification." *Perry,* 132

S. Ct. at 726.

Courts are directed to engage in a two-step analysis when determining whether witness

identification procedures should be suppressed. In *United States v. Foote*, 432 F. App'x 151 (3d

Cir. 2011), which examined the suggestiveness of a photo array, the Third Circuit wrote:

> First, we ask whether the photo identification procedure was "unnecessarily or
> impermissibly suggestive." [*United States v. Stevens*, 935 F.2d 1380, 1389 (3d
> Cir. 1991)] (internal quotation marks omitted.) To answer that, we determine the
> actual suggestiveness of the identification and whether there was a good reason
> for the failure to utilize less suggestive procedures. *Id.* If the photo array is
> unnecessarily suggestive, we then determine under the totality of the
> circumstances whether it was so much so that it gave rise to a substantial
> likelihood of misidentification amounting to a violation of due process. *Id.*
> "[R]eliability is the linchpin in determining the admissibility of identification
> testimony...." *Id.* at 1391 (internal quotation marks omitted). . . . In sum, "we must
> determine (1) whether the identification process was unduly suggestive and, if so,
> (2) whether the totality of the circumstances nonetheless renders the identification
> reliable." *Thomas v. Varner,* 428 F.3d 491, 503 (3d Cir. 2005). The defendant has
> the burden of proving that the out-of-court identification was the product of
> unduly suggestive procedures. *Lawrence,* 349 F.3d at 115.

*Id.* at 154. Factors that a court should consider in a reliability analysis include: "(1) the

opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree

of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of

certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation." *United States v. Brownlee,* 454 F.3d 131, 139 (3d Cir. 2011) (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)).

A court need not reach the reliability analysis if the police did not engage in unnecessarily suggestive behavior surrounding the identification procedure. As this Court wrote in *Wrensford*, 2014 WL 1218398, when addressing Defendant Muller's Motion to Suppress Identification Evidence:

> [I]n *Perry v. New Hampshire*, __ U.S. __, 132 S. Ct. 716 (2012), the Supreme Court held that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id*. at 730. In other words, only if a court determines that the identification process was unduly suggestive will it perform a reliability analysis, examining under the totality of the circumstances whether other indicia of reliability '"outweigh[ ] . . . the corrupting effect' of law enforcement suggestion." *Id.* at 725 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

*Id.* at *3.

## 2. Analysis

Defendant Wrensford contends that there were two unconstitutional identifications of him that should be suppressed. The first identification occurred when Witness 1 ("W1") and Witness 2 ("W2") saw him leave the police station and get into the waiting police car—while they were stopped at a light near the station on the way to their interviews—and recognized him as the shooter. The second instance was when Fieulleteau showed W2 Wrensford's license, with his photograph on it, and W2 identified him as the shooter and the person who had just left the police station. Wrensford claims that these identifications were unduly suggestive and amounted to a "show up"—where "officers have a single suspect in custody and literally show him to eyewitnesses to see if they can identify him or her as the perpetrator of the crime." (Dkt. No. 81

at 3). The Government counters that no "show-up" occurred as the police "took steps to avoid any encounter between Wrensford and the eye-witnesses" and there was no affirmative behavior on the police's part to influence the identification of Wrensford by W1 and W2. (Dkt. No. 85 at 5).

The Supreme Court has described a show-up as "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a line-up," *Stovall v. Denno*, 388 U.S. 293, 302 (1967), and the Third Circuit has characterized show-ups as "inherently suggestive." *Brownlee*, 454 F.3d at 138. As this Court found in adjudicating Defendant Muller's Motion to Suppress Identification Evidence, a "'primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place.'" *Wrensford,* 2014 WL 1218398, at *5 (quoting *Perry,* 132 S. Ct. at 726.)

With regard to the identification of Wrensford by W1 and W2 when Wrensford was leaving the police station, the uncontroverted testimony shows that Fieulleteau attempted to avoid such an encounter, not to promote it. He was aware that a person of interest had been apprehended and had been taken to C Command, and told Figueroa to pick the person up and transport him to the Frederiksted police station. After he had that conversation with Figueroa, he decided to meet with the two witnesses he had spoken with at the crime scene while the information was "fresh" in their minds. He called them to see if they could meet at C Command that evening, and they agreed. According to Fieulleteau, meeting them at C Command was convenient because he and the witnesses were closest to that police station. After he arranged to meet the witnesses, he called Figueroa and told her to hurry and pick up the detained individual at C Command and take him to Frederiksted. He testified that he did not want the witnesses and

33

detained person to see each other. Fieulleteau and Figueroa arrived at C Command at about the same time; Fieulleteau spoke briefly to Wrensford; and Figueroa and her partner escorted Wrensford from the building into the waiting police car. He was in public view for only a few seconds. Despite Fieulleteau's precautions, at the point when Wrensford was taken out of the police station, W1 and W2 were stopped at a nearby traffic light on their way to their interviews where they happened to see Wrensford leaving the station and entering the waiting police car.

Courts have termed this kind of fortuitous, unplanned encounter between witnesses and a suspect—which was not part of a formal, police-initiated identification procedure and where a witness identifies a suspect—an "accidental show-up," *see Allen v. New York,* 2010 WL 811715, at *4 (W.D.N.Y. Mar. 1, 2010), or a "spontaneous identification," *see Richardson v. Sup't of Mid-Orange Corr. Fac.*, 621 F.3d 196, 204 (2d Cir. 2010), and have found that they are not unnecessarily suggestive. For example, in *United States v. Greenstein*, 322 F. App'x 259, 263-64 (3d Cir. 2009), a police officer made pre-trial identifications of a robbery defendant on two separate occasions—once when he inadvertently viewed a single photograph of the defendant while passing the desk of a detective and a second time when he saw the defendant, being processed for an unrelated case, three days after the robbery. The court found these identifications were not unnecessarily suggestive because, in both instances, the officer recognized the defendant by coincidence, not as part of a formal identification procedure. No one requested that the officer make an identification nor did anyone suggest to him that the man he had seen being processed was involved in the robbery at all. The Third Circuit observed that all conversations between the officer and the detective concerning the identification and the robbery "occurred *after* [the officer] had already recognized [the defendant]." *Id.* at 264 (emphasis added).

34

In *Richardson*, the Second Circuit, on habeas review, analyzed state court findings that, *inter alia*, there was no unnecessary suggestiveness warranting suppression of an out-of-court identification. There, a witness was asked to go to the police station and identify participants in a crime. Once the witness entered the stationhouse, he saw the perpetrator and two other men in handcuffs, and "immediately and spontaneously identified [defendant] as one of the shooters to an unknown police officer." 621 F.3d at 199. The state court found that this identification was "voluntary and spontaneous, and there was no indication that the police officers had any prearranged knowledge that the [ ] three guys would be standing there." *Id.* at 202 (internal quotation marks omitted).

In assessing whether this result comported with clearly established law, the Second Circuit surveyed case law from other circuits and found that, in circumstances similar to those presented, unarranged or accidental encounters between a witness and a criminal defendant, were not impermissibly suggestive "particularly where there is no indication to the witness that the defendant was arrested as a suspect in the witness's case." *Id.* at 203 (citing cases). The Second Circuit noted that, although the witness might have anticipated that the police could have had a suspect in custody after the witness was asked to make an identification, he was given no reason to expect to see any suspects in the first room that he entered. In addition, simply because the defendant was handcuffed had limited significance because that is not an unusual sight in a police station. The Court opined that "while the police could have been more careful in coordinating the placement of the suspects and arrival of the witnesses, it is too much of a stretch to say that circumstances of [the witness's] initial viewing were equivalent to '[t]he practice of showing suspects singly to persons for the purpose of identification' that 'has been widely condemned.'" *Id.* at 203-04 (quoting *Stovall*, 388 U.S. at 302); *see also Allen,* 2010 WL 811715,

at *3-4 (district court, on habeas review, found that accidental show up did not amount to improper identification procedure where a startled witness, in police headquarters to provide a statement, told the police officer accompanying her that she had just seen the shooter. State appellate court found that this viewing of defendant was "accidental, unarranged, not attributable to any misconduct on the part of police, and not unduly suggestive.").

While it is true that Fieulleteau arranged to meet the witnesses in the same place where Wrensford was detained, he acted quickly to attempt to remove Wrensford from that location to prevent an encounter. The fact that he was not successful is not evidence of any "improper police influence," "police-arranged suggestive circumstances," "improper law enforcement activity," "manipulation or intentional orchestration by the police," or other police-initiated impropriety that is crucial to a legitimate due process challenge. *Perry*, 132 S. Ct. at 720, 721, 725. In fact, the testimony shows the opposite: that the VIPD acted to avoid any such encounter. Accordingly, the Court cannot conclude that the police orchestrated the sighting in order for the witnesses to identify Wrensford as a perpetrator. The absence of any improper police conduct renders unavailing Wrensford's due process challenge to his identification by W1 and W2 based on being seen in the company of police officers while leaving the police station.

Wrensford's second argument fares no better. The testimony shows that, following their sighting of Wrensford, both witnesses told their respective VIPD interviewers—without any prompting from the officers—that they had seen the shooter leaving the police station. After W2 made that statement, Fieulleteau showed W2 Wrensford's license with Wrensford's photograph on it, and asked her whether she recognized the person.[12] W2 responded that it was a photograph

---

[12] In his written submission, Wrensford argues that both W1 and W2 were shown a photograph of him. (Dkt. No. 81 at 2). The only evidence of record, however, is that Wrensford's license with his photograph was shown to W2.

of the shooter from the incident earlier that evening, and that he was the same person that she saw the officers put in the police car while W2 was at the traffic light outside the station on her way to the interview.

The Supreme Court has instructed that "identifications arising from single-photograph displays may be viewed in general with suspicion." *Manson,* 432 U.S. at 116 (citing *Simmons*, 390 U.S. at 383). In deciding whether the single photograph presented a "very substantial likelihood of irreparable misidentification," *Simmons*, 390 U.S. at 384, a court must first consider the "actual suggestiveness of the identification and whether there was a good reason for the failure to utilize less suggestive procedures." *Foote,* 432 F. App'x at 154 (citing *Stevens*, 935 F.2d at 1389).

Here, W2 was shown only one photograph (Wrensford's driver's license). However, the "actual suggestiveness of the identification" was minimal by virtue of the fact that W2 had already identified the shooter (Wrensford) as the person leaving the police station. Fieulleteau knew the name of the person who had just left the police station, had the license of that person in his possession, and showed W2 the license in order to confirm or negate the witness's earlier identification. In so doing, he did not indicate to W2 that the photograph was a picture of a suspect or the person who had just left the police station. Because W2 had made the identification of Wrensford *before* she saw the single photograph, W2's earlier identification thus distinguishes this situation from those where a single photograph is shown to a witness, not to *confirm* an earlier identification but to make an *initial* identification. *See, e.g., Burgos-Cintron v. Nyekan,* 510 F. App'x 157, 161 (3d Cir. 2013) (distinguishing situations where witness making identification was previously acquainted with, or had previously identified, the defendant, from the litany of "opinions about the possible unfair suggestive aspects of photo

arrays" where such is not the case).[13] Under the circumstances here, the Court finds that Filleuteau's single photo showing was not unnecessarily suggestive and there was "good reason for the failure to utilize less suggestive procedures." *Foote*, 432 F. App'x at 154. The Court's finding in this regard provides a sufficient basis to conclude that Wrensford's request to suppress his identification should be denied, and the Court so concludes.

Because the Court finds that the identification process was not unduly suggestive, it need not examine whether the identification was reliable. *Perry*, 132 S. Ct. at 730 (noting that Due Process Clause does not require judicial inquiry into reliability of identification when identification "was not procured under unnecessarily suggestive circumstances arranged by law enforcement"); *Wrensford*, 2014 WL 1218398 at *3 ("[O]nly if a court determines that the identification process was unduly suggestive will it perform a reliability analysis. . ."). However, even if the Court were to assume that the identification process was unduly suggestive, this would not alter the Court's conclusion that Wrensford's request to suppress his identification should be denied.

A finding that an identification is unnecessarily suggestive would not "in itself require exclusion of the evidence," *United States v. Dowling*, 855 F.2d 114, 117 (3d Cir. 1988), *aff'd* 493 U.S. 342 (1990), if the "indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances." *Perry*, 132 S. Ct. at 720. In order to

---

[13] *See also United States v. Diaz*, 444 F. App'x 551, 555 (3d Cir. 2011) (where defendant contended that identification was unduly suggestive because, during identification procedure, he was brought out of a marked police vehicle in handcuffs and under the escort of several police officers who stood next to him during the procedure; because eyewitness was able to identify defendant *before* he was arrested and handcuffed, Third Circuit could not say district court's factual findings were clearly erroneous, and affirmed holding that identification would not be suppressed).

assess such reliability, courts apply the five *Brownlee/Biggers* factors to assess whether "improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* at 724 (quoting *Biggers*, 409 U.S. at 201).

Under these factors, W2's identification was sufficiently reliable not to have violated Wrensford's due process rights. As to W2's opportunity "to view the [defendant] at the time of the crime" and her "degree of attention," *Brownlee*, 454 F.3d at 139, both Matthews and Fieulleteau testified that W2 had ample opportunity to view Wrensford as the crime was occurring, and it was clear from the details she offered that her attention was focused on the unfolding events. W2 observed the shooting from a car parked across the street in the Food Town parking lot. The crime scene was well lit. She had a good opportunity to see the shooter because he leaned his upper body out of the window of the truck to shoot the victim. Moreover, with regard to the "level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation," *id.*, W2 positively identified Wrensford—with a high level of certainty—within two hours after the crime was committed when she saw him being escorted out of the police station in a well-lit area.

The final factor concerns "the accuracy of the witness' prior description of the criminal." *Id.* W2 described the shooter as a dark skinned male, with a little sideburn goatee, hair in a stocking cap, and a black T-shirt. While Wrensford argues that an inconsistency in W2's description of Wrensford as dark-skinned, when he is light-skinned, undermines the reliability of her identification, an issue with one of the five *Brownlee/Biggers* reliability factors—when the others strongly point in the direction of reliability—is an insufficient basis to find that the identification was not sufficiently reliable. *See Biggers*, 409 U.S. at 201 (since out of court identification had sufficient indicia of reliability, issue properly went to jury, even though one

factor weighed against reliability); *United States v. Atkinson*, 316 F. App'x 93, 96-97 (3d Cir. 2008) (while some *Brownlee* factors weakened the reliability of the identification of defendant, others suggested that identification was reliable and, under totality of the circumstances, the Third Circuit affirmed lower court finding that identification possessed sufficient indicia of reliability).

In sum, considering the five factors, and the totality of the circumstances, W2's identification of Wrensford possessed "sufficient aspects of reliability" for the Court to find that no constitutional violation occurred. *United States v. Emanuele*, 51 F.3d 1123, 1128 (3d Cir. 1995). Accordingly, even if the witness identification was unnecessarily suggestive, the reliability analysis would still lead to the conclusion that the second identification of Wrensford by W2 should not be suppressed. The Court so finds.

### D.  Probable Cause to Arrest

Some time before 9:55 and 9:56 p.m., when W1 and W2 signed their statements, they had identified Wrensford as the shooter in the crime under investigation to Matthews and Fieulleteau, respectively. Further, as just discussed, W2 also identified Wrensford as the shooter to Fieulleteau from the photograph on Wrensford's driver's license. Tr. 227; Ex. 7. In addition, Fieulleteau's testimony and report provided that witnesses at the scene of the shooting identified Wrensford and Muller by name as being involved in the shooting. Ex. 6b. This evidence, known to Matthews and Fieulleteau, provided the requisite probable cause for arrest, as it was "'sufficient to warrant a prudent man in believing' that [Wrensford] had committed . . . an offense." *Schneyder v. Smith*, 653 F.3d 313, 323 (3d Cir. 2011) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

40

### E.  Wrensford's Statements to the Police

The facts show that Matthews advised Wrensford of his rights at 12:23 a.m. on May 11, 2012 by reading to him the *Miranda* warnings contained in the Advise of Rights section of the "Warning and Consent to Speak" form. Above his signature, the form provided: "I have read this statement of my rights and it has been read to me, and I understand what my rights are." (Ex. 8). Wrensford signed that section of the form, but declined to sign the bottom part of the form waiving his right to a lawyer. Although Wrensford did not sign the waiver section of the form, Matthews testified that Wrensford agreed to speak to the police. Tr. 185-86, 222. Wrensford stated that he had been in the Princesse area, with a partner, and they were playing basketball. Matthews asked for the name of the partner, and Wrensford refused to give the name. Tr. 187-88.

Shortly before his arrest at 1:30 a.m., Matthews testified that he asked Wrensford whether he would consent to the VIPD obtaining a DNA sample from him; if not, Matthews would draft a warrant to obtain such a sample. Tr. 191. According to Matthews, Wrensford responded that he was going to get arrested anyway and consented. Tr. 191-92. As discussed below, Wrensford subsequently signed a "Biological Evidence Collection Form" indicating that he "voluntarily" consented to the taking of a DNA sample. Ex. 10.[14]

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

> While "admissions of guilt by wrongdoers, if not coerced, are inherently desirable," *United States v. Washington,* 431 U.S. 181, 187, 97 S. Ct. 1814, 52 L. Ed. 2d 238 (1977), the Supreme Court in *Miranda* "presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to

---

[14] Wrensford did not specify which statement or statements he made to the police that he sought to suppress. The evidence presented revealed the two statements discussed herein.

forgo those rights." *New York v. Quarles,* 467 U.S. 649, 654, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984). The "*Miranda* rights," while not constitutionally compelled, have a "constitutional underpinning," and thus, they may not be rescinded by an act of Congress or be treated with anything but the most scrupulous regard by a reviewing court. *Dickerson v. United States,* 530 U.S. 428, 440 n.5, 444, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000).

*United States v. Drummond*, 482 F. App'x 686, 690 (3d Cir. 2012) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). Accordingly, "[c]ourts must exclude testimonial evidence obtained while a suspect is (1) in custody and (2) subject to interrogation, if the police failed to provide *Miranda* warnings, which ensures that the statement was not obtained in violation of the suspect's Fifth Amendment right against compelled self-incrimination." *United States v. Frisby*, 474 F. App'x 865, 867 (3d Cir. 2012) (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 590 (1990)).

At the suppression hearing, Wrensford argued that, even though he signed the Advise of Rights section of the form, his refusal to sign the waiver section indicated that he did not knowingly waive his right to counsel and that he was actually invoking that right. Counsel's argument is similar to the one made and rejected in *United States v. Dixon,* 1998 WL 408820, at *4 (E.D. Pa. July 16, 1998). In *Dixon*, the police brought defendant a two-part form similar to the one produced in this case, with *Miranda* warnings set out at the top and a waiver section at the bottom. The defendant, at the police station for custodial interrogation, signed the top section but not the bottom. He then orally agreed to answer questions. Acknowledging that he was read his rights and signed under a statement so acknowledging, the defendant argued that although he agreed to answer questions, he preserved his rights by refusing to sign the waiver of rights section of the form.

The Court in *Dixon* found that by "[a]greeing to answer questions and doing so, rather than waiving *Miranda* rights on a government form, is simply a rose of another color" and that he sought "refuge in elevating form over substance," and had knowingly waived those rights. *Id.*

(quoting *North Carolina v. Butler,* 441 U.S. 369, 373 (1979), providing that "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case."); *see also United States v. Velasquez,* 626 F.2d 314, 320 (3d Cir. 1980) (holding in case where defendant was given *Miranda* warnings, refused to sign waiver of rights form, but nonetheless agreed to answer questions and never attempted to request counsel or terminate the questioning, that such behavior constituted an implied waiver under *Butler*); *United States v. Filiberto,* 712 F. Supp. 482, 487 (E.D. Pa. 1989) (after defendant was given *Miranda* warnings, he refused to sign a waiver but nevertheless responded to police questions without invoking right to counsel or to remain silent, finding no violation under *Miranda*, and refusing to suppress responses to police questioning). Moreover, invocation of the right to counsel must be unambiguously invoked. *United States v. Tyree,* 292 F. App'x 207, 211 (3d Cir. 2008).

Based on the evidence presented, the Court finds that Wrensford was given his *Miranda* warnings after which he volunteered to speak with the police—"freely decid[ing] to forgo those rights." *Quarles,* 467 U.S. at 654. Counsel's argument that by not signing the waiver form, Wrensford was actually invoking his right to counsel has no merit, because he never affirmatively and unambiguously invoked such a right. Indeed, he proceeded to sign a consent form in connection with the DNA sample. Accordingly, the Court will not suppress Wrensford's statements to the police.

### F.  The Buccal Swab

Wrensford also seeks to suppress the buccal swab (DNA sample) that was taken from him after his arrest, arguing that the swab would not have been "inevitably discovered as the result of a legal search." (Dkt. No. 72 at 13).

In *United States v. Mitchell*, 652 F.3d 387 (3d Cir. 2011), the Third Circuit ruled that "[t]he collection of a DNA sample constitutes an invasion of privacy that is subject to the strictures of the Fourth Amendment." *Id.* at 406; *see also Maryland v. King,* 133 S. Ct. 1958, 1968-69 (2013) (holding that "a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search."). "[T]he question of whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all circumstances." *Schneckloth v. Bustamonte*,  412 U.S. 218, 227 (1973). The government bears "the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

The inevitable discovery doctrine is inapplicable here, as the swab was taken after Wrensford was arrested, pursuant to probable cause. Furthermore, the uncontroverted testimony is that Wrensford consented to the buccal swab taken by Officer Encarnacion, both verbally, Tr. 191-92, and in writing on the "Biological Evidence Collection Form" which provided: "I voluntarily give consent to the Virgin Islands Police Department to collect from my person the biological evidence checked above." Gov't Ex. 10. Accordingly, based on these uncontroverted facts, the Court will deny Wrensford's motion to exclude the buccal swab and finds that no constitutional violation occurred in its collection. *See United States v. Cloud*, 2010 WL 2301537, at *4 (D. Minn. Apr. 19, 2010) ("The signed Consent Form is evidence that the Defendant voluntarily consented to the taking of the buccal swab."); *United States v. Kent*, 2007 WL

44

1098501, at *9 (E.D. Mo. Apr. 12, 2007) (finding that buccal swab was taken by consent and therefore was admissible).

### G. Police Reports

At the January 2014 suppression hearing, Wrensford argued that the police reports contained in Government's Exhibits 6a, 6b, 7, and 8 should be excluded as hearsay since counsel was unable to cross-examine the declarants.[15] The Court conditionally admitted the exhibits over Defendant's objection and allowed counsel to submit briefing on this issue. Tr. 183.

In his post-hearing brief, Wrensford states that he has "not found any substantive holdings that illustrate or give specific guidance to the district court's discretion to limit the admission of evidence at pretrial hearings." (Dkt. No. 81 at 8). While maintaining his objection to the admissibility of the reports, Wrensford "concedes that the more important issue concerns what weight, if any, should the Court place on the value of the information written in a police report." *Id.* Wrensford also withdrew his objections to the admissibility of the 911 Call History, Exhibit 12. (Dkt. No. 81 at 9).

It is well established that "[a]t a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667, 679 (1980). In *United States v. Williams*, 574 F. Supp. 2d 530, 536 n.6 (W.D. Pa. 2008), the district court admitted a police report over a hearsay objection at a suppression hearing, quoting *Raddatz* and citing *United States v. Hubbard,* 269 F. Supp. 2d 474,

---

[15] Exhibit 6a is page one of Det. Fieulleteau's Supplementary Police Report, and Exhibit 6b is page two of that report; Exhibit 7 is Fieulleteau's police report following the interview with W2 in which W2 identified Wrensford as the shooter; and Exhibit 8 is the *Miranda* "Warning and Consent to Speak" form.

479 (D. Del. 2003) (admitting police reports during suppression hearing over objections based on hearsay).

Given Defendant's concession that questions about the reliability of police reports go to weight not admissibility, and case law that squarely permits their admission during a suppression hearing, the Court denies Defendant's motion to exclude Government Exhibits 6a, 6b, 7, and 8.

### III.    CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Defendant Wrensford's Motion to Suppress. (Dkt. No. 53). An appropriate Order accompanies this Memorandum Opinion.

Date: August 11, 2014                              _____/s/_____
                                                   WILMA A. LEWIS
                                                   Chief Judge