**DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | ) | |
| PEOPLE OF THE VIRGIN ISLANDS, | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal Action No. 2013-0003 |
| ELVIN WRENSFORD and | ) | |
| CRAIG MULLER, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

**Attorneys:**
**Alphonso G. Andrews, Jr., Esq.,**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
     *For the Government*

**Omodare B. Jupiter, Esq.,**
St. Croix, U.S.V.I.
     *For Defendant Elvin Wrensford*

**Martial A. Webster, Sr., Esq.,**
St. Croix, U.S.V.I.
     *For Defendant Craig Muller*

<u>**MEMORANDUM OPINION**</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on "Defendant Wrensford's Motion for a New Trial." (Dkt. No. 261). The Motion, filed pursuant to Rule 33 of the Federal Rules of Criminal Procedure, was joined by Defendant Craig Muller. (Dkt. No. 262). For the reasons that follow, the Court will deny the Motion.

**I.     BACKGROUND**

Defendants Elvin Wrensford ("Wrensford") and Craig Muller ("Muller") were indicted in January 2013 on charges of possession of a firearm in a school zone, pursuant to 18 U.S.C. §§

922(q)(2)(A) and 924(a)(1)(B) (Count One); using a firearm during a violent crime, pursuant to 18 U.S.C. § 924(c)(1)(A)(iii) (Count Two); murder in the first degree, pursuant to 14 V.I.C. §§ 922(a)(1) and 923(a) (Count Four); and unauthorized possession of a firearm, pursuant to 14 V.I.C. § 2253(a) (Count Five). In addition, Wrensford was indicted on the charge of possession of a firearm with an obliterated serial number, pursuant to 18 U.S.C. §§ 922(k) and 924(a)(1)(B) (Count Three). The charges related to the shooting on May 10, 2012 of Gilbert Hendricks, Jr., who died on May 12, 2012.

Following a twelve-day trial in March 2015, a jury found Wrensford guilty on all five counts, and found Muller guilty on Counts One, Four, and Five. Wrensford timely filed his Motion for a New Trial and the United States opposed the Motion. (Dkt. No. 268). Muller filed a one-sentence "Notice of Joinder in Defendant Elvin Wrensford's Motion for New Trial" in which he stated that he joins Wrensford's Motion "as it pertains to defendant Craig Muller." (Dkt. No. 262).

Wrensford advances two arguments in seeking a new trial. He contends first, that the Court erred by admitting eyewitness identification testimony that was inherently suggestive, and second, that the Court abused its discretion when it failed to grant a mistrial after a juror indicated at the time of polling that the verdict announced did not represent her independent verdict. (Dkt. No. 261). The Court will address each argument in turn.

## II.    DISCUSSION

### A.  Standard of Review

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Such a motion may be granted only if the court "believes that

there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (internal quotation marks omitted). "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). Relief under this standard should be granted "sparingly and only in exceptional cases." *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (citation omitted).

### B. Eyewitness Identifications

Wrensford challenges the Court's pretrial suppression decision in its own right, as well as evidentiary rulings made at trial that allowed into evidence statements by eyewitnesses Trevor Teague and his daughter Tynicia Teague that identified Wrensford as the shooter.

#### 1. Pretrial Motion to Suppress

Wrensford filed a motion to suppress in November 2013 (Dkt. No. 53), and the Court held a suppression hearing on January 17, 2014. In his post-hearing memorandum, Wrensford raised for the first time the argument that the identification of him by two witnesses— subsequently identified as Trevor Teague and Tynicia Teague—on the evening of the shooting was "unnecessarily suggestive." (Dkt. No. 81 at 3).

The Court reconvened the suppression hearing on June 26, 2014 to take testimony on the identification issue. At the hearing, two Virgin Islands Police Officers—Detective Kirk Fieulleteau and Sergeant Richard Matthews—testified. Fieulleteau stated that, on the evening of the shooting, he asked the Teagues to come to the police station to give their statements. In the interim, Wrensford had been detained and had been brought to the same station. Fieulleteau told

two police officers to quickly transport Wrensford to another police station because he did not want the witnesses to have any "inadvertent interaction" with Wrensford. As it turns out, the Teagues saw Wrensford being escorted out of the station by police officers while the Teagues were stopped at a traffic light across from the station.

Fieulleteau interviewed Tynicia Teague once the Teagues arrived. The Court's August 8, 2014 Memorandum Opinion described what occurred during the interview:

> Before the interview began, as Fieulleteau was preparing the paperwork, [Tynicia Teague] blurted out, "That's the shooter." In explaining what she meant, [Ms. Teague] said that the guy that the police officers had just put in the police car was the shooter in the incident earlier that evening. Fieulleteau went to the room where Sgt. Matthews was interviewing [Trevor Teague], and told Matthews what [Tynicia Teague] had said. Matthews told Fieulleteau that [Trevor Teague] had just told him the same thing. Fieulleteau returned to the interview and showed [Tynicia Teague] Wrensford's driver's license and asked her if she recognized the picture of the person. [Ms. Teague] answered that it was a photograph of the shooter from the earlier incident, who was the same person that she saw the officers put into the car while she was at the traffic light outside the police station on her way to the interview. Fieulleteau stated that [Tynicia Teague] was "very, very positive" that the shooter was the person who was leaving the station with the officers.

(Dkt. No. 138 at 11-12).

Wrensford argued that his identification as the shooter by the Teagues was unconstitutional on two grounds and should be suppressed. First, he claimed that when the Teagues recognized him as the shooter as they saw him leave the police station and get into a waiting police car while they were stopped at a traffic light nearby on the way to their interviews, that identification amounted to "a 'show up' where 'officers have a single suspect in custody and literally show him to eyewitnesses to see if they can identify him or her as the perpetrator of the crime.'" *Id.* at 32 (quoting Dkt. No. 81 at 3). The second instance of an alleged unconstitutional identification claimed by Wrensford was when Detective Fieulleteau showed Tynicia Teague Wrensford's driver's license, and she identified Wrensford as the shooter and the person she had

just seen leaving the police station. According to Wrensford, this identification was unduly suggestive, amounting to a single person photo array.

The Court rejected Wrensford's arguments. It found that Fieulleteau had actually attempted to avoid an encounter between the witnesses and Wrensford—not promote it—by arranging to have Wrensford moved quickly to another station. *Id.* at 33-34. However, despite Fieulleteau's efforts, the Teagues happened to see Wrensford during the "few seconds" that he was in public view as he exited the station. *Id.* The Court found that such a "fortuitous, unplanned encounter between witnesses and a suspect—which was not part of a formal, police-initiated identification procedure and where a witness identifies a suspect" constituted an "accidental show up" or "spontaneous identification." *Id.* at 34-36 (citing cases). The Court further found that the fact that Fieulleteau was unsuccessful in preventing an encounter was not evidence of any "improper police influence" or "police-arranged suggestive circumstances" that would support a due process challenge. *Id.* at 36, quoting *Perry v. New Hampshire*, 132 S. Ct. 716, 720, 721 (2012). Because there was no improper police conduct, the Court rejected Wrensford's due process challenge.

With regard to Wrensford's second argument, the Court noted that the Teagues spontaneously told their respective police interviewers—without any prompting from the officers—that they had just seen the shooter leave the police station. After Tynicia Teague made that statement, Fieulleteau showed her Wrensford's license and asked if she recognized the person. She responded that the photograph on the license depicted the shooter from the incident earlier that evening, who was the same person she saw leaving the police station and being placed into a police car. *Id.* at 36-37. While acknowledging the premise that "'identifications arising from single-photograph displays may be viewed in general with suspicion,'" the Court

5

observed that in order to find a constitutional violation, it was required to consider the "'actual suggestiveness of the identification.'" *Id.* at 37 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) and *United States v. Foote,* 432 F. App'x 151, 154 (3d Cir. 2011)). The Court concluded that Ms. Teague's identification of Wrensford from the driver's license was not unduly suggestive because she had *already* identified the person leaving the police station as the shooter before she was shown the license. *Id.* The Court found that because Ms. Teague made the identification of Wrensford *before* she saw the single photograph, that fact distinguished this case from cases where police officers improperly show a single photograph to a witness to make an *initial* identification. *Id.*

The Court added that since the identification procedure here was not unduly suggestive, it was not required to examine whether the identification was reliable. *Id.* at 38 citing *Perry*, 132 S. Ct. at 730. Nonetheless, the Court undertook a reliability analysis and found that Ms. Teague's identification was sufficiently reliable such that Wrensford's due process rights were not violated. *Id* at 39-40.

### 2.  Trial Testimony

At trial, Trevor Teague, who was standing in the parking lot at Food Town grocery on the night of the shooting, testified that he saw the victim, Gilbert Hendricks, Jr., running down the road in his direction. He heard shots being fired from a red pickup truck heading in the same direction. The truck turned right onto a road opposite Food Town and stopped, trapping Hendricks. Mr. Teague heard shots fired in rapid succession. He saw the shooter lean out of the truck and continue to shoot at Hendricks while he was on the ground. The truck then sped away. Mr. Teague testified that he could not identify the driver or the passenger, but that the passenger wore dreadlocks. He added that "all Rastaman look alike." He testified that, when he made his

statement to the police on the night of the shooting, he did not tell them that he could recognize the shooter. He further testified that he could not recall if he had told the police that the person leaving the police station that evening was the shooter, since he had only seen a silhouette of the shooter.

On the witness stand, Tynicia Teague stated that she had difficulty recollecting the events surrounding the shooting. She vacillated between recalling basic details to stating that her mind was "blank" and that she did not remember anything. On the one hand, she testified that she heard shots coming from the passenger side of a red truck; she observed "two guys" in the truck; she talked to the police and identified the people in the truck; and she signed a written statement that evening and signed another statement a couple of days later (a photo array in which she identified Muller). On the other hand, she testified that she did not remember where the shots were coming from; and she did not remember signing anything or identifying anyone, nor did she remember what she told the police. Ms. Teague stated that she did not want to testify and the only reason she was doing so was because she was under subpoena and did not want to be arrested. On more than one occasion, Ms. Teague's refusal to respond to questions posed or directives given to her prompted warnings from the Court.

During the Government's case, one page of Ms. Teague's fourteen-page statement that she had given to the police on May 10, 2012, which contained her identification of Wrensford, was admitted into evidence pursuant to Fed. R. Evid. 801(d)(1)(C).[1] In that excerpt from her

---

[1] Fed. R. Evid. 801(d)(1)(C) provides:

> (d) A statement that meets the following conditions is not hearsay:
>> (1) A Declarant Witness's Prior Statement. The declarant testifies and is subject to cross-examination about a prior statement, and the statement:
>>> * * *
>> (C)    identifies a person as someone the declarant perceived earlier.

statement, Ms. Teague was asked: "After seeing the shooting incident tonight in front of Food

Town Grocery, did you see any one that was involved in the shooting incident again?" She

responded:

> Yes. When me and my dad was waiting at the traffic light in front of this Police
> Station, I saw two Police Officers come out the door with a guy and put him in a
> police car. The guy the police put in the car is the guy I saw shooting from the
> front passenger window of the red truck earlier during the shooting incident in
> front of Food Town Grocery.

(Gov't Ex. 92).[2]

With regard to Trevor Teague's identification of Wrensford, Virgin Islands Police

Department Sergeant Richard Matthews testified that, just before he was about to take a

statement from Mr. Teague on the night of the shooting, Mr. Teague told him that he had just

seen the guy involved in the shooting. The Court permitted Matthews to continue to testify

concerning Mr. Teague's identification of Wrensford, pursuant to Fed. R. Evid. 801(d)(1)(C).

Matthews stated that Mr. Teague told him that he had stopped at a stoplight near the police

station, saw an individual leaving the police station, and identified him as the person on the

passenger side of the truck who did the shooting. Matthews testified that Mr. Teague did not

appear unsure of his identification, and never said anything about seeing only a silhouette of the

shooter. Matthews further testified that Wrensford was the only person who had been detained at

the police station that night and that the Teagues arrived only one or two minutes after

Wrensford left to be taken to another police station.

---

Fed. R. Evid. 801(d)(1)(C).

[2] During Wrensford's case, the entire fourteen-page statement that Tynicia Teague gave to the
police on the evening of May 10, 2012—Wrensford Exhibit 8—was offered by Wrensford and
admitted without objection.

### 3. Analysis

In his Rule 33 motion, Wrensford claims that his identification as the shooter was unduly suggestive because the Teagues saw Wrensford in police custody and the identification of Wrensford did not occur until Tynicia Teague was shown a single photograph of him from his driver's license. While acknowledging that the Court previously found to the contrary in denying his pretrial suppression motion, Wrensford maintains that "[a]fter hearing all of the testimony, the Court cannot reasonably find that Ms. Teague actually made an identification before she was shown the single photo driver's license." (Dkt. No. 261 at 4). The testimony upon which Wrensford relies is: the absence of an in-court identification of Wrensford by Trevor Teague and Tynicia Teague; Trevor Teague's testimony that he never identified Wrensford at the police station, that he could only make out a silhouette of the shooter, and that "all Rastaman look alike"; and Tynicia Teague's testimony that she did not remember what happened. (Dkt. No. 261 at 3-4). According to Wrensford, based on the trial testimony, "the court had further reason to conclude that the identification by Tynicia Teague was the result of impermissibl[y] suggestive police procedures." *Id.* at 4.

Wrensford's attempt to relitigate the Court's August 11, 2014 adjudication of his pretrial Motion to Suppress by supplementing his earlier arguments with the trial testimony of Trevor Teague and Tynicia Teague is unavailing. Wrensford appears to contend that selected aspects of the Teagues' trial testimony—where they variously asserted that they could not identify him, denied identifying him previously, or claimed they could not remember details about the shooting in general—supersedes, or should be considered together with, the record developed at the earlier suppression hearing, and further, should result in the conclusion that the identifications of Wrensford made by Tynicia and Trevor Teague were unconstitutionally

suggestive. However, there is no legal basis for concluding that the subsequent trial testimony should be considered in conjunction with evidence presented at the earlier suppression hearing or that such testimony negates the suppression hearing record, the Court's factual findings based thereon, or the legal conclusions drawn from the application of the governing law to the relevant facts. Nor does the Court agree—contrary to Wrensford's contention—that consideration of the trial testimony together with the evidence presented at the suppression hearing would in any way alter the conclusions previously reached by the Court in its suppression opinion. While various aspects of the Teagues' trial testimony were internally inconsistent, and inconsistent with events as recounted by Detective Fieulleteau and Sergeant Matthews and as recorded in written statements by Tynicia Teague around the time of the incident, at trial it was for the jury to assess the credibility of the Virgin Islands Police Department personnel and Trevor and Tynicia Teague in arriving at its verdict.[3]

Wrensford also argues that the Court erred in admitting at trial the Teagues' eyewitness identifications of him as the shooter, and thus a new trial is warranted. (Dkt. No. 261 at 4-6). In admitting the Teagues' identifications of Wrensford pursuant to Fed. R. Evid. 801(d)(1)(C), the Court relied on Third Circuit and Supreme Court authority for its rulings: *United States v. Lopez*, 271 F.3d 472 (3d Cir. 2001), *United States v. Brink*, 39 F.3d 419 (3d Cir. 1994), and *United States v. Owens*, 484 U.S. 554 (1988).

---

[3] As noted earlier, Muller joined Wrensford's Motion for a New Trial "as it pertains to Craig Muller." (Dkt. No. 262). Muller argued at his suppression hearing that the photo array from which he was selected by Tynicia Teague was unduly suggestive because the other individuals in the array did not look like him and therefore he stood out. The Court denied Muller's Motion to Suppress in a Memorandum Opinion and Order entered March 24, 2014. (Dkt. Nos. 108, 109). To the extent that, through his one-sentence joinder, Muller seeks to make an argument for the supplementation of his suppression hearing record with Ms. Teague's trial testimony, that argument fails for the same reasons that the Court rejects Wrensford's argument above.

In *United States v. Lopez,* a witness who previously told a police officer that he had seen the three defendants on the night of the crime in the vicinity of the crime scene, denied making any such statement when he was on the witness stand. The Third Circuit affirmed the trial court's ruling that allowed the police officer to whom the witness had made the statement to testify about the previous identification. *Lopez*, 271 F.3d at 484-85. The Court went on to say that "[a]ny concerns regarding conditions or circumstances that might bear on reliability are matters going to the weight of the evidence, which can be addressed on cross-examination, and should not affect the admissibility of the statement." *Id.* at 485. Similarly, in *United States v. Brink*, the Third Circuit affirmed a district court ruling that permitted a police officer to testify regarding previous statements of an eyewitness who forgot or changed his testimony at trial. *Brink*, 39 F.3d at 425-26. Finally, in *United States v. Owens*, the Supreme Court pointed out that the Advisory Committee Notes and legislative history of Rule 801(d)(1)(C) showed that "out-of-court identifications were generally preferable to courtroom identifications," and that "their use was to be fostered rather than discouraged." *Owens*, 484 U.S. at 562. The Supreme Court applied the rule to circumstances involving "a memory loss that makes it impossible for the witness to provide an in-court identification or testify about details of the events underlying an earlier identification." *Id.* at 563; *see also United States v. O'Malley*, 796 F.2d 891, 899 (7th Cir. 1986) (stating that FBI Agent's testimony regarding prior statements of witness who recanted was admissible).

Rule 801(d)(1)(C) is intended to address situations such as Tynicia and Treavor Teagues' failure to identify Wrensford at trial; their claimed inability to remember their earlier identifications of Wrensford; and the differing accounts concerning those identifications. Both Teagues testified and were subject to cross-examination about their prior statements, and both—

according to police testimony and the written record—had identified Wrensford on the evening

of the shooting. Thus, the requirements for Rule 801(d)(1)(C) were all met; the Teagues' pretrial

identifications were properly admitted; and it was within the province of the jury to decide

whether to believe the Teagues' prior statements—as reflected in the police testimony and the

written record—or their statements on the witness stand.[4]

Wrensford also maintains that Tynicia Teague's statement that she "saw the shooter"

could not constitute an identification "as it was not clear [w]hat these words meant, at that time,

that she recognized the person as the shooter or if she was guessing that he was the shooter, or

that she was in agreement with her father that this person had the same 'silhouette' as the

shooter." (Dkt. No. 261 at 5). To the extent that this argument is intended to challenge the

Court's pretrial conclusion in its suppression opinion that Tynicia Teague made an identification

of the defendant before being shown his photograph, or the Court's conclusion at trial that Ms.

Teague's statement fell within the scope of Rule 801(d)(1)(C) for purposes of admission of the

statement, it is difficult to reconcile Defendant's argument with the actual facts. Given the plain

language of the statement and the follow-up explanation by Tynicia Teague that the person

referred to "was the shooter in the incident earlier that evening," Defendant's suggestion that Ms.

Teague could have meant that she was "guessing" has no basis in fact. In addition, because Ms.

Teague testified *before* her father, and thus could not have agreed beforehand with what he had

not yet said regarding the alleged "silhouette," Wrensford's argument is confusing. Finally, to

the extent that the argument is intended to question the jury's verdict, it was wholly within the

---

[4] At trial, the Government moved to admit a statement by Tynicia Teague in which she identified
Muller from a photo array as the driver of the red truck. Muller's counsel objected to the
admission of the exhibits (Gov't Exhibits 73A and 73B). The Court admitted these exhibits
under Rule 801(d)(1)(C). To the extent that Muller's joinder represents a challenge to the
admission of the identification exhibits, the challenge is rejected based on the same reasoning as
discussed above with regard to Wrensford.

province of the jury to decide what Tynicia Teague meant when she identified Wrensford as "the shooter" in Gov't Ex. 92. Defendant has offered no basis for finding that the jury's assessment of the evidence in this regard should be overturned.

The Court thus concludes that Wrensford has failed to identify any evidentiary errors, much less errors warranting a new trial. In view of the foregoing, the Court finds that there is no basis for disturbing the Court's August 11, 2014 Memorandum Opinion and Order which denied Wrensford's motion to suppress the Teagues' statements. The Court further finds that the admission of Trevor Teague's identification of Wrensford through Sgt. Matthews, and Tynisha Teague's identification of Wrensford through her previous statement to the police (Gov't Ex. 92) were proper under Rule 801(d)(1)(C). Accordingly, the Court finds no merit in Wrensford's motion for a new trial based on purported errors in the admission of evidence identifying Wrensford as the shooter.[5]

### C. Juror Polling Issues

Wrensford's second argument is that the Court abused its discretion when it failed to grant a mistrial after a juror indicated during polling that the verdict as announced did not represent her independent verdict. For the reasons that follow, the Court rejects Wrensford's argument.

### 1. Background

The jury received evidence for eight days (between March 11th and March 20th); began its deliberations during the late afternoon of March 23rd; and returned its verdict during the early afternoon of March 24th. The original verdict form, signed by all twelve jurors, indicated that the jury found Wrensford guilty on all five counts with which he had been charged. The Court asked

---

[5] As discussed in footnotes three and four, the same reasoning and conclusions apply to any corresponding challenges by Muller.

the foreperson if the verdict was unanimous and the foreperson responded "yes." The foreperson announced the guilty verdicts on all counts as to Mr. Wrensford in open court.

Wrensford's counsel requested that the jury be polled. When polled, each juror was asked separately, for each count, whether the verdict as announced represented his/her independent verdict. After polling Counts I through IV as to Wrensford, his counsel requested a sidebar conference. Wrensford's attorney stated that he observed a particular juror (the "Juror") shrug her shoulders and he did not hear any verbal response when she was polled as to Count IV. Counsel added that he barely heard a verbal yes from that Juror as to Count III; it may have been a yes but there was some hesitation in her answer. Based on those purported cues, counsel argued that the Juror indicated that the guilty finding was not her independent verdict and, therefore, the verdict was not unanimous. Alternatively, counsel requested that the Juror be re-polled. The Court, the Government, and the Court Reporter all indicated that they heard the Juror respond "yes" to the polling for Counts III and IV against Wrensford, although in a low voice. Nonetheless, the Court granted counsel's request for the Juror to be re-polled on Counts Three and Four.

When the Juror was re-polled for Counts III and IV, the colloquy with the Deputy Clerk and the Juror was as follows:

Clerk: [W]e were unable to hear your response as to Count III. Is this your independent verdict?

Juror: Yes

Clerk: As to Count IV, is this your independent verdict?

Juror: Yes.

Clerk: Yes? I can't hear you.

Juror: Yes.

Clerk: And that was as to Wrensford on both counts. Is this your independent verdict?

Juror: No.

Clerk: As to Wrensford? As to Count III?

Juror: No.

Clerk: As to Count IV?

Juror: No.

(Dkt. No. 283—3/24/15 Trial Transcript at 25).

Based on this colloquy, Wrensford's counsel argued that the verdict was not unanimous and a mistrial should be declared because there would be "too much pressure" on the Juror to return for further deliberations after she had been publicly identified as the one who stood in the way of a unanimous verdict. The Court denied Wrensford's motion for a mistrial and provided supplemental instructions to the jury, directing them to deliberate further as to Counts Three and Four only.[6] A supplemental verdict form that contained only those counts was also provided to

---

[6] The Supplemental Instructions provided:

Thank you again for your time and attention to this matter.

It appears that there is not or may not be a unanimous verdict as to all of the counts. And in particular, as to certain specific counts. As to Mr. Wrensford, Counts III and IV[.]

So I'm going to ask you to go back and deliberate further as to those particular counts only. And I will provide you with a supplemental verdict form that has only those counts in which there appears not to be a unanimous verdict.

Now, let me remind you of a couple of things as you go back for these further deliberations. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself. But do so only after an impartial consideration of the evidence in the case with your fellow jurors.

the jury. In the supplemental instructions, the Court reminded the jury that it was their "duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if [they could] do so without violence to individual judgment." (Dkt. No. 283—3/24/15 Trial Transcript at 71). The Court further stated:

> In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced that your view is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. It is desirable if a verdict can be reached, but your verdict must reflect the conscientious judgment of each juror.

*Id.* at 71-72. The Court also instructed the jurors not to change their mind "just because the other jurors see something differently, or just to get the case over with." *Id.* at 72.

---

> In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced that your view is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. It is desirable if a verdict can be reached, but your verdict must reflect the conscientious judgment of each juror. Under no circumstances must any juror yield his conscientious judgment.
>
> You're reminded also that the government bears the burden of proving each element of the offense beyond a reasonable doubt. Do not ever change your mind just because the other jurors see something differently, or just to get the case over with. As I've told you before, in the end your vote must be exactly that, your own vote. And as important as it is for you to reach a unanimous agreement, it is just as important that you do so honestly and in good conscience.
>
> So with that, by way of supplemental instruction, I will ask that you return to the jury room and deliberate further on the particular counts that I have mentioned, that is . . . Counts III and IV for Mr. Wrensford, possession of a firearm with an obliterated serial number, is Count III, and murder in the first degree is Count IV, with the lesser included offense, Second Degree Murder, as part of Count IV as well.
> So with that, I ask you to return to the jury room for further deliberations. Thank you.

(Dkt. No. 283—3/24/15 Trial Transcript at 70-73).

16

The jury recommenced their deliberations at 4:10 p.m. on March 24th. At 5:35 p.m., the jury returned guilty verdicts on Counts Three and Four. Wrensford's counsel again requested polling. The jury was polled, and all twelve jurors expressed their agreement with the guilty verdicts.

In his Rule 33 Motion, Wrensford argues that it would be impossible for the Juror "to maintain her position that she was opposed to the guilty verdicts, if she were to return to deliberate with eleven other jurors who disagreed with her. Further, this juror lost her anonymity as being the only one who was in disagreement. Any further deliberations could only take place in a coercive environment." (Dkt. No. 261 at 7). Wrensford maintains that the verdict was not free from coercion because: (1) the Juror's body language during polling and her inaudible voice before she finally said "no" indicated her discomfort with the process; (2) her disagreement was clear on the third inquiry; and (3) the supplemental verdict was reached at approximately the same time—5:30 p.m.—that the jury was generally excused during the trial, indicating that the jurors were not inclined to return the next day, which they would have had to do if the Juror did not change her vote.

### 2. Analysis

Rule 31(d) of the Federal Rules of Criminal Procedure. entitled "Jury Poll," provides:

> After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually. If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury.

Fed. R. Crim. P. 31(d).

The object of a jury poll is

> to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the fore[person] has returned and thus to enable the court and the parties to ascertain with certainty that a unanimous

verdict has in fact been recorded and that *no juror has been coerced or induced to agree to a verdict to which he [or she] has not fully assented.*

*Gov't of the V.I. v. Hercules*, 875 F.2d 414, 418 (3d Cir. 1989) (quoting *United States v. Grosso*, 358 F.2d 154, 160 (3d Cir. 1966)), *rev'd on other grounds*, 390 U.S. 62 (1968) (emphasis in original). If there is not unanimous concurrence, "'the jury may be directed to retire for further deliberation or may be discharged.' The choice is a matter within the discretion of the trial judge, even if a motion for mistrial is made." *United States v. Aimone*, 715 F.2d 822, 832 (3d Cir. 1983) (quoting Fed. R. Crim. P. 31(d)). A trial judge's judgment on whether to direct the jury to continue deliberating or to declare a mistrial "must be given proper deference"—particularly "after a lengthy trial." *Id.*

As a preliminary matter, rather than a coerced verdict or a coercive environment warranting a mistrial, the Court properly exercised its discretion under the circumstances here to provide supplemental instructions and have the jury engage in further deliberations. While Wrensford asserts that the Juror had a "position that she was opposed to the guilty verdicts" that would be difficult "to maintain" in the face of "eleven other jurors who disagreed with her" (Dkt. No. 261 at 7), the purported existence of a claimed dissenting opinion was uncertain in view of the Juror's conflicting responses. When the Juror was polled the first time—separately for each Count—the Court, the Court Reporter, and Government counsel all heard the Juror respond affirmatively. Wrensford's counsel—who was located farthest from the jurors being polled—indicated he might have heard "yes" on Count III but did not hear the Juror's response to Count IV and asked for re-polling. The Juror was re-polled for Counts III and IV separately, and once again said "yes." When the Deputy Clerk responded with further polling of the Juror for both Counts collectively, followed by each Count separately, the Juror then said "no" on each occasion. Under the circumstances here—where the Juror responded both affirmatively and

negatively to the Deputy Clerk's polling—obtaining clarity as to whether there was or was not a unanimous verdict through further jury instructions and deliberations was a proper exercise of the Court's discretion.

Wrensford's attempt to strengthen his coercion argument by pointing out that the Juror shrugged her shoulders and spoke softly on the first polling—even though the Court, the Court Reporter, and Government heard her respond "yes"—does not aid his cause. In *United States v. Musto*, 540 F. Supp. 318 (D.N.J. 1982), *aff'd United States v. Aimone*, 715 F.2d 822 (3d Cir. 1983), the court was confronted with a juror who not only shrugged her shoulders when she indicated her agreement with the verdict, but also cried. The court concluded that these gestures did not indicate the juror's uncertainty with the decision, stating that it could not be "required to go beyond a juror's verbal response to a poll and determine whether the juror's body language is consistent with the stated response." *Id.* at 342. The court observed:

> Furthermore, agreement with a verdict does not require pleasure in its announcement. A juror may display unhappiness with a verdict, or reluctance or sadness in its rendition, but still believe in its correctness. A juror may cry over a verdict in which he or she has participated without in any way evidencing disagreement with it. Few jurors relish a finding of guilt. To suggest that tears, a shrug of the shoulders or other body movement should negate or place in question an answer of a juror is to impose upon a court powers of perception which it does not possess and should not attempt to employ. The validity of a poll should depend on what the court hears and not what it sees.

*Id.* (footnote omitted).

While the Juror's conflicting responses to the polling required clarification, Wrensford's attempt to create a coercion argument by contending that the Juror's body language and soft-spoken affirmative responses signified a negative response and thus "is strong evidence that she gave in to the majority against her own conviction" (Dkt. No. 261 at 8-9) cannot be credited. As the court in *Musto* aptly noted, in rejecting reliance on a juror's shrug of the shoulders and tears, it is what the court hears, not a juror's body language or emotional response that is important.

Further, Defendant's effort to view the timing of the verdict at 5:30 p.m. as evidence that the Juror was coerced into rendering her guilty verdict fails as well. In this context, courts have found circumstances to be coercive only in cases involving "*affirmative* coercive conduct of the district court, such as reminding the jury that the weekend was approaching, *United States v. Flannery*, 451 F.2d 880 (1st Cir. 1971), or creating the impression that the jury would be locked up all night, *United States v. Chaney,* 559 F.2d 1094 (7th Cir. 1977)." *United States v. Graham*, 758 F.2d 879, 885 (3d Cir. 1985) (full citations inserted). In *Graham*, a juror requested that the court conclude proceedings on Friday at 4:00 p.m. for the Jewish holiday of Yom Kippur. That Friday morning, the jury indicated that they were having difficulty reaching a unanimous verdict on all the charges and further deliberations would be fruitless. The court gave a supplemental charge which indicated that there were no time deadlines within which they had to reach a verdict. On appeal, the Third Circuit found that there was "no evidence that the jurors were coerced to agree upon a verdict by the impending onset of the Yom Kippur holiday." *Id.* The court went on to say that given the trial judge's discretion in determining the length of time a jury may be kept together for the purpose of deliberation, "the impending holiday of and by itself"—without any affirmative coercive conduct by the district court such as prescribing a deadline by which deliberations must be concluded—was "an insufficient additional factor to render the district court's order for further deliberations coercive." *Id*.

Here, the fact that the trial day normally ended between 5:00 and 5:30 p.m., and that the jury appeared comfortable with that schedule, is "an insufficient additional factor" to establish coercion. *See id.* The fact that the Court did not establish any time by which the jury had to conclude its deliberations, including, as Wrensford acknowledges, that the trial went later on one day (March 19th, with dismissal at 6:05 p.m.), belies any contrary conclusion.

Finally, the fact that there was only one juror whose independent judgment was in question does not alter the Court's conclusion that a mistrial was not warranted. Indeed, even in circumstances much more egregious than occurred here, courts have not found juror coercion. For example, in *Aimone*, once a guilty verdict was announced, the wife of a defendant broke into tears, clutched at her husband and continued to weep. Several of the female jurors, "observing [the wife's] reaction to the verdict, then began to cry themselves." *Aimone*, 715 F.2d at 831 (internal quotation marks omitted). Defense counsel requested a poll; the first three jurors answered yes, that they agreed with the verdict, but the fourth juror responded "no." The court described the scene: "[P]andemonium broke out in the courtroom. Many supporters of the defendants who were present leapt to their feet screaming. People pounded on the benches of the courtroom and some of the defense attorneys pounded on their desks and shouted." *Id.* (internal quotation marks omitted). The trial judge nevertheless directed the jurors to resume deliberations.

Ten to fifteen minutes later, the jury sent a note asking for the polling to continue. When polled, each member of the jury answered "yes." One of the defense lawyers moved for a mistrial, stating that although the juror at issue now answered yes, she "put her hands in the air and shrugged and was crying and shook her head and said 'yes' in a tone of resignation which I really did not have the impression represented her free will." *Id.* (internal quotation marks omitted). The trial judge denied the motion, ruling that the poll did not reveal the juror's uncertainty with the verdict, and that the gestures did not indicate uncertainty with the decision.[7] The Third Circuit in *Aimone* upheld the district court's ruling, citing Fed. R. Crim. P. 31(d) and

---

[7] The trial judge was the same judge as in *United States v. Musto*, cited earlier. Musto and Aimone were co-defendants in the district court; their convictions were upheld in *Aimone*.

the discretion accorded trial judges to "determine the likelihood of an ultimate unanimous verdict after a dissenting vote during a poll. [The judge's] judgment, particularly after a lengthy trial such as this one, must be given proper deference." *Id.* at 832.

Here, by contrast, there was no emotionally charged atmosphere in the courtroom. After the Juror answered negatively, the Court addressed that circumstance by giving a supplemental instruction and sending the jury back to deliberate. *See United States v. Fiorilla*, 850 F.2d 172, 177 (3d Cir. 1988) (observing that the possibility of coercion is significantly lessened when the trial judge "deliver[s] a cautionary instruction asking the jurors to carefully weigh and consider the view of their fellow jurors" before the jurors are sent back to the jury room to continue their deliberations).[8] In this case, the Court did not engage in any affirmative coercive conduct, nor was there a coercive environment so as to warrant a mistrial.[9]

For all the foregoing reasons, the Court rejects Wrensford's argument that the Court abused its discretion when it opted to send the jury back for further deliberations, rather than grant a mistrial, under the circumstances here.

In sum, Wrensford offers no meritorious argument that, based on the evidence adduced, "a miscarriage of justice has occurred—that is, that an innocent person has been convicted."

---

[8] The Third Circuit has encouraged district courts to use language in their supplemental instructions that urges "the jurors to re-examine their own view[s] but not to 'surrender [their] honest conviction as to the weight or effect of evidence solely because of the opinion of [their] fellow jurors, or for the mere purpose of returning a verdict.'" *United States v. Brennan,* 326 F.3d 176, 192 (quoting *United States v. Fioravanti,* 412 F.2d 407, 420 n.32 (3d Cir. 1969)). This was done here. *See* n.6, *supra.*

[9] When the jury was polled as to Muller, the same Juror responded "No" when asked if Count I was her independent verdict, and responded "Yes" as to the remaining Counts. Muller's counsel moved for a mistrial on the ground of juror coercion. The Court recognizes that, unlike with Wrensford, there were no conflicting responses by the Juror before the jury was sent back for further deliberations in Muller's case. Nonetheless, to the extent that Muller challenges the denial of his motion for a mistrial on grounds of coercion, the Court finds, for the reasons discussed above, that the kind of coercive environment that warrants a new trial was absent here.

*Brennan,* 326 F.3d at 189 (internal quotation marks omitted). Accordingly, the Court will deny Defendant's Motion for a New Trial pursuant to Fed. R. Crim. P. 33.

### D.  Reconsideration of Rule 29 Arguments

At the end of his memorandum, Wrensford makes a one-sentence argument: "Counsel further submits that the court reconsider Mr. Wrensford's arguments for Rule 29 Judgment of Acquittal." (Dkt. No. 261 at 10). For the Court to reconsider its decision denying Wrensford's Rule 29 motions, made at the close of the Government's case and renewed at the end of the case, Wrensford would have to show: (1) an intervening change in controlling law; (2) new evidence not available when the court entered its original order; or (3) that reconsideration was necessary to correct a clear error of law or fact or to prevent manifest injustice. *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). Wrensford has not argued, much less shown, that any of these factors apply. Accordingly, to the extent that Wrensford seeks reconsideration of the Court's earlier decision denying his Rule 29 motions, the Court will deny that request.

### III.    CONCLUSION

For the reasons stated above, the Court denies "Defendant Wrensford's Motion for a New Trial," (Dkt. No. 261), joined by Defendant Craig Muller. (Dkt. No. 262). An appropriate Order accompanies this Memorandum Opinion.

Date: November 30, 2015                          _____/s/_____
                                                 WILMA A. LEWIS
                                                 Chief Judge