|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and<br>PEOPLE OF THE VIRGIN ISLANDS | ) | |
| | ) | |
| v. | ) | Criminal Action No. 2013-0003 |
| | ) | |
| ELVIN WRENSFORD, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**Attorneys:**
**Alphonso G. Andrews, Jr., Esq.,**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
    *For the Government*

**Gabriel J. Villegas, Esq.,**
St. Thomas, U.S.V.I.
    *For Defendant Elvin Wrensford*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

    THIS MATTER comes before the Court following the Third Circuit's vacatur and remand of

Defendant Elvin Wrensford's ("Wrensford") conviction on federal and territorial charges arising from

a fatal shooting on St. Croix on May 10, 2012. *United States v. Wrensford*, 866 F.3d 76 (3d Cir. 2017),

*cert. denied sub nom. Muller v. United States*, 138 S. Ct. 1566 (2018).[1] For the reasons that follow,

the Court concludes that Wrensford is entitled to a retrial on the charges of first-degree murder (Count

4), using a firearm during a violent crime (Count 2), unauthorized possession of a firearm during the

---

[1] Specifically, Wrensford was charged with possession of a firearm in a school zone in violation of
18 U.S.C. §§ 922(q)(2)(A) and 924(a)(1)(B) (Count 1); using a firearm during a violent crime in
violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count 2); possession of a firearm with an obliterated serial
number in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B) (Count 3); first-degree murder in
violation of 14 V.I.C. §§ 922(a)(1) and 923(a) (Count 4); and unauthorized possession of a firearm
during the commission of a crime of violence in violation of 14 V.I.C. § 2253(a) (Count 5).

commission of a crime of violence (Count 5), and possession of a firearm in a school zone (Count 1). The Court further concludes that the suppression hearing in this case should be reopened to receive evidence on the issue of whether the inevitable discovery doctrine applies to the DNA sample collected from Wrensford following his de facto arrest. The Court defers its ruling regarding Wrensford's entitlement to a retrial on the charge of possession of a firearm with an obliterated serial number (Count 3) pending the outcome of the reopened suppression hearing.

## I.   BACKGROUND

The Third Circuit provided a detailed summary of the underlying facts in this case, which the Court adopts here:

> Wrensford and [codefendant Craig] Muller were involved in an altercation with a man at Ben's Car Wash on the afternoon of May 10, 2012. A few hours later, the man returned to the car wash with Gilbert Hendricks, apparently looking for someone. Hendricks and the man left, but Hendricks returned to the car wash at around 8:00 p.m. Shortly after he arrived, a red truck passed in front of the car wash and, moments later, the truck turned around and chased Hendricks down the road toward Food Town, a local supermarket. The passenger, who was later identified as Wrensford, fired several shots at Hendricks. Hendricks died two days later from gunshot wounds to his head.

> *          *          *          *          *

> Several officers responded to the scene at around 8:06 p.m. Witnesses told Officer Julio Mendez that a red truck left the area at a high speed. Mendez drove in the direction the truck was observed going, and 45 minutes later, he encountered two men walking on the road. Mendez stopped in front of them and noticed that both were sweating profusely; one said they were coming from a basketball court in the area. Mendez called for backup, and before he could approach them, both men ran. One ran into the bushes and the other ran toward a gas station. Mendez radioed a general description of the men to other officers.

> Officer Leon Cruz was patrolling after the shooting when, at 8:46 p.m., he heard the transmission from Mendez stating that two "black, rasta males" were on the run. App. 358-59. (Cruz testified that "rasta" means a person who has dreadlocks. App. 428-29.) Cruz thereafter observed a man wearing a white shirt running across the street toward a ballpark. Cruz turned toward the ballpark and saw a "rasta guy" standing near the bush area. App. 362-63. He also saw a white shirt hanging in the bushes. At approximately 8:58 p.m., Cruz drew his gun, ordered the individual—Wrensford—to show his hands and get on the ground, and once another officer arrived, Cruz

placed Wrensford in handcuffs. Cruz patted Wrensford down and removed a knife, keys to a GMC truck, a wallet, and an insurance card from Wrensford's pockets. Wrensford was then transported to the "C Command" police station in a police vehicle at around 9:06 p.m. and placed in a cell. Officers later returned to the area where Wrensford was stopped and recovered a Smith & Wesson 9 mm pistol close to where he had been standing. Shortly after Wrensford was detained, Mendez notified the other officers that a red GMC truck had been found, partially hidden in bushes, next to an abandoned building.

At the scene of the shooting, Detective Kirk Fieulleteau spoke to two witnesses: Tynicia Teague and her father, Trevor Teague, who were in the Food Town parking lot during the shooting and said they were able to identify the shooter. Fieulleteau decided to speak with the witnesses at C Command, so he asked a fellow officer, Lydia Figueroa, to take Wrensford from C Command to the Rainbow Building police station in Frederiksted. Fieulleteau went to the station and found Wrensford in a cell. Fieulleteau took Wrensford's driver's license and then he, Figueroa, and another officer escorted Wrensford outside while handcuffed and placed him in a police car in front of the station. Fieulleteau testified that he did not want the witnesses "to have any sort of inadvertent interaction with him." App. 659.

Tynicia and Trevor Teague arrived at C Command at around 9:55 p.m. As Wrensford was being taken out of the station and into the car, which was a few steps from the station's front door, Tynicia Teague was waiting at a traffic light outside the station. She looked toward C Command and observed Wrensford being put into the police car. The Teagues thereafter entered the police station and met with the police. Before Fieulleteau had formally commenced the interview with Tynicia Teague, she "blurted out" that she saw the shooter, referring to Wrensford, being taken out of the station. App. 600. Trevor Teague told Officer Richard Matthews "the same thing." App. 661. Tynicia Teague then provided a statement concerning the shooting, and when shown Wrensford's driver's license, she confirmed that he was the shooter and the person she saw outside the station.

Matthews met with Wrensford later that night at Rainbow Building. At 12:23 a.m., Matthews read Wrensford his *Miranda* rights, and Wrensford acknowledged his rights but did not sign the *Miranda* waiver form. Wrensford told Matthews that he was playing basketball that evening in the Princess area with "a partner of his," but he declined to give his partner's name. App. 509. While being booked at approximately 1:30 a.m. on May 11, Wrensford agreed to provide a DNA sample.

Tynicia Teague also said she saw the truck's driver. Three days after the shooting, she was shown a photo array that included Muller's photo and she identified him as the driver. She said that prior to the shooting, she had seen Muller with Wrensford.

*Wrensford*, 866 F.3d at 80-82.

The Government filed an indictment against Wrensford and Muller on January 29, 2013. (Dkt.

No. 1). Wrensford moved to suppress the evidence seized from his person (*i.e.*, the knife, keys, wallet,

and insurance card); a statement he made to law enforcement; and the DNA sample taken at the time of his booking. (Dkt. No. 53). The Government opposed the motion. Following suppression hearings held on January 17, 2014 and June 26, 2014, the Court granted Wrensford's motion in part and denied it in part.[2] Specifically, the Court granted Wrensford's request for the suppression of the keys, wallet, and insurance card discovered on his person, and denied his request for the suppression of the knife, the DNA sample, the witness identifications, and the statement Wrensford made to law enforcement. (Dkt. No. 138 at 1-2).

In ruling on Wrensford's Motion to Suppress, the Court found that, at the time he encountered Wrensford, Officer Cruz had a reasonable suspicion that Wrensford was involved in criminal activity and a reasonable belief that Wrensford might be armed and dangerous, thereby justifying his decision to stop Wrensford and conduct a "reasonable search for weapons." *Id.* at 19 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Accordingly, the Court denied Wrensford's request for the suppression of the knife recovered by Officer Cruz during his protective search of Wrensford for weapons. *Id.*

The Court also found that Officer Cruz's seizure of the keys, wallet, and insurance card from Wrensford's person "went beyond the parameters of a protective search for weapons allowed in a *Terry* stop." *Id.* at 20. The Court further concluded that the Government had not established that the keys, wallet, and insurance card would inevitably have been discovered as part of a search incident to Wrensford's arrest because it had failed to put forward evidence during the suppression hearings that the Virgin Islands Police Department ("VIPD") has "an established procedure in place where, upon arrest of a suspect, an officer will routinely conduct a search of the person incident to that

---

[2] The June 26, 2014 suppression hearing focused on whether the procedures employed during the identifications of Wrensford by the Teagues were improper.

4

arrest[.]" *Id.* at 22. As such, the Court granted Wrensford's request for the suppression of the keys, wallet, and insurance card.

The Court also determined that Wrensford was not subject to a de facto arrest when he was transported from the location where he was encountered by Officer Cruz to the C Command police station. *Id.* at 30. It therefore did not consider whether the identifications of Wrensford by Tynicia and Trevor Teague at the police station (hereinafter, the "Teague identifications"), the statement Wrensford made to VIPD officers, and the DNA sample taken from Wrensford were the fruits of an illegal arrest. The Court did consider other challenges advanced by Wrensford to the admission of this evidence, ultimately rejecting each of them. *Id.* at 30-45.

A jury trial commenced on March 9, 2015. Evidence introduced by the Government at trial included: that the Teagues had identified Wrensford at the police station; that Wrensford's DNA profile matched a DNA sample obtained from the firearm discovered close to where Wrensford was encountered by Officer Cruz; and that Wrensford had made a statement to the police indicating that he had been playing basketball in the Princesse area with a partner prior to the time he was encountered by law enforcement. The jury convicted both Wrensford and Muller of all counts charged on March 25, 2015. Wrensford filed an appeal challenging, *inter alia*, the denial in part of his Motion to Suppress.

On appeal, the Third Circuit disagreed with the Court's conclusion regarding Officer Cruz's detention of Wrensford, holding that Wrensford was subject to a de facto arrest without probable cause by VIPD officers when he was transported from the location where he was found to a police station and placed in a cell shortly after the shooting. *Wrensford*, 866 F.3d at 80. In light of its determination that Wrensford was illegally arrested, the Third Circuit found that the evidence recovered by law enforcement after the arrest and later admitted at his trial—specifically, the Teague

identifications, the DNA sample taken from Wrensford at the police station, and Wrensford's statement to law enforcement—should have been suppressed as "fruit of the poisonous tree" pursuant to the Fourth Amendment's exclusionary rule, unless an exception to that rule "such as the independent source, inevitable discovery, or attenuation doctrines, or the good faith exception" is applicable. *Id.* at 88, 93.[3]

As noted above, because this Court concluded that Wrensford was not subjected to a de fact arrest, no determination was made as to the applicability of any of the above-mentioned exceptions to the Fourth Amendment's exclusionary rule to evidence recovered following Wrensford's transport to the C Command station. The Third Circuit therefore vacated Wrensford's conviction, and remanded the case for the Court to consider whether the evidence recovered following Wrensford's illegal arrest is admissible pursuant to any exception to the exclusionary rule. *Id.* If no exception to the exclusionary rule applies, then the evidence should have been suppressed, and its admission at

---

[3] The Third Circuit identified Wrensford's driver's license as among the evidence subject to further consideration on remand. However, while there was testimony at trial that law enforcement showed Wrensford's driver's license to Tynicia Teague while she was at the C Command police station, the license itself was not admitted at trial. In any event, in light of the Third Circuit's ruling, neither the license itself nor testimony about the license are admissible in the absence of an exception to the exclusionary rule.

The Third Circuit did not identify testimony regarding Trevor Teague's identification of Wrensford as a part of the evidence for consideration on remand. At trial, Trevor Teague testified that he saw an individual being placed into a police car as he was arriving at the C Command police station, and that he told officers that this individual "could resemble" the person he earlier saw shooting from the red truck—although he was not able to positively identify that person. (Dkt. No. 279 at 113:18-116:2). VIPD Detective Richard Matthews testified that Wrensford—the only person being held in a cell at the C Command station on the night of the shooting—was transferred from the C Command station into a police car just before Tynicia and Trevor Teague arrived at the station. *Id.* at 129:13-131:24. He further testified that Trevor Teague stated that he had seen the person who was shooting from the passenger side of the red truck coming out of the C Command police station as he was arriving. *Id.* at 159:9-161:23. This statement by Trevor Teague was obtained in identical fashion as Tynicia Teague's identification of Wrensford, and thus sits in the same posture on remand. The Court will therefore consider the evidence regarding the Teague identifications in combination as part of the evidence under review on remand.

trial was error. *Id.* at 88-89. If the evidence should have been suppressed, then the Court must determine "whether its admission was nevertheless harmless beyond a reasonable doubt." *Id.* at 89. If the admission of the evidence was harmless beyond a reasonable doubt, then the verdict against Wrensford must be reinstated. *Id.* If the admission of the evidence was not harmless beyond a reasonable doubt, Wrensford must be granted a new trial. *Id.*

In light of the Third Circuit's guidance regarding the remand proceedings, the Court held a status conference with the parties and set a two-phase briefing schedule to facilitate its consideration of the issues. (Dkt. No. 348). For the first phase of briefing, the Court ordered the parties to address whether the suppression hearing should be reopened. *Id.* at 1. For the second phase of briefing, the Court ordered the parties to address (1) whether the current record supports application of an exception to the Fourth Amendment's exclusionary rule to evidence recovered after Wrensford's de facto arrest, and (2) whether—in the event this evidence is deemed inadmissible—its admission at Wrensford's trial was nonetheless harmless beyond a reasonable doubt. *Id.* at 2. The parties' briefs have been submitted, and the issues are ripe for adjudication.

## II. DISCUSSION

The Court will begin by addressing the parties' arguments regarding the admissibility of evidence recovered after Wrensford's de facto arrest under any applicable exception to the Fourth Amendment's exclusionary rule. In this regard, the only item of evidence identified by the Government as potentially admissible under an exception to the exclusionary rule is Wrensford's DNA sample, which the Government contends is admissible under the inevitable discovery doctrine. (Dkt. No. 359 at 18). The Government puts forth no argument that Wrensford's statement to law enforcement falls within any exception to the exclusionary rule. The Government similarly fails to identify any exception to the exclusionary rule applicable to the Teague identifications, although it

argues that Wrensford waived his right to challenge the admission of Tynicia Teague's statement identifying Wrensford as the person she saw shooting from the red truck by entering the statement into evidence at trial. (Dkt. No. 359 at 19-20).

## A.  Wrensford's Alleged Waiver of an Objection to Tynicia Teague's Statement

The Government relies on the Supreme Court's decision in *Ohler v. United States*, 529 U.S. 753 (2000), in support of its contention that Wrensford waived his right to challenge the admission of Tynicia Teague's statement. In *Ohler*, the Supreme Court considered a defendant's challenge to a district court's *in limine* ruling permitting the government to introduce evidence of her prior conviction on narcotics charges as impeachment evidence under Federal Rule of Evidence 609. *Id.* at 753. The Ninth Circuit held that Ohler had waived her objection to the district court's ruling by preemptively introducing evidence of her conviction during direct examination at trial. *Id.*[4] The Supreme Court agreed with the Ninth Circuit, holding that "a defendant who preemptively introduces evidence of a prior conviction on direct examination may not on appeal claim that the admission of such evidence was error." *Id.* at 760. In so holding, the Supreme Court pointed out that it is normally the government's right to decide *after* a defendant testifies whether or not to introduce evidence of a prior conviction. *Id.* at 758. Permitting Ohler to present the conviction evidence herself while still maintaining a claim of error on appeal would inappropriately "short circuit that decisional process[.]" *Id.* Thus, only if the government "exercises its option to elicit [] testimony is an appellate court confronted with a case where, under the normal rules of trial, the defendant can claim the denial of a substantial right if in fact the district court's *in limine* ruling proved to be erroneous." *Id.* at 759.

---

[4] Ohler's decision to introduce evidence of the conviction was designed to "remove the sting" of the evidence by addressing the conviction on direct examination rather than waiting for the government to introduce the conviction as impeachment evidence on cross-examination. *Id.* at 757-58.

As an initial matter, it is not clear that the *Ohler* rule applies in the context of a district court's denial of a defendant's motion to suppress. *See, e.g., United States v. Lackey*, 164 F. App'x 205, 208 (3d Cir. 2006) (noting that "*Ohler* concerned the admission of evidence of prior convictions which was introduced only for impeachment purposes under Rule 609" and expressing reluctance to extend *Ohler*'s waiver rule to a defendant's challenge to the admission of prior bad acts evidence under Federal Rule of Evidence 404(b)). In any event, *Ohler* is inapposite, because the Government concedes that it first introduced a portion of Tynicia Teague's statement during its case in chief. (Dkt. No. 359 at 20).[5] At trial, Tynicia Teague initially testified that she could not recall whether she had identified either of the two people she saw in a red truck from which shots were fired on the night of the May 10, 2012 shooting. (Dkt. No. 276 at 11:3-12:9). The Government presented Tynicia Teague with a copy of the statement she gave to law enforcement at the police station later that night as a means of refreshing her recollection. *Id.* at 13:2-24. After reading her statement, Tynicia Teague acknowledged that she had identified an individual as the shooter while she was at the police station. *Id.* at 27:23-28:4. Given Tynicia Teague's recalcitrance in answering any further questions posed by the Government about her statement to the police, the Court permitted the Government to treat her as a hostile witness. *Id.* at 32:3-34:11. The Government then proceeded to question Tynicia Teague regarding the identification, relying on information contained in her statement. *Id.* at 35:23-37:1. One page of Tynicia Teague's statement to law enforcement was admitted as Government Exhibit 92 over a defense objection. *Id.* at 66:10-22. This portion of the statement contained her identification of

---

[5] The Court notes that *Ohler* addresses a defendant's right to challenge the admission of evidence on appeal. It would thus have been more appropriate for the Government to advance its argument that Wrensford waived his right to challenge the admission of Tynicia Teague's statement during the proceedings on appeal. The Government did not raise this argument in its brief to the Third Circuit. BRIEF FOR THE UNITED STATES, *Wrensford v. United States*, 866 F.3d 76 (3d Cir. 2017) (No. 16-1373).

Wrensford as the person she saw shooting from the red truck after she saw him being placed into a police car at the C Command station.

It is thus clear from the record that the Government "exercise[d] its option to elicit [] testimony" from Tynicia Teague regarding her identification of Wrensford as the shooter and secured the admission of a portion of her statement containing the identification during its case in chief. *Ohler*, 529 U.S. at 759. Although Wrensford's counsel later moved Tynicia Teague's full statement into evidence without objection (Dkt. No. 280 at 146:9-151:3), this is not an instance where a defendant preemptively introduced potentially damaging evidence as a means of lessening its prejudicial effect and then maintained an objection to its admission on appeal. The Government has presented no caselaw, and the Court is aware of none, for the proposition that Wrensford waived his pretrial challenge and objection at trial to the admission of Tynicia Teague's statement by moving her full statement into evidence after the portion in controversy—her out-of-court identification of Wrensford as the shooter—was moved into evidence by the Government over a defense objection.[6] The Government's argument that Wrensford waived his right to challenge the admission of Tynicia Teague's statement is therefore rejected.

In the absence of any argument from the Government that an exception to the Fourth Amendment's exclusionary rule applies to the Teague identifications or Wrensford's statement to the police, the Court finds that this evidence should have been excluded at Wrensford's trial.[7] The Court

---

[6] Wrensford, on the other hand, points the Court to an Eleventh Circuit panel decision observing that *Ohler*'s waiver rule did not apply where a defendant testified about a prior conviction only after the government introduced evidence of another prior conviction during its case in chief. *United States v. Young*, 574 F. App'x 896, 900 n.4 (11th Cir. 2014).

[7] The Government similarly fails to identify any exception to the exclusionary rule applicable to testimony regarding Wrensford's driver's license. Although the license itself was not introduced at trial, the testimony relating to Wrensford's driver's license—which arose in the context of Tynicia Teague's identification of Wrensford—should also have been excluded from the trial.

thus turns to the parties' arguments with respect to the applicability of the inevitable discovery doctrine to the remaining piece of evidence recovered following Wrensford's de facto arrest—his DNA sample.

### B. Wrensford's DNA Sample and the Inevitable Discovery Doctrine

Law enforcement obtained Wrensford's DNA sample in this case through a buccal swab taken with Wrensford's consent at the time he was officially booked at approximately 1:30 a.m. on May 11, 2012. Because Wrensford's consent to the buccal swab was the product of his unlawful arrest by Officer Cruz, the DNA evidence must be suppressed in the absence of an applicable exception to the exclusionary rule. The Government contends that the inevitable discovery doctrine should apply to Wrensford's DNA sample because law enforcement would eventually have developed probable cause that Wrensford was responsible for Hendricks' murder, and at that point—following VIPD's routine procedures for the collection of DNA evidence—would have either (1) arrested Wrensford and obtained a DNA sample through consent or by warrant (Dkt. No. 359 at 17-19); or (2) secured a search warrant to obtain a DNA sample from Wrensford (Dkt. No. 364 at 9-11).

### 1. Applicable Legal Principles

Evidence obtained as the result of a Fourth Amendment violation must ordinarily be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). Although the exclusion of what may often be highly probative evidence entails "the high social cost of letting persons obviously guilty go unpunished for their crimes," the exclusionary rule is "needed to deter police from violations of constitutional and statutory protections." *Nix v. Williams*, 467 U.S. 431, 442-43 (1984). As such, the rule functions to ensure that the prosecution is not "put in a better position than it would have been in if no illegality had transpired." *Id.* at 443.

On the other hand, courts have recognized that the scope of the exclusionary rule must be limited to "ensure[] that the prosecution is not put in a worse position simply because of some earlier police error or misconduct." *Id.* One such limit on the scope of the exclusionary rule is the inevitable discovery doctrine. Under this doctrine, unlawfully obtained evidence need not be excluded from trial where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means[.]" *Id.* at 444. The inevitable discovery doctrine provides a balance between "the public interest in providing a jury with all relevant and probative evidence in a criminal proceeding" and "society's interest in deterring unlawful police conduct." *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) (citing *Nix*, 467 U.S. at 443).

The prosecution can meet its burden of establishing that evidence would have been discovered by lawful means if it shows "that the police, following routine procedures, would inevitably have uncovered the evidence." *Id.* (citation omitted). Thus, the doctrine is normally applied where the illegal seizure of physical evidence is at issue, and the government demonstrates that— were it not for an illegal seizure—its officers would nonetheless have uncovered the evidence through a lawful routine search under similar circumstances. *Id.*

The Third Circuit has cautioned that "[i]nevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing the Fourth Amendment and the exclusionary rule, courts must take care to hold the government to its burden of proof." *Id.* at 196 (quoting *United States v. Jones*, 72 F.3d 1324, 1334 (7th Cir. 1995)). Application of the doctrine requires courts to "view[] affairs as they existed at the instant before" the unlawful police conduct, and determine "what would have happened had the unlawful [conduct] never occurred." *Id.* at 195 (quoting *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995)). Courts must be wary of engaging in "assumption or

speculation." *Id.* at 196. "Proof of inevitable discovery involves no speculative elements but focuses

on demonstrated historical facts capable of ready verification or impeachment and does not require a

departure from the usual burden of proof at suppression hearings." *Id.* at 195 (quoting *Kennedy*, 61

F.3d at 498).

### 2. Inevitable Discovery on the Current Record

The Government contends that—in the absence of Wrensford's illegal arrest—probable cause

for Wrensford's arrest or for the issuance of a warrant for Wrensford's DNA sample would still have

arisen as of the time that the firearm analysis linking the gun—discovered near where Officer Cruz

encountered Wrensford—to Hendricks' murder was completed. (Dkt. No. 359 at 18).[8] At that point,

the Government claims, VIPD officers following routine procedures would either have lawfully

arrested Wrensford and obtained a DNA sample through consent, or secured a warrant for his DNA

sample. The Government thus maintains that, because Wrensford's DNA sample would have been

lawfully obtained through these mechanisms in the absence of his illegal arrest, the inevitable

discovery doctrine should apply.

---

[8] There is no contention that the firearm discovered near where Wrensford was detained by Officer Cruz was discovered *as a result of* Wrensford's illegal arrest. The circumstances surrounding the discovery of the firearm are thus distinguishable from cases where an illegal arrest resulted in the discovery of challenged evidence. *See, e.g., United States v. Connerly*, 75 F. Supp. 3d 1154, 1166-67 (N.D. Cal. 2014) (the government failed to demonstrate that a firearm would have inevitably been discovered in the home where a defendant was illegally arrested because police discovered the firearm only after the defendant informed officers of its existence and location within the home following his illegal arrest, and any contention that the defendant would have provided similar information in the event he had been legally arrested was "too speculative to establish inevitable discovery"). Indeed, the firearm is not among the evidence that the Third Circuit has identified as evidence gathered after the de facto arrest that is to be considered on remand for purposes of determining whether it falls within an exception to the exclusionary rule. Because there is no argument that the discovery of the firearm was the product of Wrensford's illegal arrest, the Court need not consider whether the firearm would have been discovered in the absence of the arrest. The Court may thus consider the fact of the firearm's discovery for purposes of determining whether law enforcement would have inevitably obtained Wrensford's DNA sample.

Although Wrensford consented to the collection of a DNA sample following his illegal arrest, any claim that he would have similarly consented to the collection of his DNA following a hypothetical lawful arrest at a later point falls into the realm of unacceptable assumption and speculation in the inevitable discovery analysis. As the Third Circuit has recognized, in contrast to tangible evidence, "a statement not yet made is, by its very nature, evanescent and ephemeral. Should the conditions under which it was made change, even but a little, there could be no assurance the statement would be the same." *Velazquez de Reyes*, 149 F.3d at 195; *see also Connerly,* 75 F. Supp. 3d at 1166-67. The same holds true with respect to an individual's decision to provide consent to a search. There can be no assurance that, under different conditions, Wrensford would have provided consent to the collection of his DNA sample. Accordingly, if the inevitable discovery doctrine may potentially apply in this case, it must be based on a showing that VIPD officers would inevitably have collected Wrensford's DNA by securing a warrant for his DNA sample.

Probable cause for the issuance of a search warrant requires a showing that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Martinez*, 982 F. Supp. 2d 421, 431 (E.D. Pa. 2013) (quoting *United States v. Conley,* 4 F.3d 1200, 1205 (3d Cir.1993)). "[W]hen police seek a DNA sample, they must have probable cause that the suspect's genetic material would be linked to evidence from the crime." *Id.* (quotation and internal quotation marks omitted).

On the facts here, probable cause justifying a request for a warrant to obtain Wrensford's DNA sample would have arisen on the basis of evidence recovered independently of his illegal arrest as of the time the firearm analysis was completed.[9] By that time, the lawfully-collected evidence suggesting

---

[9] An initial firearm analysis linking the firearm discovered near where Officer Cruz encountered Wrensford to shells found at the scene of Hendricks' murder and in the red truck was completed on

that Wrensford was involved in Hendricks' murder included: (1) Officer Mendez's discovery of two individuals walking in the road and sweating profusely approximately 45 minutes after the shooting at Ben's Car Wash; (2) the subsequent flight of the two individuals when Officer Mendez approached; (3) Officer Cruz's discovery of Wrensford—who matched the description of one of the individuals that had fled from Officer Mendez—hiding in the bushes shortly thereafter; (3) the discovery of the firearm in close proximity to where Officer Cruz encountered Wrensford; (4) the discovery of a red truck matching the description of the truck involved in the shooting; (6) the discovery of shells at the crime scene and in the bed of the red truck, and the post-mortem recovery of a bullet from Hendricks' head; and (7) the forensic analysis indicating that the firearm discovered in close proximity to Wrensford was the weapon used to murder Hendricks. This evidence is sufficient to establish a fair probability that Wrensford's genetic material would be linked to evidence of Hendricks' murder—specifically, the firearm discovered in close proximity to where Officer Cruz encountered Wrensford. In other words, the evidence provides probable cause for the issuance of a warrant for Wrensford's DNA sample.

But the fact that probable cause supporting a warrant for Wrensford's DNA sample would have been developed in the absence of his illegal arrest is not sufficient, standing alone, to demonstrate that the inevitable discovery doctrine applies. The Court is confronted with a situation in which the Government's claim of inevitable discovery relies on "the expected issuance of a warrant that was never actually sought." *United States v. Restitullo*, 215 F. Supp. 3d 343, 355 (D.N.J. 2016). Although it has applied the inevitable discovery doctrine to evidence recovered as the result of an illegal search conducted in reliance on a *defective* search warrant, *see United States v. Stabile*, 633

May 22, 2012. A second analysis was later performed linking the firearm to a bullet recovered post-mortem from Hendricks' head.

F.3d 219, 246 (3d Cir. 2011) (observing that "there would be little deterrence benefit in punishing the Government" where it "attempted to secure state and federal search warrants at every step of the search" of a defendant's hard drive), the Third Circuit has not opined on the application of the inevitable discovery doctrine where the Government relies on a claim that a warrant *could* have been obtained, but was never sought.

Courts have expressed "special concern for the potential that the Government's post-hoc claims to the existence of probable cause absent evidence of corresponding police efforts to obtain valid search warrants erode the Fourth Amendment's warrant requirement." *Restitullo*, 215 F. Supp. 3d at 356; *see also United States v. Richardson*, 2007 WL 2823336 at *4 (W.D. Pa. Sept. 26, 2007) (declining to apply the inevitable discovery doctrine where the government contended that a warrantless search was supported by probable cause, but officers had failed to obtain or even begin the process to obtain a search warrant). "[M]any circuits recognize that there is a manifest difference between good faith efforts to comply with the Fourth Amendment's warrant requirement and situations where police fail to pursue a warrant and later seek the admission of evidence based on claims of probable cause." *Restitullo*, 215 F.3d at 355 (citing *United States v. Allen*, 159 F.3d 832, 841 (4th Cir. 1998); *United States v. Reilly*, 224 F.3d 986, 995 (9th Cir. 2000); *United States v. Johnson*, 22 F.3d 674, 683 (6th Cir. 1994)). As expressed by the Sixth Circuit in *Johnson*, 22 F.3d 674, "[t]o hold that simply because the police could have obtained a warrant, it was therefore inevitable that they would have done so would mean that there is inevitable discovery and no warrant requirement whenever there is probable cause." *Id.* at 683; *see also Richardson*, 2007 WL 2823336 at *3 (applying the inevitable discovery doctrine on the ground that an officer "had probable cause prior to the illegal search" and thus "would have obtained a warrant and then seized the evidence he

illegally obtained" in the absence of the illegal search would "seriously diminish[]" the Fourth Amendment's warrant requirement)

The Court is sensitive to these concerns. It concludes, however, that application of the inevitable discovery doctrine under the specific circumstances of this case would not pose a risk of swallowing the exclusionary rule. The fact that Wrensford consented to the collection of a DNA sample—thus obviating any need for law enforcement to obtain a warrant—is important here. There is no contention that VIPD's decision to request consent from Wrensford for the collection of a DNA sample violated the Fourth Amendment. Rather, the admissibility of the DNA sample is at issue because the collection of Wrensford's DNA sample followed in the wake of Wrensford's illegal arrest, and thus must be considered fruit of the poisonous tree in the absence of an exception to the exclusionary rule.

There is a subtle but significant distinction between the facts here and a case in which a law enforcement officer ignores the Fourth Amendment's warrant requirement, and later attempts to justify the warrantless search by arguing that he *could* have obtained a warrant on the basis of probable cause, but simply did not. In this case, law enforcement did not flaunt the requirement of a warrant for Wrensford's DNA sample. Instead, law enforcement obtained Wrensford's DNA sample by an alternative but—viewed in isolation from the illegal arrest—equally valid method (a request for consent). The absence of any effort by law enforcement to obtain a warrant is attributable to Wrensford's provision of consent, which obviated the need for a warrant. Therefore, application of the inevitable discovery doctrine under these circumstances would not serve to excuse a decision by law enforcement to simply ignore the warrant requirement and perform an illegal search. In other words, because the method by which law enforcement actually obtained Wrensford's DNA sample in this case was valid (absent the illegal de facto arrest), application of the doctrine would not pose

the same risk of seriously diminishing the Fourth Amendment's warrant requirement as in the cases cited above, where a claim that law enforcement *could* have sought a warrant was used in an attempt to paper over its decision to ignore the warrant requirement. Accordingly—if the Government can demonstrate that officers would in fact have obtained a warrant for Wrensford's DNA sample absent his illegal de facto arrest and subsequent consent—the Court finds that the inevitable discovery doctrine may appropriately be applied here to provide a balance between "the public interest in providing a jury with all relevant and probative evidence in a criminal proceeding" and "society's interest in deterring unlawful police conduct." *Vasquez De Reyes*, 149 F.3d at 195 (citing *Nix*, 467 U.S. at 443).

The question thus becomes whether on the current record the Government has met its burden of demonstrating by a preponderance of the evidence that the police, following routine procedures, would inevitably have sought a warrant for Wrensford's DNA sample once probable cause had developed. For this burden to be met, "the record must support a finding that the police had relevant procedures in place, that those procedures would have been followed, and that [they] would have inevitably led to the discovery of the evidence in question." *United States v. Carrion-Soto*, 493 F. App'x 340, 342 (3d Cir. 2012) (citing *Vasquez de Reyes*, 149 F.3d at 195).

There is arguably some evidence in the record that VIPD maintains procedures to obtain warrants for the collection of suspects' DNA samples. For example, VIPD Corporal Luis Encarnacion testified during the January 17, 2014 suppression hearing that "the process of collecting any saliva samples or any hair fibers *has to come through court document*. Or you can ask the subject if he voluntarily gives his saliva or any type of evidence." (Dkt. No. 106 at 5:23-6:2) (emphasis added). Similarly, VIPD Detective Richard Matthews testified at the suppression hearing that he explained to Wrensford on the night of his arrest that if Wrensford did not consent to the collection of the DNA

sample, Detective Matthews would "draft a warrant and get a DNA swab from him." *Id.* at 191:16-22.

Without more, however, these general references to the existence of procedures for the collection of DNA samples by warrant are insufficient to satisfy the Government's burden. The record does not reveal any information about the substance of these procedures, nor does it reflect evidence of the routine application of the procedures that would support a conclusion that those procedures would inevitably have been followed in this case once probable cause was developed.

The Government argues that the Court need not engage in the standard inevitable discovery analysis because Detective Matthews' suppression hearing testimony establishes that—regardless of VIPD procedures—he intended to obtain Wrensford's DNA sample in this particular case. (Dkt. No. 364 at 9-10). The Court disagrees. Even if it were appropriate for the Court to forgo the standard inevitable discovery analysis, evidence of Detective Matthews' intent with respect to the collection of DNA evidence on the night of Wrensford's illegal arrest does not establish that, under different circumstances, he or another VIPD officer would inevitably have sought a warrant for Wrensford's DNA sample at a later time pursuant to routine VIPD procedures. The Government's reference to the fact that DNA samples were collected in two other cases in this district—*United States v. Sixtus Emmanuel*, CRIM. ACTION NO. 2015-0041, and *United States v. Thomas*, CRIM. ACTION NO. 2018-0005—does not provide any insight into the procedures that VIPD maintains for the collection of DNA samples by warrant, and thus provides an insufficient basis for the Court to take judicial notice of any such procedures or to conclude that the procedures would inevitably have been followed here. (Dkt. No. 359 at 18).

Accordingly, while the Court finds that the inevitable discovery doctrine is potentially applicable to Wrensford's DNA sample, it concludes that the Government cannot meet its burden on

the current record to demonstrate by a preponderance of the evidence that his DNA sample would inevitably have been obtained pursuant to routine VIPD procedures—that would necessarily have been followed here—for the collection of DNA samples by warrant.

### C.     Government's Motion to Reopen the Suppression Hearing

Having concluded that the current record does not support application of the inevitable discovery doctrine to Wrensford's DNA sample, the Court turns to the Government's argument that the suppression hearing should be reopened in order that it may put forward evidence of VIPD's routine procedures in the collection of DNA samples. Wrensford opposes the Government's request.

### 1.    Applicable Legal Principles

The Third Circuit has instructed that "[t]he question of whether the government may augment the record at a suppression hearing after a remand following the conviction of the defendant is analogous to the question of whether the government may reopen its case after resting." *United States v. Coward,* 296 F.3d 176, 180 (3d Cir. 2002) (citing *United States v. Vastola,* 915 F.2d 865, 876 (3d Cir. 1990)). While resolution of the issue is a matter left to the Court's discretion, *Wrensford*, 866 F.3d at 88 n.6, the Third Circuit has previously "cautioned that courts should be extremely reluctant to grant reopenings," *Coward*, 296 F.3d at 180 (quoting *United States v. Kithcart*, 218 F.3d 213, 219 (3d Cir. 2000) (internal quotation and quotation marks omitted)). Although this cautionary principle remains applicable in the context of a motion to reopen a suppression hearing, it has recently come under scrutiny by the Third Circuit and has been eliminated as a consideration in the context of a motion to reopen at trial. *See United States v. Trant*, 924 F.3d 83 (3d Cir. 2019).[10]

---

[10] In *Trant*, 924 F.3d 83, the Third Circuit considered a challenge to the district court's decision to allow the government to reopen its case at trial to enter into evidence the parties' stipulation that Trant had a prior felony conviction. *Id.* at 86-88. Taking the opportunity to "clarify and build upon" its prior decisions, the Third Circuit announced that its caution that "courts should be extremely reluctant to

"When faced with a motion to reopen, the district court's primary focus should be on whether the party opposing reopening would be prejudiced if reopening is permitted." *Kithcart*, 218 F.3d at 220. "Whether a defendant will be prejudiced depends on whether he will have an opportunity to respond to and rebut the evidence." *Wrensford*, 866 F.3d at 88 n.6 (citing *Coward*, 296 F.3d at 181 (quoting *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985))). "[P]rejudice in this context does not mean the loss of an opportunity for an unearned windfall," but rather "results when a party experiences an unfair or unreasonable impairment of his defense." *Trant*, 924 F.3d at 91 (citations omitted). "Courts also consider the timeliness of the motion to reopen, the nature of the evidence, the reason why the evidence was not initially presented, and whether the timing of its presentation will distort its importance." *Wrensford*, 866 F.3d at 88 n.6 (citation omitted). The party requesting a reopening must provide a "reasonable and adequate explanation for its failure to present evidence." *Id.* (quoting *Coward*, 296 F.3d at 181) (internal quotation marks omitted). In considering the reasons

---

grant reopenings . . . does not apply to a district court's consideration of a motion to reopen at trial." *Id.* at 89 (internal quotation and quotation marks omitted). The Third Circuit further noted that "decisions to reopen proceedings are traditionally a discretionary matter for the district court," and therefore declined to "direct a district court to place a thumb on the scale by suggesting that reopening a trial record is somehow disfavored, while at the same time giving lip service to our reliance upon the trial judge's sound discretion." *Id.* (quotation omitted). Such an approach "would only confuse the trial judge's inquiry into whether or not to reopen, as well as [the Third Circuit's] eventual review for abuse of discretion." *Id.*

Although these general concerns about the confusion of the trial court's inquiry and the appellate court's review appear to be equally relevant in the context of a motion to reopen a suppression hearing, the Third Circuit did not reach the question whether its prior statement "instructing district courts to exercise extreme reluctance to grant reopening in suppression hearings after remand is dicta and accordingly not binding, even in that context." *Id.* at 90 n.5. The Third Circuit also noted three distinctions between the suppression and trial contexts that warranted the elimination of the caution for reluctance to reopen in the trial setting: (1) the "greater need for district courts to be unconstrained in the exercise of their case-management discretion" at trial; (2) relatedly, that "suppression hearings usually present fewer and more narrow issues than arise at trial;" and (3) that a decision "whether to allow the Government to reopen its case-in-chief will more often be outcome determinative . . . than in the suppression-following-remand context." *Id.* at 89-90.

for the failure to present evidence, courts should examine "how the new evidence came to light and whether the law was unsettled or unclear at the time of the initial proceedings." *Id.* (citation omitted). A reopening may also be permitted where a "technical matter" has been "overlooked by inadvertence." *Id.* (internal quotation omitted).

### 2. Analysis

Because the Third Circuit has identified prejudice as the "primary focus" for the district courts in considering a motion to reopen, the Court turns to that factor first.

### a. Prejudice

The Government represents that—were the Court to reopen the suppression hearing—it would put on testimony regarding VIPD's routine procedures for the collection of DNA samples where relevant evidentiary items are seized, either through consent or by warrant. (Dkt. No. 350 at 4). The Government contends that Wrensford would not be prejudiced by the introduction of this evidence because he would have an opportunity to respond to or rebut the Government's evidence through cross-examination or by calling his own witnesses. *Id.* at 4-5.

In response, Wrensford argues that while "the government will have no problem finding members and veterans of the [VIPD] who will plainly state that it was their policy to collect DNA evidence . . . and that this policy was followed all of the time[] . . . [i]t will be much harder for Mr. Wrensford to find police officers who are willing to say the opposite, especially in a circumstance where doing so can result in the reversal of a murder conviction." (Dkt. No. 357 at 15-16). He contends that the substantial period of time that has passed since Wrensford's arrest in May 2012 would make finding a rebuttal witness that much more difficult. *Id.*

To the extent that Wrensford's argument rests on the bald assertion that he will be prejudiced were the suppression hearing to be reopened because Government witnesses would testify

untruthfully regarding VIPD procedures, the Court flatly rejects this argument. It would be entirely inappropriate for the Court to draw preemptive conclusions regarding the veracity of any potential witness' testimony—and equally inappropriate to do so with regard to the potential testimony of VIPD officers—in making the prejudice determination. Wrensford's parallel suggestion that current or former VIPD officers would refuse to testify regarding the absence of routine procedures for the collection of DNA samples *even if* no such procedures were in place is similarly baseless and summarily rejected.

As noted above, the question of whether a defendant will be prejudiced by the reopening of a suppression hearing rests on the issue "whether he will have an opportunity to respond and rebut [the Government's] evidence." *Wrensford*, 866 F.3d at 88 n.6. (citations omitted). Wrensford puts forward no valid argument that—were the suppression hearing reopened in this case—he would be deprived of an opportunity to effectively cross-examine Government witnesses and offer any witnesses of his choosing on the issue of routine VIPD procedures in the collection of DNA samples by warrant. Accordingly, the Court finds that the prejudice factor weighs in favor of the Government's position.

### b. Timing of the Motion to Reopen

The substantial length of time between the suppression hearings in 2014 and the Government's instant motion to reopen the suppression hearing on remand cannot be ignored. As Wrensford points out, there were opportunities for the Government to act more expeditiously in seeking to reopen the suppression hearing over the course of the proceedings in this matter. Nonetheless, the Court finds that the fact of the delay is not dispositive. Concerns around the timing of the motion to reopen the suppression hearing are linked to the prejudice determination and are directed at the question whether the timing of the request impedes the opposing party's opportunity to respond to the evidence. *See Coward*, 296 F.3d at 181 (a motion to reopen is "not nearly as likely

to be prejudicial" if it "comes at a stage in the proceedings where the opposing party will have an opportunity to respond and attempt to rebut the evidence introduced after reopening") (quoting *Blankenship*, 775 F.2d at 741); *see also United States v. Keyes*, 214 F. App'x 145, 153 (3d Cir. 2007) (concluding that the timing of a motion by the government to reopen its case at trial "did not prejudice [the defendant] because there was an opportunity to respond and rebut the evidence during the defense case"). Unlike situations where the loss of witnesses or dimming memories might adversely affect the ability to present or rebut evidence, the Court is not convinced that Wrensford's ability to contest or rebut the Government's evidence with respect to routine VIPD procedures is materially different at this point than it would have been had the Government presented the evidence initially. Therefore— as viewed through the lens of prejudice to Wrensford—the timing of the Government's request to reopen the suppression hearing weighs in favor of the Government's position.

### c. Explanation for the Failure to Present Evidence

To properly exercise its discretion in resolving a motion to reopen a suppression hearing, the Court must evaluate the moving party's explanation for its prior failure to present the evidence and "determine if it is both reasonable, and adequate to explain why the government initially failed to introduce evidence that may have been essential to meeting its burden of proof." *Kithcart*, 218 F.3d at 220.

The Government asserts that its request to reopen the suppression hearing is justified because its initial failure to present evidence of VIPD's routine procedures for the collection of DNA samples was the result of oversight. (Dkt. No. 350 at 3-4). It contends that because the focus of its response to Wrensford's request for the suppression of his DNA sample was on the question whether the sample was validly obtained through Wrensford's consent, it overlooked the need to establish the

applicability of the inevitable discovery doctrine by presenting evidence of routine VIPD procedures in the collection of DNA samples. *Id.*

Wrensford argues that this explanation from the Government is neither reasonable nor adequate. Wrensford notes that he argued in his Motion to Suppress both that the recovery of his DNA sample was the product of an illegal arrest and that the inevitable discovery doctrine was inapplicable to the DNA sample, such that the Government cannot reasonably argue that its failure to present evidence to establish the applicability of the doctrine resulted from a lack of notice that inevitable discovery was at issue. (Dkt. No. 366 at 3, 12). Wrensford also contends that because proof of VIPD's routine DNA collection procedures is not a technical matter and evidence of VIPD's routine procedures is not newly discovered, a claim of oversight is insufficient to establish that the suppression hearing should be reopened. *Id.* at 10-11, 23-26.

The record is clear that Wrensford maintained in his suppression briefing that his DNA sample should be excluded as a result of his illegal arrest, and that the inevitable discovery doctrine was inapplicable to the DNA evidence. (Dkt. No. 72 at 13-14). It is also true, however, that the Government's evidence and arguments during the suppression hearings did not focus on the application of the inevitable discovery doctrine to the DNA sample taken from Wrensford, and instead centered on the Government's theory—ultimately flawed in light of the Third Circuit's ruling that Wrensford was subjected to an illegal de facto arrest—that the DNA sample was admissible pursuant to Wrensford's consent given at the police station. (Dkt. No. 106 at 5:4-20).

Anticipating a finding that the search of Wrensford's person by Officer Cruz was illegal to the extent that he removed items other than weapons from Wrensford's pockets, the Government focused its arguments at the suppression hearing on the application of the inevitable discovery doctrine to items recovered as a result of that illegal seizure. The Government failed to argue that the

DNA sample was admissible pursuant to the inevitable discovery doctrine because—under its theory—Wrensford's transfer to the police station did *not* constitute an illegal arrest, and there was thus no need to consider the inevitable discovery doctrine with respect to Wrensford's DNA sample in light of his subsequent consent to its collection.[11]

In hindsight, the failure by the Government to address inevitable discovery with respect to the DNA sample was significant, as the admissibility of the DNA sample now depends upon the Government's ability to demonstrate the applicability of the inevitable discovery doctrine. At this point, the pertinent question is whether the Government's explanation that its failure to introduce evidence of VIPD's routine DNA collection procedures was the result of oversight in light of the Government's focus on its own (ultimately flawed) theory of admissibility is sufficient to allow the Government an opportunity to reopen the suppression hearing on remand.[12]

In the context of a suppression hearing, it is reasonable to expect that the parties would anticipate unfavorable findings by the Court and—to the extent they exist—offer alternative theories to support their requested relief. The Government failed to meet that expectation when it neglected to present evidence of VIPD's routine DNA collection procedures during the suppression hearing. Nonetheless, the Government's misstep in failing to recognize the need to put forward evidence of

---

[11]  Indeed, the Court similarly erred in concluding that the inevitable discovery doctrine was inapplicable under the circumstances here. (Dkt. No. 138 at 44).

[12]  Wrensford contends that there is evidence in the record suggesting that the Government intentionally avoided eliciting testimony regarding VIPDs' routine DNA collection procedures in its direct examination of Corporal Luis Encarnacion during the suppression proceedings. Specifically, Wrensford notes that the Government queried Corporal Encarnacion as to whether he would collect saliva samples from suspects "from time to time"—as opposed to questioning him regarding VIPD's standard procedures for the collection of DNA. (Dkt. No. 354 at 4-5, 10-11). The Court rejects this argument. The Government's claim that it failed to recognize the need to establish inevitable discovery is a more plausible explanation for its decision to phrase its question to Corporal Encarnacion in this manner, as the line of questioning at the time was directed toward the issue of Wrensford's consent to the collection of his DNA sample.

inevitable discovery with respect to Wrensford's DNA sample is understandable. The question whether Wrensford's DNA would inevitably have been discovered by other means was obscured at the suppression hearing by the Government's focus on the question of Wrensford's consent to the collection of the DNA sample. In the context of the overall complexity of the suppression proceedings in this case,[13] the Court finds that the Government's explanation that its failure to present evidence of VIPD's routine procedures in the collection of DNA samples was the result of oversight is neither unreasonable nor inadequate to support its request to reopen the suppression hearing under the circumstances.

In reaching this conclusion, the Court notes that the circumstances of this case are distinguishable from those considered by the Third Circuit in *United States v. Kithcart*, 218 F.3d 213, which Wrensford cites. In *Kithcart*, a defendant's conviction on a charge of felon in possession of a firearm was reversed following the Third Circuit's determination that his suppression motion was improperly denied based on the district court's erroneous conclusion that police had probable cause to search the defendant during a traffic stop. *Id.* at 215, 217-18. Although prior to the initial suppression hearing the government was "fully aware of what it had to establish to successfully

---

[13] As reflected in the Court's 46-page Memorandum Opinion, the factual and legal issues presented by Wrensford's Motion to Suppress were numerous and required extensive analysis. In addition, the initial hearing was subsequently reopened to permit additional evidence when Wrensford raised for the first time in his post-hearing memorandum the issue of the alleged improper suggestiveness of his identification by the Teagues. The issues as presented in the combined hearings included: whether Officer Mendez's initial stop and Officer Cruz's subsequent stop of Wrensford were each supported by reasonable suspicion; whether a knife, keys, wallet, and insurance card seized from Wrensford's person were legally seized under the Fourth Amendment or, alternatively, were admissible under the inevitable discovery exception to the exclusionary rule; whether Wrensford was subject to a de facto arrest; whether Tynicia Teague's and Trevor Teague's identifications of Wrensford as they saw him leave the police station were impermissibly suggestive or otherwise improper so as to violate Wrensford's due process rights; whether Tynicia Teague's identification of Wrensford from his driver's license photograph violated Wrensford's due process rights; whether Wrensford was given *Miranda* warnings and knowingly waived his right to counsel; and whether Wrensford provided consent for the collection of his DNA.

oppose [the defendant's] suppression motion," it failed to present any evidence to support its *own* theory of the admissibility of the contested evidence. *See id.* at 220 (noting that "the government did not present any evidence of the circumstances of a pat-down nor any testimony to support a conclusion that a *Terry* 'pat-down' was justified"). On remand, the district court permitted the government to reopen its case to introduce additional testimony relevant to the *Terry* pat-down despite the "total absence of any explanation for why such evidence was not produced during the first suppression hearing." *Id.* Absent any explanation for the Government's failure, the Third Circuit found that the district court had erred in permitting the reopening of the suppression hearing. *Id.* at 221.

*Kithcart* does not present an apt analogy. The suppression hearing in the instant matter was significantly more complex in terms of the number of issues raised and the extent of analysis required. Moreover, the evidence that the Government neglected to present at the suppression hearing in this case was not essential to establishing its own theory of the admissibility of Wrensford's DNA sample—i.e., that the sample was validly collected through the provision of consent following Wrensford's legal arrest. Instead, evidence related to VIPD's routine procedures for the collection of DNA samples was necessary only in the event that the Government's argument that Wrensford's arrest was legal was rejected, as a finding of an illegal arrest would in turn taint Wrensford's subsequent provision of consent to the collection of his DNA and necessitate a demonstration of inevitable discovery. Further, whereas the prosecution did not offer any explanation for its failure to introduce evidence in *Kithcart*, in this case the Government has explained that its failure to present evidence to establish inevitable discovery during the suppression hearing was the result of oversight—an explanation which the Court finds reasonable under the circumstances. Accordingly, *Kithcart* is distinguishable with respect to both the circumstances surrounding the Government's

failure to present evidence during the suppression hearing and the existence of an explanation for that failure.

The Court also notes that while it might be argued that a claim of oversight presents a "less than compelling" explanation for a failure to present evidence, it has been deemed a sufficient explanation for reopening in both the suppression and trial contexts in cases where—as here—the risk of prejudice to the opposing party was low. *See United States v. Rey*, 595 F. App'x 152, 155 (3d Cir. 2014) (while the government's explanation that its failure to enter search warrants into evidence at a suppression hearing was due to "oversight" was "less than compelling," it was "not so unreasonable that a District Court could not, in light of the low risk of prejudice, elect to reopen the suppression hearing"); *Trant*, 924 F.3d at 90 (while the government's explanation that it "simply forgot" to enter the parties' stipulation to a defendant's prior felony conviction into evidence before resting was "hardly compelling," the district court "was not required to deny the motion solely because the Government's explanation was weak" where the defendant was not prejudiced by the reopening).

Accordingly, having considered the relevant factors—and recognizing the question of prejudice as the primary consideration—the Court finds that reopening the suppression hearing to permit the presentation of evidence regarding VIPD's DNA collection procedures is warranted under the circumstances here. The Court will therefore grant the Government's request.

### D. Harmless Error

A determination as to whether the inevitable discovery doctrine applies to Wrensford's DNA sample must be deferred until after evidence and argument is received at the reopened suppression hearing. For the reasons discussed below, however, the Court need not defer its ruling on the question whether Wrensford is entitled to a new trial on the charges of first-degree murder (Count 4), using a

firearm during a violent crime (Count 2), unauthorized possession of a firearm during the commission of a crime of violence (Count 5), and possession of a firearm in a school zone (Count 1). Because it finds as to those counts that—even assuming Wrensford's DNA sample was properly before the jury for consideration—the admission of the Teague identifications was not harmless beyond a reasonable doubt, the Court will order a retrial.[14] As further described below, the Court will defer its determination as to whether Wrensford is entitled to a retrial on the remaining count—possession of a firearm with an obliterated serial number (Count 3)—pending the results of the reopened suppression hearing.

### 1. Applicable Legal Principles

In *Chapman v. California*, 386 U.S. 18 (1967), the Supreme Court recognized that not every federal constitutional error requires the reversal of a conviction. *Id.* at 22 ("[T]here may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.").[15] Whether a trial error resulting in a constitutional violation was harmless depends on "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 23 (quoting *Fahy v. State of Conn.*, 375 U.S. 85, 86-87 (1963)). The prosecution carries the burden of demonstrating that the erroneous admission of evidence was "harmless beyond a reasonable doubt." *United States v. Walton*, 10 F.3d 1024, 1032 (3d Cir. 1993) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 294-95 (1991)). "That is, the

---

[14] Because the Court finds that the admission of the Teague identifications standing alone was not harmless beyond a reasonable doubt, it is unnecessary for purposes of this Opinion to consider the *combined* effect of the admission of the Teague identifications and Wrensford's statement to the police.

[15] The admission of evidence that should have been suppressed on Fourth Amendment grounds is a constitutional violation.

government must show that admission of the [evidence] did not contribute to the defendant's conviction." *Id.* (quoting *Fulminante*, 499 U.S. at 294-95).

### 2. Analysis

#### a. Wrensford's Conviction on the First-Degree Murder, Using a Firearm During a Violent Crime, Unauthorized Possession of a Firearm During the Commission of a Crime of Violence, and Possession of a Firearm in a School Zone Counts

The Government argues that—assuming the Court were to determine that *all* of the evidence recovered as a result of Wrensford's illegal arrest was inadmissible—the admission of the evidence at trial was harmless beyond a reasonable doubt in light of other "overwhelming" evidence of Wrensford's guilt introduced at trial. (Dkt. No. 364 at 3). With respect to the Teague identifications in particular, the Government contends that the identifications were simply cumulative of other evidence introduced at trial, such that their admission did not contribute to the jury's guilty verdict against Wrensford. (Dkt. No. 359 at 13-14; Dkt. No. 364 at 6).

Wrensford contests the Government's characterization of the Teague identifications as cumulative, pointing out that evidence that the Teagues identified Wrensford as Hendricks' shooter was the only evidence directly establishing that Wrensford fired shots at Hendricks through eyewitnesses to the crime. (Dkt. No. 366 at 4, 11). He contends that, under these circumstances, it would be impossible to conclude that the introduction of the Teague identifications at trial did not contribute to the jury's verdict.

Assuming for purposes of this analysis that Wrensford's DNA sample was admissible at trial, the circumstantial evidence linking Wrensford to Hendricks' murder was substantial even absent the Teague identifications. It included: (1) testimony that, on the day of the shooting, Wrensford and Muller were involved in an altercation at Ben's Car Wash with an individual who was seen later that

day at Ben's Car Wash with Hendricks; (2) testimony that Hendricks was shot by individuals driving a red truck; (3) evidence that Officer Mendez encountered two individuals walking in the road and sweating profusely approximately 45 minutes after the shooting at Ben's Car Wash; (4) evidence that the two individuals fled when Officer Mendez approached; (5) evidence that Officer Cruz encountered Wrensford—who matched the description of one of the individuals that had fled from Officer Mendez—hiding in the bushes shortly thereafter; (6) evidence that a firearm was discovered in close proximity to where Officer Cruz encountered Wrensford; (7) evidence that a red truck matching the description of the truck involved in the shooting was discovered hidden in bushes; (8) evidence that some of the shells discovered at the crime scene and in the bed of the red truck, and a bullet recovered post-mortem from Hendricks' head, had been fired from the firearm discovered in close proximity to where Officer Cruz encountered Wrensford; and (9) evidence that Wrensford's DNA sample matched DNA discovered on the firearm. The Court has little trouble concluding that this circumstantial evidence would be sufficient to support the jury's decision to convict Wrensford of Hendricks' murder, even in the absence of the Teague identifications.

It is well-established, however, that the question whether the admission of evidence was harmless beyond a reasonable doubt is not the equivalent of a sufficiency of the evidence test. *See, e.g., Gov't of Virgin Islands v. Davis*, 561 F.3d 159, 166 (3d Cir. 2009) (noting that the Appellate Division erroneously focused its harmless error analysis "on whether the evidence was sufficient to convict despite the error, as opposed to whether there was a reasonable possibility that the error contributed to the jury verdict") (citing *Satterwhite v. Texas,* 486 U.S. 249, 258-59 (1988) (internal citation omitted)). Even the existence of "significant evidence from which the jury could have found guilt" is not necessarily sufficient to satisfy the Government's burden of demonstrating that an error was harmless beyond a reasonable doubt. *Id.* at 165-66. Rather, the Government must demonstrate

that the properly-admitted evidence was "so overwhelming that the jury's verdict 'was surely unattributable to the error.'" *Id.* at 166 (quoting *United States v. Korey*, 472 F.3d 89, 97 (3d Cir. 2007) (internal quotation omitted)); *see also United States v. Cunningham*, 694 F.3d 372, 391-92 (3d Cir. 2012) (explaining that the "test for harmless error is whether it is highly probable that the error did not contribute to the judgment," and that "[t]his '[h]igh probability' requires that the court possess a sure conviction that the error did not prejudice the defendant ") (quoting *United States v. Vosburgh,* 602 F.3d 512, 540 (3d Cir. 2010) (internal quotations and quotation marks omitted)).

In the instant case, the Teague identifications were the only *direct* evidence identifying Wrensford as the shooter on the night of Hendricks' murder. The discovery of the firearm in close proximity to the location where Officer Cruz encountered Wrensford; the forensic analysis linking that firearm to Hendricks' murder; and the DNA evidence linking Wrensford to the firearm all represent strong circumstantial evidence that Wrensford was responsible for shooting Hendricks. Even considering this evidence in combination, however, the jury would still be required to infer that Wrensford was in fact the individual that shot at Hendricks from the red truck. The Teagues' positive identifications of Wrensford as the person they saw shooting from the red truck eliminate the need for the jury to make any such inferential step.[16]

Under these circumstances, the Court cannot conclude that there is no reasonable probability that the erroneous admission of the Teague identifications did not contribute to the jury's verdict against Wrensford, nor can it find that the properly-admitted evidence of Wrensford's guilt was "so overwhelming that the jury's verdict was surely unattributable to the error." *Davis*, 561 F.3d at 166 (internal quotation and quotation marks omitted). In other words, the Court does not possess a "sure

---

[16] In this regard, the Teague identifications were not cumulative of other evidence introduced at Wrensford's trial, as the Government argues.

conviction" that the error in the admission of the Teague identifications did not prejudice Wrensford. *Cunningham*, 694 F.3d at 391-92.

Neither of the cases to which the Government points in support of its position that otherwise "overwhelming" evidence of a defendant's guilt renders the erroneous admission of evidence harmless address the situation before the Court here—where the challenged evidence represents the only direct evidence of a defendant's guilt. *See Schneble v. Fla.*, 405 U.S. 427, 431 (1972) (potentially erroneous admission of a codefendant's incriminating statements was harmless where those statements "at most tended to corroborate certain details of [the defendant's own] comprehensive confession"); *United States v. Scarfo*, 685 F.2d 842, 846 (3d Cir. 1982) (potentially erroneous admission of documents used by the prosecution to establish the defendant's control over the drawer where the documents and a gun were found was harmless where the prosecution presented "abundant other evidence to establish [the defendant's] connection to the drawer"). Further complicating the Government's position, the Supreme Court has considered whether the prosecution's case rests on direct or circumstantial evidence as a factor in the determination of whether properly-admitted evidence is so "overwhelming" as to render the erroneous admission of evidence harmless. *See, e.g., Harrington v. California*, 395 U.S. 250, 254 (1969) (*Bruton* error was harmless where other evidence was overwhelming and the prosecution's case was "not woven from circumstantial evidence" but instead proved by direct evidence including the properly-admitted statements of codefendants who testified that the defendant had a gun and participated in the crime).

The Government also fails to identify any case in which the admission of evidence establishing that a defendant was identified by the sole eyewitnesses to a crime was found to be harmless. Where courts have concluded that the erroneous admission of identification evidence was harmless, the record has contained additional strong identification evidence that was properly

admitted. *See, e.g., United States v. Smith*, 127 F. App'x 608, 613 (3d Cir. 2005) (erroneous admission of a witness' in-court identification of a defendant was harmless where that identification "pale[d] against the positive identification of [the defendant] as the direct seller of crack or powder cocaine by five witnesses who knew [the defendant] for years"); *Marsden v. Moore*, 847 F.2d 1536, 1546 (11th Cir. 1988) (admission of a witness' improper identification of the defendant was harmless where that witness was "only one of three witnesses who placed [the defendant] at Vanderbilt Hospital the day after the murder")

Accordingly, the Court concludes that the Government has failed to meet its burden of demonstrating that the admission of evidence regarding the Teague identifications of Wrensford as the individual who shot at Hendricks from the red truck was harmless beyond a reasonable doubt. Even if Wrensford's DNA sample was admissible at trial, the identifications provide the only direct evidence from eyewitnesses establishing that Wrensford was the individual who fired shots at Hendricks. Establishing that Wrensford was the individual who shot at Hendricks was essential to the Government's ability to carry its burden of proof beyond a reasonable doubt on the charges of first-degree murder (Count 4), using a firearm during a violent crime (Count 2), unauthorized possession of a firearm during the commission of a crime of violence (Count 5),[17] and possession of a firearm in

---

[17] With respect to the unauthorized possession of a firearm during the commission of a crime of violence charge (Count 5), the indictment alleged that Wrensford, while aiding and abetting Muller, possessed or carried a firearm during the commission of a crime of violence—to wit, Hendricks' murder—while not being authorized to do so, in violation of Virgin Islands law. The Virgin Islands statute under which Wrensford was charged on Count 5 establishes that simple possession of a firearm by a person unauthorized to do so is a violation of Virgin Islands law. *See* 14 V.I.C. § 2253(a) ("Whoever, unless otherwise authorized by law, has, possesses, bears, transports or carries either, actually or constructively, openly or concealed any firearm . . . may be arrested without a warrant, and shall be sentenced to imprisonment of not less than ten years"). The statute also provides for increased penalties where the firearm is possessed "during the commission or attempted commission of a crime of violence[.]" 14 V.I.C. § 2253(a). At trial, the jury was informed that the Government was required to prove three elements beyond a reasonable doubt to support a guilty verdict on Count 5: (1) that Wrensford possessed or carried a firearm, or aided and abetted the possession, or carrying,

a school zone (Count 1).[18] Thus, because the Court finds that the Government cannot prove beyond a reasonable doubt that the admission of the Teague identifications did not contribute to the jury's verdict against Wrensford on these charges, the Court finds that Wrensford is entitled to a retrial on those counts.

### b. Wrensford's Conviction on the Possession of a Firearm with an Obliterated Serial Number Count

On the other hand, neither the Teague identifications nor Wrensford's statements to law enforcement were significant pieces of evidence bearing on the question of Wrensford's guilt on the possession of a firearm with an obliterated serial number charge (Count 3), because the Government's burden at trial with respect to that count did *not* require the Government to prove beyond a reasonable doubt that Wrensford used the firearm to commit Hendricks' murder.[19] Assuming that Wrensford's DNA sample is ultimately determined to be admissible, the evidence supporting the jury's finding

---

of a firearm by another; (2) that Wrensford was not authorized to possess or carry a firearm; and (3) that the possession or carrying of the firearm occurred during the commission of a crime of violence, that is, the murder charged in Count 4. A lesser included offense instruction was not given at trial. Accordingly, absent a lesser included offense instruction, the jury's finding of guilt as to Count 5 was dependent on the Government's ability to prove beyond a reasonable doubt that Wrensford's possession of the firearm occurred during the commission of Hendricks' murder as charged in Count 4.

[18] The evidence introduced by the Government that Wrensford possessed a firearm in a school zone came in the form of testimony from VIPD Officer Arthur Joseph that the site of Hendricks' murder—Ben's Car Wash—sits within 1000 feet of a school zone. (Dkt. No. 275 73:23-79:11). Thus, a conclusion that Wrensford possessed a firearm in a school zone is tied to the Government's ability to prove that Wrensford was in possession of the firearm at the time of Hendricks' murder. The Government recognizes this point in its briefing. (*See* Dkt. No. 359 at 13 (noting that a "showing that Wrensford's DNA was on a firearm . . . establishes that he touched it . . . . [but] does not establish where or when his touching or possession occurred")). Because the Teague identifications are the only direct evidence in the record on this issue, their erroneous admission was not harmless with respect to the jury's guilty verdict on the possession of a firearm within a school zone count.

[19] Tynicia Teague's reference to Wrensford's driver's license at trial also had no significant bearing on the question of Wrensford's guilt on Count 3.

that Wrensford possessed a firearm with an obliterated serial number was overwhelming. As the Government points out, in addition to the DNA evidence, the evidence presented at trial to establish Wrensford's guilt on this count included: (1) the discovery of a firearm in close proximity to the location where Officer Cruz encountered Wrensford; (2) uncontested evidence that Wrensford did not have a license to possess a firearm; and (3) uncontested evidence that the firearm in question was operable, had an obliterated serial number, and had traveled in interstate commerce. (Dkt. No. 359 at 12-13). The Court therefore finds that the Government has met its burden of demonstrating beyond a reasonable doubt that the erroneous admission of the Teague identifications and Wrensford's statements to law enforcement did not contribute to the jury's verdict on the possession of a firearm with an obliterated serial number charge.

The Court also concludes, however, that the question of Wrensford's entitlement to a new trial on Count 3 depends on the outcome of the reopened suppression hearing in this case and the ultimate determination of whether Wrensford's DNA sample was admissible at trial pursuant to the inevitable discovery doctrine. Although the Government argues that Wrensford's conviction on this count should stand even if his DNA sample was erroneously admitted at trial, the Government also recognizes that "DNA evidence can be powerful" and that a "showing that Wrensford's DNA was on [the] firearm . . . establishes that he touched it." (Dkt. No. 359 at 13).

It is clear from the record that the Government's purpose in introducing the results of a DNA analysis comparing the DNA sample collected from Wrensford to the DNA sample collected from the firearm was to present compelling evidence to the jury that Wrensford in fact possessed the firearm that was discovered close to the location where Wrensford was encountered by Officer Cruz. The Government's DNA expert—Tiffany Roy—testified based on her DNA analysis that the chance that the DNA recovered from the firearm belonged to someone other than Wrensford was one in 27

trillion. (Dkt. No. 277 at 149). Although strong circumstantial evidence that Wrensford possessed the firearm exists even without the DNA evidence, it is also true that no direct evidence was properly introduced at trial establishing that Wrensford was ever observed in possession of a firearm.[20] In the absence of any direct evidence of Wrensford's possession of the firearm, the Court cannot conclude that the powerfully-incriminating DNA evidence establishing that Wrensford in fact possessed the firearm did not contribute to the jury's verdict on the possession of a firearm with an obliterated serial number charge.[21]

Accordingly, the Court finds that the issue of Wrensford's entitlement to a new trial on the possession of a firearm with an obliterated serial number count hinges on the determination of whether the inevitable discovery doctrine applies to his DNA sample. The Court will therefore defer its finding on Wrensford's entitlement to a new trial on Count 3 until after it rules on the inevitable discovery issue following the reopened suppression hearing. If the Government shows that the inevitable discovery doctrine applies to Wrensford's DNA sample, then the DNA evidence was properly admitted at his trial, and the Court will reinstate Wrensford's conviction on Count 3. If it is determined that the inevitable discovery doctrine does not apply to Wrensford's DNA sample, then Wrensford will be entitled to a retrial on Count 3, and thus retried on all counts of the indictment.

---

[20] Because the Teague identifications were admitted in error, that evidence cannot be considered for purposes of the instant harmless error analysis.

[21] While this holding is equally applicable to the charges of unauthorized possession of a firearm during the commission of a crime of violence (Count 5) and possession of a firearm in a school zone (Count 1), the Court has not considered those counts in this section of its analysis because it has already determined that Wrensford is entitled to a new trial on Counts 5 and 1 based on the erroneous admission of the Teague identifications at trial, and regardless of the admissibility of the DNA evidence.

### III.    CONCLUSION

For the reasons discussed above, the Court concludes that the Teague identifications and Wrensford's statement to law enforcement were admitted in error at his trial.[22] Because the admission of the Teague identifications was not harmless beyond a reasonable doubt with respect to Wrensford's convictions on the charges of first-degree murder (Count 4), using a firearm during a violent crime (Count 2), unauthorized possession of a firearm during the commission of a crime of violence (Count 5), and possession of a firearm in a school zone (Count 1), Wrensford is entitled to a new trial on those counts.

The Court will grant the Government's request to reopen the suppression hearing in this case to receive evidence on the issue of whether the inevitable discovery doctrine is applicable to Wrensford's DNA sample. The Court therefore defers its determination as to whether Wrensford's DNA sample should have been excluded at trial pending the outcome of the reopened suppression hearing. If it is determined that Wrensford's DNA sample was admissible at trial, the Court will reinstate Wrensford's conviction on the charge of possession of a firearm with an obliterated serial number (Count 3). If it is determined that Wrensford's DNA sample should have been excluded at trial, Wrensford is entitled to a retrial on Count 3, in addition to the other counts of the indictment referenced above.

An appropriate Order accompanies this Memorandum Opinion.

Date:   August 15, 2019

_____/s/_____
WILMA A. LEWIS
Chief Judge

---

[22] Testimony elicited from Tynicia Teague regarding Wrensford's driver's license was also improper, as the driver's license is not admissible at trial.