# DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA and ) <br> PEOPLE OF THE VIRGIN ISLANDS ) <br> ) <br> v. ) <br> ) <br> ELVIN WRENSFORD, et al., ) <br> ) <br> **Defendants.** ) <br> ) | **Criminal Action No. 2013-0003** |

**Attorneys:**
**Alphonso G. Andrews, Jr., Esq.,**
St. Croix, U.S.V.I.
    *For the Government*

**Gabriel J. Villegas, Esq.,**
St. Thomas, U.S.V.I.
    *For Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court following the Court's Memorandum Opinion concluding, *inter alia*, that the suppression hearing in this case should be reopened to receive evidence on the issue of whether the inevitable discovery doctrine applies to the DNA sample collected from Defendant Elvin Wrensford ("Wrensford" or "Defendant") following his de facto arrest ("August 15 Opinion") (Dkt. No. 370 at 20–29); the testimony at the reopened suppression hearing held on September 17, 2019; the parties' respective supplemental memoranda filed on October 15, 2019 (Dkt. Nos. 389, 390); and the parties' respective supplemental replies filed on

October 25, 2019 (Dkt. No. 391, 392).[1] For the following reasons, the Court finds that the Government has established by a preponderance of the evidence that the inevitable discovery doctrine applies to the collection of Wrensford's DNA sample and that the DNA sample was therefore admissible at trial. In view of the Court's conclusion in this regard, the Court will reinstate Wrensford's conviction on the charge of possession of a firearm with an obliterated serial number (Count 3). *See* Dkt. No. 370 at 6–7, 39.

I. BACKGROUND

A detailed statement of the underlying factual and procedural background is set forth in the Court's August 15 Opinion. (Dkt. No. 370 at 2–7). The Court found, *inter alia*, that, while the inevitable discovery doctrine may apply to Defendant's DNA sample, the Government could not meet its burden of proof on that issue on the then-current record. *Id.* at 13–20. The Court further found that a reopening of the suppression hearing was warranted under the circumstances presented. *Id.* at 20–29. Thereafter, the Court reopened the suppression hearing to determine the sole issue of whether the Government can demonstrate by a preponderance of the evidence that the police, pursuant to routine Virgin Islands Police Department ("VIPD") procedures, would have inevitably obtained Defendant's DNA sample. This opinion contains the Court's findings on that issue.

A. The Reopened Suppression Hearing

At the reopened suppression hearing, the Government offered the testimony of VIPD Lieutenant Richard Matthews ("Lt. Matthews") and Captain Dino Herbert ("Capt. Herbert"). The

---

[1] The Government's supplemental reply was refiled on October 28, 2019 due to an ECF formatting error (Dkt. No. 393).

defense did not present any witnesses. The following facts emerged from the record established at the suppression hearing.

Lt. Matthews testified that he has been employed with VIPD for approximately 25 years. (Hr'g Tr. 22). He was assigned to the Investigation Bureau within VIPD from 1997 to 2015. *Id.* His duties while assigned there were to investigate various crimes, including homicides. *Id.* According to Lt. Matthews, VIPD had a DNA collection practice that it applied to situations where the police had identified a murder suspect and a murder weapon. *Id.* at 30–31. This practice, which was in place prior to and including 2012, *id.* at 33–34, was to "swab [] the murder weapon and try to get the DNA from the suspect and compare the two," *id.* at 31, 33–34.

Lt. Matthews further explained that the forensics team swabs physical evidence, such as a murder weapon, for DNA with or without a murder suspect identified. *Id.* at 43–46, 51. Forensics reports are, as "standard practice," generated independently by the forensics team, but the reports are shared with VIPD investigators. *Id.* at 46–51. He stated that the practice regarding the murder suspect is to locate the suspect and request consent for a DNA swab. *Id.* at 31. If VIPD asked for, but could not obtain, a suspect's consent, VIPD would seek a warrant to obtain the suspect's DNA. *Id.* If the weapon was recovered and there was probable cause to obtain a DNA warrant, but the suspect was not in custody, VIPD "would immediately start seeking that [DNA] warrant." *Id.* at 33. Once the DNA warrant was obtained, VIPD practice is to commence a search for the suspect through several methods: entering the DNA warrant in the National Crime Investigation Center database ("NCIC"); distributing notices to VIPD officers island-wide and to airports; and posting flyers with the suspect's photo. *Id.* at 34–36.

Lt. Matthews testified that VIPD's DNA collection practice is not in writing. *Id.* at 38. Lt. Matthews learned this practice from his supervisors "from the time [he] entered the Investigation

3

Bureau. *Id.* at 38. He testified that it was "standard practice," but could not identify a specific date on which he was taught the practice. *Id.* at 39. According to Lt. Matthews, at some point during 1997, three of his supervisors—Sergeant Ramirez, Captain Edwards, and Detective Jose Silva—showed him "what the standard practices were." *Id.* He did not know where his supervisors learned the practices. *Id.* at 39. He confirmed that he did not learn them from a police procedure manual and that he never received outside DNA collection practice training. *Id.* at 39–42.

Lt. Matthews also testified that, on May 10, 2012, he was the case agent assigned to the investigation of a homicide and that he reported to the scene of the crime. *Id.* at 23. According to Lt. Matthews, witnesses at the scene identified Wrensford as the shooter and he was apprehended within two miles of the crime scene less than two hours after the incident. *Id.* at 25–27. The vehicle identified at the scene as being involved in the incident was also found within two miles of the location of the homicide. *Id.* at 25, 29. Later, police officers searched the area near where Wrensford was found and discovered a firearm in close proximity. *Id.* at 28–29. Police subsequently analyzed the weapon and determined that the firearm matched the casings at the scene, casings found in the bed of the vehicle, and a bullet recovered from the body of the deceased. *Id.* at 29. According to Lt. Matthews, the police concluded that the firearm was the murder weapon and swabbed it for DNA. *Id.* at 30. Lt. Matthews testified that he was the officer that requested consent from Defendant to obtain his DNA. *Id.* at 31. During this interaction, Lt. Matthews told Wrensford that if he did not consent, Lt. Matthews would obtain a warrant to collect Wrensford's DNA. *Id.* Wrensford consented and Lt. Matthews obtained the buccal swab. *Id.*

Lt. Matthews further testified that, even if Defendant had not been available to consent at the police station on that night, VIPD would have followed the next step in the procedure. Based on the situation presented—that "the gun would still have been recovered . . . [and Defendant] was

4

in close proximity [to the location where the weapon was found]—Lt. Matthews confirmed that "the next step" would have been to obtain a DNA warrant for Defendant. *Id.* at 32–33. According to Lt. Matthews, Defendant would have been located subsequent to obtaining the DNA warrant because Defendant was known to VIPD and Lt. Matthews ascertained where Defendant's "girlfriend had lived, and [Lt. Matthews] went to her house[,] [s]o [Lt. Matthews] kn[e]w [he] could have gotten to know [Defendant's] whereabouts and where he frequents and even his job, if he had one." *Id.* at 35–36.

Capt. Herbert testified that he has worked at VIPD for over twenty-seven years and was assigned to the Investigation Bureau from 2007 to approximately 2016. *Id.* at 52. From approximately 2009 through 2012, he was the supervisor of the homicide division of the Investigation Bureau. *Id.* at 53. Capt. Herbert testified that in 2012, VIPD had a practice in place concerning DNA collection "where you have a murder suspect, and . . . where you have a firearm that has been recovered and you've determined was used in the murder." *Id.* at 54. He further explained that VIPD's policy is to link a suspect in custody to the recovered firearm through asking the suspect for consent to obtain a DNA swab. *Id.* If the suspect did not consent, the policy is to submit an affidavit to court to obtain a DNA warrant. *Id.* In circumstances where the suspect is not in custody, VIPD practice is to obtain a DNA warrant and attempt to locate the suspect. *Id.* According to Capt. Herbert, in order to locate the suspect, VIPD practice is to enter the DNA warrant into the NCIC system and issue a "Be on the lookout" or "BOLO" warning to points of travel. *Id.* at 55–57.

Capt. Herbert also described the method by which he learned the practice regarding obtaining DNA from a suspect. He testified that the practice was in place during his tenure in the Investigation Bureau, including in 2012. *Id.* at 55, 60–61. He learned the practice from his

5

supervisors at VIPD and through independent study and training. *Id.* at 55, 58–62. He noted that when he joined the Investigation Bureau in 2007, Captain Edwards instructed him in the DNA collection protocol, which had been in place prior to his tenure. *Id.* at 61–63. He could not confirm whether the "protocol" was in writing. *Id.* at 55.

### B. The Parties' Supplemental Briefing

Defendant asserts in his supplemental briefing that his DNA was taken in violation of his Fourth Amendment right to be free from illegal searches and seizures. Defendant argues that his DNA was recovered without a warrant, probable cause or reasonable suspicion to justify arrest. (Dkt. No. 389 at 9). He contends that the Government has not met its burden to prove that VIPD would have inevitably obtained his DNA. *Id.* at 10. According to Defendant, the Government did not prove that VIPD had routine procedures in place, "that those procedures were followed, and that the following of those procedures would have inevitably led to the discovery of [Defendant's DNA evidence]." *Id.* at 13. Defendant asserts that the Court should not credit the testimony of Lt. Matthews or Capt. Herbert because it does not demonstrate "a complete picture of VIPD routine procedure in the collection of DNA." *Id.* Defendant states that in addition to the lack of substantive testimony on the part of the witnesses, the Government failed to put forth evidence through "experts, supervisory lay opinion, manuals, procedures, or practice guidance." *Id.* at 15. Defendant also argues that the Court should take into consideration that the Government was unsuccessful in establishing the applicability of the inevitable discovery doctrine for other procedures in unrelated cases. *Id.* at 17–18.

With regards to the specifics of his argument, Defendant contends that the Government has not established that VIPD had probable cause "at the time of taking the buccal swab from Mr. Wrensford." (Dkt. No. 392 at 7). Defendant further argues that VIPD does not have routine

6

procedures regarding when or if they would have applied for a DNA warrant if Defendant had refused to consent to a DNA swab. *Id.* at 5–6. Defendant also maintains that the Government has failed to demonstrate that, even if the Government could prove it was routine to obtain a warrant in similar circumstances, it would have inevitably arrested Defendant. *See* Dkt. No. 389 at 18; Dkt. No. 392 at 4–5. In addition, Defendant asserts that the Government failed to show that, even if VIPD collected DNA from him, VIPD would have compared his DNA to the DNA taken from the murder weapon. (Dkt. No. 392 at 4–5).

According to Defendant, the Court should approach the issue of the inevitable discovery of Defendant's DNA by considering "the historical fact that VIPD was under a consent decree in 2012." (Dkt. No. 389 at 19). Defendant argues that VIPD cannot have routine procedures because the U.S. Department of Justice entered into a stipulated consent decree with VIPD "to provide training, develop policy and proper police practices related to the use of force, and develop protocol related to citizen complaints." *Id.* at 20. Because VIPD was not in compliance with the consent decree in 2012, Defendant asserts that VIPD "is incapable of ready verification of routine procedures as related to the collection of DNA." *Id.* at 21.

In its supplemental briefing, the Government argues that, "based on historic facts of what would have happened if the unlawful de facto arrest of Wrensford did not occur," the Government has demonstrated that VIPD would have inevitably discovered Defendant's DNA through routine practices in place at the time. (Dkt. No. 390 at 12). The Government asserts that Lt. Matthews and Capt. Herbert's testimony meets the Government's burden to prove that, at the relevant time in 2012, VIPD had routine procedures in place regarding the collection of DNA in circumstances where: "1) there is a murder suspect and 2) the firearm used in the murder was recovered." According to the Government, the testimony was consistent that the practice, while not in writing,

7

had been in place for at least 15 years prior to Defendant's de facto arrest. *Id.* Further, the Government contends, VIPD would have followed their routine practice regarding DNA collection and obtained a warrant for Defendant's DNA because Defendant was VIPD's "prime murder suspect." *Id.* at 13. The Government argues that because there was "ample probable cause" to obtain a warrant for Defendant's DNA sample,[2] as the Court previously found, *id.* at 15–16 (citing the August 15 Opinion), the Court can also conclude by a preponderance of the evidence that VIPD would have obtained such a warrant and "located, and executed the DNA warrant on, Wrensford," pursuant to VIPD procedure, *id.* at 16.

The Government further asserts that Defendant has failed to show that the evidence the Government presented at the reopened suppression hearing was insufficient. (Dkt. No. 393). The Government argues that the Court should rely on "the uncontradicted sworn testimony of two veteran officers of the VIPD." *Id*. at 2. The Government contends that Defendant's reliance on cases where the Court has found that the Government failed to establish the existence of other VIPD policies is irrelevant to the Court's analysis of whether VIPD has established the existence of routine DNA collection procedures in this case. *Id.* at 2–3. Further, the Government contests Defendant's assertion that it must prove that his arrest was inevitable. *Id.* at 3. According to the Government, the Court may find in the Government's favor if it finds that "it is more likely than not that the police would have located Wrensford and extracted a DNA sample absent his arrest."

---

[2] In this regard, the Government cited to the following evidence: "1. Wrensford's name was called as one of the perpetrator[]s of the murder from even before his apprehension; 2. Wrensford was apprehended some 7 feet from the murder weapon; 3. Wrensford matched the description of one of the individual[s] who ran from [O]fficer Mendez shortly before his apprehension; 4. The two individuals that ran from Mendez were sweating profusely; 5. Wrensford's truck was recovered in Princess, where witness[es] stated the red getaway truck traveled, and contained spent casings that matched the recovered firearm based on firearm analysis; and 6. The recovered firearm matched shell casings recovered from the crime scene based on firearm analysis." (Dkt. No. 390 at 14–15).

*Id.* Finally, the Government asserts that it is immaterial to the instant case whether VIPD has complied with a consent decree that has no bearing on VIPD's DNA collection procedures. *Id.* at 3–4.

## II. APPLICABLE LEGAL PRINCIPLES

In *United States v. Mitchell*, 652 F.3d 387 (3d Cir. 2011), the Third Circuit ruled that "[t]he collection of a DNA sample constitutes an invasion of privacy that is subject to the strictures of the Fourth Amendment." *Id*. at 406. The Supreme Court held, in particular, that "a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search." *Maryland v. King*, 133 S. Ct. 1958, 1968–69 (2013).

Ordinarily, evidence obtained as the result of a Fourth Amendment violation is suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). The exclusionary rule is "needed to deter police from violations of constitutional and statutory protections." *Nix v. Williams*, 467 U.S. 431, 442–43 (1984). The inevitable discovery doctrine is an exception to the exclusionary rule. Under this doctrine, unlawfully obtained evidence need not be excluded from trial where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means[.]" *Id.* at 444. The inevitable discovery doctrine provides a balance between "the public interest in providing a jury with all relevant and probative evidence in a criminal proceeding" and "society's interest in deterring unlawful police conduct." *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) (citing *Nix*, 467 U.S. at 443).

The inevitable discovery doctrine is generally applied where the police have illegally seized physical evidence. The government must demonstrate that its officers would have uncovered the evidence through a lawful routine search under similar circumstances. *Id.* To

establish that evidence would have been discovered by lawful means, the government must show, by a preponderance of the evidence, "that the police, following routine procedures, would inevitably have uncovered the" illegally obtained evidence, by demonstrating "what would have happened had the unlawful search never occurred." *Id.* (citations omitted). To determine whether the prosecution has met this burden, courts must analyze "historical facts capable of ready verification, not speculation." *Id.* "Thus, when the government proves that its officers conduct a routine search in similar circumstances, a court is likely to adopt the government's argument that the evidence would have been discovered in the course of that search." *Id.* Under the inevitable discovery doctrine, "'if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received.'" *Vasquez de Reyes*, 149 F.3d at 195 (quoting *Nix*, 467 U.S. at 444).

The Government meets its burden to show that evidence would have been acquired by lawful means by establishing a record that "support[s] a finding that the police had relevant procedures in place, that those procedures would have been followed, and that [they] would have inevitably led to the discovery of the evidence in question." *United States v. Carrion-Soto*, 493 F. App'x 340, 342 (3d Cir. 2012) (citing *Vasquez de Reyes*, 149 F.3d at 195). The Government may create such a record through "written rules and regulations or testimony regarding standard practice." *United States v. Matthews*, 532 F. App'x 211, 219 (3d Cir. 2013) (addressing proof of standardized inventory search as basis for inevitable discovery). The Court may rely on the testimony of law enforcement officers to determine whether procedures are routine. *See, e.g., id.* at 225; *United States v. Cors*, 120 F. App'x 170, 171 (9th Cir. 2005) (applying inevitable discovery doctrine based on officer testimony); *United States v. Pardue*, 385 F.3d 101, 107 (1st Cir. 2004)

(same); *United States v. McMillan*, 227 F. Supp. 3d 432, 443 (W.D. Pa. 2017) (finding uncontradicted officer testimony at a suppression hearing sufficient to apply inevitable discovery doctrine); *United States v. Fautz*, 812 F. Supp. 2d 570, 649 (D.N.J. 2011) (officer testimony regarding the scope and execution of search warrants); *United States v. Miles*, No. CRIM. 10-279-2, 2010 WL 2991737, at *3–4 (E.D. Pa. July 29, 2010) (officer testimony regarding routine procedures of a search). The Court may not "speculate about any such procedures unless the facts are so clear as to justify taking judicial notice of them." *Carrion-Soto*, 493 F. App'x at 343.

### III.  DISCUSSION

This Court concluded in its August 15 Opinion, and reiterates here, that the evidence on the record prior to the reopened suppression hearing provided probable cause for the issuance of a warrant for Wrensford's DNA sample. (Dkt. No. 370 at 15).[3] In this regard the Court stated:

> On the facts here, probable cause justifying a request for a warrant to obtain Wrensford's DNA sample would have arisen on the basis of evidence recovered independently of his illegal arrest as of the time the firearm analysis was completed. By that time, the lawfully-collected evidence suggesting that Wrensford was involved in Hendricks' murder included: (1) Officer Mendez's discovery of two individuals walking in the road and sweating profusely approximately 45 minutes after the shooting at Ben's Car Wash; (2) the subsequent flight of the two individuals when Officer Mendez approached; (3) Officer Cruz's discovery of Wrensford—who matched the description of one of the individuals that had fled from Officer Mendez—hiding in the bushes shortly thereafter; (3) the discovery of the firearm in close proximity to where Officer Cruz encountered Wrensford; (4) the discovery of a red truck matching the description of the truck involved in the shooting; (6) the discovery of shells at the crime scene and in the bed of the red truck, and the post-mortem recovery of a bullet from Hendricks' head; and (7) the forensic analysis indicating that the firearm discovered in close proximity to Wrensford was the weapon used to murder Hendricks. This evidence is sufficient to establish a fair probability that Wrensford's genetic material would be linked to evidence of Hendricks' murder—specifically, the firearm discovered in close proximity to where Officer Cruz encountered Wrensford. In other words, the

---

[3] As noted earlier, the Government also pointed in its supplemental memorandum to evidence that bore on the issue of probable cause. *See supra*, note 2.

11

evidence provides probable cause for the issuance of a warrant for Wrensford's DNA sample.

*Id.* at 14–15

The Court also found that the inevitable discovery doctrine is potentially applicable to the collection of Defendant's DNA sample, but that there was insufficient evidence on the then-existing record for the Government to carry its burden of establishing the applicability of that doctrine under the circumstances here. *Id.* at 19–20. Accordingly, the sole issue to be decided from the evidence presented in the reopened suppression hearing is whether the Government has demonstrated by a preponderance of the evidence that the police would inevitably have obtained Defendant's DNA sample, pursuant to routine VIPD procedures that would have been followed. *Id.* at 29.[4]

In order for the inevitable discovery doctrine to apply, the Court must find that there is a record that "support[s] a finding [1] that the police had relevant procedures in place, [2] that those procedures would have been followed, and [3] that [they] would have inevitably led to the discovery of the evidence in question." *Carrion-Soto*, 493 F. App'x at 342 (citing *Vasquez de Reyes*, 149 F.3d at 195). The Government must provide historical facts to do so. *See Vasquez de Reyes*, 149 F.3d at 195. The Court concludes that the Government has met its burden under the circumstances here.

First, the Government has established by a preponderance of the evidence that there is a routine VIPD procedure to collect DNA from murder suspects in circumstances where a murder weapon has been recovered. Both Government witnesses testified to the same procedure: where

---

[4] Defendant's challenge to the Government's evidence on the ground that it fails to show that Defendant would inevitably have been arrested or that VIPD would inevitably have compared Defendant's DNA with the DNA taken from the murder weapon is therefore misguided.

there is a murder suspect and the police recovers the firearm used in the murder, VIPD would take steps to compare DNA from the suspect and the firearm. (Hr'g Tr. 31, 54).

Based on the evidence presented, the VIPD practice to obtain DNA from the suspect is to obtain consent from the suspect or obtain a warrant. *Id.* at 31–33.[5] Where the suspect is not in custody and thus cannot give consent, or she or he refuses to consent, it is VIPD practice to obtain a DNA warrant for that individual. *Id.* at 32–33.[6] Once the DNA warrant has been obtained, the routine procedure is then to post the warrant so that VIPD officers and other law enforcement may search for the suspect. *See generally id.* at 34–36, 55–57. Specifically, VIPD will enter the DNA warrant into the NCIC so that all law enforcement is aware of the warrant. *Id.* at 34, 56. VIPD also distributes the warrant to their VIPD zones to post with a picture of the suspect such that "if anyone traffic stops or anybody sees [the suspect, they will] call [the investigating officer] or call the [Investigations] Bureau to come get him to get DNA." *Id.* at 34–35. Once VIPD officers serve the DNA warrant on a suspect, they collect DNA from the suspect and submit it for comparison with the DNA recovered from the firearm used in the murder. *Id.* at 38.[7] Both witnesses testified that they learned the practice from their superiors, and that this is how VIPD officers continue to learn

---

[5] While Defendant challenged the witnesses' use of the term "practice" as somehow insufficient to establish a routine procedure, in the context used by the witnesses the Court dismisses Defendant's challenge as mere semantics, and uses the terms interchangeably herein. *See* Hr'g Tr. 95–100.

[6] In its August 15 Opinion, the Court stated "Although Wrensford consented to the collection of a DNA sample following his illegal arrest, any claim that he would have similarly consented to the collection of his DNA following a hypothetical lawful arrest at a later point falls into the realm of unacceptable assumption and speculation in the inevitable discovery analysis. . . . Accordingly, if the inevitable discovery doctrine may potentially apply in this case, it must be based on a showing that VIPD officers would inevitably have collected Wrensford's DNA by securing a warrant for his DNA sample." (Dkt. No 370 at 14).

[7] The VIPD forensics team obtains the DNA from the firearm and provides a report to VIPD investigating officers. (Hr'g Tr. 40–43, 49–51).

the procedure. *Id.* at 39–41, 61–63.[8] The Court finds the VIPD witnesses to be credible and their testimony uncontradicted. Accordingly, the Court concludes that VIPD has a routine procedure to obtain and execute a DNA warrant in circumstances where there is a murder suspect and a murder weapon.

Second, Lt. Matthew's testimony supports the conclusion that VIPD would have followed the above routine practice in the instant case. Lt. Matthews, the case agent, testified that he led the murder investigation in 2012. *Id.* at 23. According to Lt. Matthews, Defendant was a suspect because a witness at the crime scene identified him by name and the firearm used in the murder was found in close proximity to where he was apprehended. *Id.* at 23–27. Lt. Matthews further testified that the forensics team obtained DNA from the firearm and that he obtained the DNA sample from Defendant for the purpose of comparison. *Id.* at 28–31. Lt. Matthews also testified that, while he obtained consent from Defendant to obtain his DNA, it was Lt. Matthews' intention to obtain a warrant for Defendant's DNA if Defendant had refused. *Id.* at 31–32.[9] The Court has already determined there was probable cause to obtain such a warrant. (Dkt. No. 370 at 15).

Regarding the third prong of the *Carrion-Soto* analysis, the evidence establishes that the procedures would have inevitably led to the collection of the DNA evidence. Based on the uncontradicted testimony, if there is a murder suspect and the recovery of a firearm used in the murder—as was the case here—steps are taken that are specifically designed to locate the suspect

---

[8] Capt. Herbert also testified that he learned the practice from his individual study of books and from trainings regarding evidence collection and criminal investigations. *See* Hr'g Tr. 58–61.

[9] At the initial suppression hearing, Lt. Matthews testified that he told Wrensford on the night of his arrest that if Wrensford did not consent to the collection of the DNA sample, Matthews would get the DNA sample by securing a warrant. (Dkt. No. 390 at 19). While this alone was insufficient to establish the applicability of the inevitable discovery doctrine, it provides support for that conclusion in light of the additional testimonial evidence described herein.

and obtain DNA evidence by consent or warrant. Based on the evidence, once the warrant was obtained (based on the probable cause that the Court previously found to have existed (Dkt. No. 370 at 15)), VIPD would have put the warrant into NCIC and posted BOLO notices to ensure Defendant would be located if he was found at an airport or otherwise encountered by law enforcement. Lt. Matthews stated that he was confident that VIPD would have located Defendant because Defendant's identity was known and Lt. Matthews knew Defendant's girlfriend's residence. (Hr'g Tr. 36). After he had found the suspect, he would have executed the DNA warrant and obtained the DNA evidence. *Id.* at 47–48. Thus, the Court concludes that, by following the VIPD procedures, the DNA evidence would inevitably have been collected.

Defendant contends that the Court should not rely on the testimony presented at the reopened suppression hearing because the Government's witnesses' testimony is unreliable and contradictory, and thus the Government has failed to meet its burden. Defendant points to a lack of written policy regarding the routine procedures of VIPD regarding DNA collection. (Dkt. Nos. 389 at 14, 392 at 2). According to Defendant, the witnesses did not testify "as to anything more than bald assertions and limitless scope of DNA collection." (Dkt. No. 389 at 15–16). Defendant also argues that the Court should consider that VIPD is unreliable because VIPD was under a consent decree since 2008 and, in 2012, was found to be out of compliance. *Id.* at 20–23. The Government counters that the witnesses gave consistent testimonies and Defendant provided no contradictory evidence that would call into question the Court's reliance on the sworn testimony. (Dkt. No. 393 at 2).

The Court does not find Defendant's argument regarding the sufficiency or reliability of the testimony of the two VIPD officers persuasive. First, Defendant provides no authority for the proposition that a policy must be in writing in order to establish that a routine practice exists for

15

the purpose of assessing whether evidence will be inevitably discovered. To the contrary, the Court may rely on officer testimony regarding routine procedures as the basis for the applicability of the inevitable discovery doctrine. *See, e.g.*, *Matthews*, 532 Fed. App'x 211, 219; *Cors*, 120 F. App'x at 171; *Pardue*, 385 F.3d at 107. Additionally, while Defendant claims that the testimonies of the two officers are contradictory,[10] there is a clear record that Capt. Herbert and Lt. Matthews both learned the DNA collection practice from their superiors at the Investigation Bureau, Hr'g Tr. 38–41, 61–63, and that this practice was established since at least 1997 when Lt. Matthew's entered the Investigations Bureau. *Id.* at 39, 22.

Further, Defendant's reference to the consent decree and other cases is not relevant to the issue of DNA collection. *See id.* at 103–06. There is no basis for concluding that VIPD's failure to comply with a consent decree regarding use of excessive force, or its failure to establish routine procedures in a different context, indicates that VIPD has not established a routine procedure regarding DNA collection in this case. Defendant's arguments are inapt in this context.[11]

---

[10] Defendant claims that the Government "failed to give this court any reason to credit the testimony of" the witnesses, and describes—without citations—portions of the testimony that purport to render the witnesses unreliable. (Dkt. No. 398 at 14–15). Defendant fails to explain how the referenced testimony bears adversely on the witnesses' credibility and the Court can discern no basis of such a conclusion. To the contrary, the Court finds the testimony of both Lt. Matthews and Capt. Herbert to be credible and a reliable basis upon which to draw the conclusion that the DNA collection practice was a routine VIPD practice in 2012.

[11] Defendant also argues that the Government fails to establish that DNA collection is routine in VIPD booking procedures. (Dkt. No. 389 at 7–9). According to Defendant, the Virgin Islands DNA statute, 5 V.I.C. Section 4201 et seq., does not provide for the collection of DNA in the case of Defendant, who was not a designated defender and thus, VIPD would not have been able to collect DNA from Defendant as an arrestee, pursuant to routine booking procedures. (Dkt. No. 389 at 6–9). The Government counters that this statute is "totally irrelevant, to the question before the Court because Wrensford would have been a suspect, not an arrestee, in the inevitable discovery analysis before the Court. (Dkt. No. 393 at 1). Because the sole question remaining in determining whether Defendant's DNA sample should be suppressed is whether VIPD inevitably would have sought and executed a DNA warrant for Wrensford, pursuant to the probable cause the Court has already determined existed, the Court finds that it is not necessary for the Government to prove that Defendant would have been arrested or that his DNA would have been collected pursuant to

In short, the Government has established the existence of a routine practice of DNA collection in circumstances—as here—where there is a murder suspect and the recovery of a firearm used in the murder. Thus, the Court finds that the inevitable discovery doctrine applies to the collection of Defendant's DNA sample.

## CONCLUSION

In view of the foregoing, the Court concludes that the Government has shown by a preponderance of the evidence that VIPD: (1) had a routine procedure to seek a DNA warrant for an identified murder suspect where there was a recovered firearm; (2) would have followed its routine practice in this case; and (3) would have collected DNA from Defendant. *See Carrion-Soto*, 493 F. App'x at 342 (citing *Vasquez de Reyes*, 149 F.3d at 195). Accordingly, the Court finds that Wrensford's DNA sample was admissible at trial pursuant to the inevitable discovery doctrine. Based on this finding, the Court will reinstate Wrensford's conviction on the charge of possession of a firearm with an obliterated serial number (Count 3).

An appropriate Order accompanies this Memorandum Opinion.

Date: December 22, 2019　　　　　　　　　　　　　_____/s/_____
　　　　　　　　　　　　　　　　　　　　　　　WILMA A. LEWIS
　　　　　　　　　　　　　　　　　　　　　　　Chief Judge

---

that arrest. Therefore, the Court agrees that the DNA statute is irrelevant to this analysis, and further, that the Government need not establish that Defendant would inevitably have been arrested for purposes of the issue before the Court.