## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | **Criminal Action No. 2013-0003** |
| **v.** | ) | |
| | ) | |
| **ELVIN WRENSFORD, et. al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**Attorneys:**
**Evan Rikhye, Esq.,**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
        *For the Government*

**Robert Millan, Esq.,**
San Juan, Puerto Rico
        *For Defendant Elvin Wrensford*

### MEMORANDUM OPINION

**Lewis, District Judge**

THIS MATTER comes before the Court on Defendant Elvin Wrensford's Second Motion to Suppress (Dkt. No. 425) and the Government's Response thereto (Dkt. No. 441). For the reasons that follow, the Court will deny the Motion.

### I.        BACKGROUND

On January 29, 2013, the Government indicted Defendant Elvin Wrensford ("Defendant" or "Wrensford") on five charges, including First Degree Murder and various firearm charges, based on his alleged involvement in the shooting death of Gilbert Hendricks that occurred in Christiansted on May 10, 2012.[1] Following this Court's denial in part of Defendant's First Motion

---

[1] Specifically, Defendant was charged with: Possession of a Firearm in a School Zone in violation of 18 U.S.C. §§ 922(q)(2)(A) and 924(a)(1)(B) (Count 1); Using a Firearm During a Violent Crime

to Suppress and a twelve-day trial, a jury found Defendant guilty on all five counts on March 25, 2015. Defendant appealed his convictions, based in part on this Court's partial denial of his First Motion to Suppress. The Third Circuit vacated Defendant's convictions based on that partial denial and remanded for additional fact-finding. Defendant has now moved to suppress the firearm with which he is alleged to have murdered Hendricks, and which also forms the factual predicate for the firearm charges that remain pending.[2] (Dkt. No. 425). The Government opposes. (Dkt. No. 441).

The Court assumes the parties' familiarity with the facts and procedural history, which have been detailed at length in the Court's prior memorandum opinions in this matter, as well as by the Third Circuit. *See United States v. Wrensford* ("*Wrensford I*"), No. CR 2013-0003, 2014 WL 3907021 (D.V.I. Aug. 11, 2014) (granting in part and denying in part Defendant's First Motion to Suppress), *vacated sub nom. United States v. Wrensford* ("*Wrensford II*"), 866 F.3d 76 (3d Cir. 2017) (reversing in part this Court's partial denial of Defendant's First Motion to Suppress and vacating Defendant's convictions); *United States v. Wrensford* ("*Wrensford III*"), No. CR 2013-0003, 2019 WL 3842860 (D.V.I. Aug. 15, 2019) (reopening evidentiary hearing on Defendant's First Motion to Suppress, granting that motion in part, and finding that Defendant is entitled to retrial on four of five charges, including charge of First Degree Murder); *United States v. Wrensford* ("*Wrensford IV*"), No. CR 2013-0003, 2019 WL 7134416 (D.V.I. Dec. 22, 2019)

---

[2] in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) (Count 2); Possession of a Firearm with an Obliterated Serial Number in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B) (Count 3); Murder in the First Degree in violation of 14 V.I.C. § 922(a)(1) and 923(a) (Count 4); and Unauthorized Possession of a Firearm in violation of 14 V.I.C. § 2253(a) (Count 5). (Dkt. No. 1). Wrensford's co-defendant, Craig Muller, was also indicted on all counts except Count 3. *Id.*

[2] Following remand, this Court reinstated Defendant's conviction on one of the four firearm charges, Possession of a Firearm with an Obliterated Serial Number. *United States v. Wrensford*, No. CR 2013-0003, 2019 WL 7134416, at *8 (D.V.I. Dec. 22, 2019).

(denying Defendant's First Motion to Suppress in part and reinstating Defendant's conviction on Count 3, Possession of a Firearm with an Obliterated Serial Number). The Court will therefore provide only a brief overview of the facts and history relevant to its resolution of the instant motion.

### A. Factual Background

On the night of May 10, 2012, Gilbert Hendricks was shot to death near a car wash on St. Croix after being chased by two men in a truck. The alleged assailants were later identified as Craig Muller, the driver, and Elvin Wrensford, the passenger and shooter. *Wrensford I*, 2014 WL 3907021, at *6. Officers, including Officer Julio Mendez, responded to the scene of the shooting within minutes. *Id.* at *2. Officer Mendez then drove off in pursuit of the red truck in which the assailants were allegedly driving, and he encountered two men sometime later. *Id.* at *2-*3. Following a brief encounter, the two men fled, and Officer Mendez radioed a general description of the men to other officers. *Id.*

Officer Leon Cruz was patrolling nearby and heard Officer Mendez's description of the two men. *Id.* at *3. A few minutes later, Officer Cruz observed a man standing next to a bush— later identified as Wrensford—who matched Officer Mendez's general description. *Id.* Officer Cruz then ordered Wrensford to show him his hands and Wrensford did not immediately comply, leading Officer Cruz to draw his firearm and repeat the order. *Id.* After Wrensford complied, Officer Cruz handcuffed him and removed a knife, keys, a wallet, and an insurance card from Wrensford's pockets. *Id.* After removing these items, Officer Cruz frisked Wrensford, and Wrensford was then transported to a police station, where officers subsequently obtained a statement from Wrensford, his license and a DNA sample. *Id.* at *4-*6. Two witnesses also identified Wrensford as the shooter. *Id.* at *6.

Around the same time that Wrensford was transported to the police station, Officer Mendez separately located a red truck. *Id.* at *3. Officer Mendez radioed the location of the truck, and Officer Cruz—who was still at the site where he had encountered Wrensford—responded to the location, where he observed spent rounds and casings in the rear of the truck. *Id.* at *4. Officer Cruz and four other officers then returned to the site where Officer Cruz had encountered Wrensford to see if they could locate a firearm. *Id.* They discovered one very close to where Wrensford had been standing at the beginning of his interaction with Officer Cruz. *Id.*

### B. Procedural History

*Wrensford I*. Notwithstanding that Defendant did not move to suppress the firearm in his First Motion to Suppress, the Court's memorandum opinion in response thereto contains four holdings that bear on the instant motion. First, the Court held that Officer Mendez's seizure of Defendant—a *Terry* stop—was precipitated by reasonable suspicion and was therefore lawful. *Wrensford I*, 2014 WL 3907021, at *8. Second, the Court held that Officer Cruz's seizure of Defendant—also a *Terry* stop—was likewise precipitated by reasonable suspicion and was therefore lawful. *Id.* at *9. Third, the Court held that Officer Cruz's subsequent search of Defendant—in which he recovered the knife, keys, wallet, and insurance card—was unlawful insofar as it exceeded the permissible scope of a protective pat-down after Officer Cruz recovered the knife, but before he recovered the other items. *Id.* at *9-*10. Based on that conclusion and other relevant considerations, the Court suppressed the keys, wallet, and insurance card, but did not suppress the knife. *Id.* at *11. Fourth, the Court held that the officers did not unlawfully arrest Defendant when they transported Defendant from the scene of his encounter with Officer Cruz to the police station and placed him in a cell because the officers' actions did not constitute a *de facto* arrest for which probable cause is necessary. *Id.* at *11-*15. Based on that conclusion and other

4

relevant considerations, the Court did not suppress Defendant's statement to police, his license and DNA sample, and the two witness identifications. *Id.* at *15-*22.

*Wrensford II*. The Third Circuit reversed this Court's fourth holding in *Wrensford I*. *Wrensford II*, 866 F.3d at 80. Specifically, the Third Circuit held that "the involuntary transportation [of Defendant] to the police station and [his] placement in a custodial setting thereafter constituted a *de facto* arrest" for which probable cause—which the officers did not have at the time—is necessary. *Id.* at 87; *see also id.* (declining to address "at exactly which point along the timeline [] [Defendant] was *de facto* arrested" because "it is clear that he was subjected to a *de facto* arrest once he was put in a cell"). Based on that conclusion and this Court's admission of the post-*de facto* arrest evidence at trial—namely, Defendant's statement to police, the two witness identifications, and Defendant's DNA sample and testimony about his license—the Third Circuit vacated Defendant's convictions and remanded for additional fact-finding as to the admissibility of that evidence.[3] *Id.* at 93. The Third Circuit affirmed in all other respects. *Id.*

*Wrensford III and IV*. Following the Third Circuit's vacatur and remand, this Court held that Defendant was entitled to a retrial on the murder charge and three of the four firearm charges, and reinstated Defendant's conviction on one firearm charge. *Wrensford III*, 2019 WL 3842860, at *15-*17 (finding retrial warranted on murder charge and three of four firearm charges); *Wrensford IV*, 2019 WL 7134416, at *1 (reinstating Defendant's conviction on one firearm charge). In so finding, the Court determined that the two witness identifications, Defendant's

---

[3] Because this Court had found that the officers' transportation and detention of Defendant was lawful, it had declined to address whether the evidence that police officers subsequently obtained—the two witness identifications, Defendant's statement to police, and Defendant's license and DNA sample—was subject to an exception to the exclusionary rule. *Wrensford I*, 2014 WL 3907021, at *22. As such, the Third Circuit remanded for additional factfinding on "whether the evidence gathered after the *de facto* arrest is subject to such an exception and hence is admissible." *Wrensford II*, 866 F.3d at 88.

5

statement to police, and Defendant's license were the fruit of his unlawful arrest and must be suppressed. *Wrensford III*, 2019 WL 3842860, at *5, *5 n.7. Conversely, the Court determined that Defendant's DNA sample was admissible under the inevitable discovery doctrine. *Wrensford IV*, 2019 WL 7134416, at *8. Under the circumstances here, neither *Wrensford III* or *Wrensford IV* has any particular bearing on the Court's resolution of the instant Second Motion to Suppress, except for the fact that four charges now remain against Defendant.[4]

### C.  The Second Motion to Suppress

In the instant motion—his Second Motion to Suppress—Defendant moves to suppress the firearm recovered by Officer Cruz and his colleagues, arguing that the firearm is the fruit of his unlawful arrest. (Dkt. No. 425 at 8-10). The Government opposes, contending that the firearm is not the fruit of the officers' unlawful conduct, and, further, that Defendant lacks standing to challenge the firearm's inclusion in evidence. (Dkt. No. 441 at 7-11). Neither party has requested

---

[4] It is worthy of note, however, that Defendant's instant Motion was filed in April 2020—more than four months after the Court's *Wrensford IV* Opinion in December 2019. As the Court noted in its *Wrensford III* Opinion—which set the stage for its *Wrensford IV* Opinion, in which it deemed Defendant's DNA sample admissible under the doctrine of inevitable discovery—Defendant did not argue at that time that the officers' "discovery of the firearm was the product of [Defendant's] illegal arrest." *Wrensford III*, 2019 WL 3842860, at *7 n.8 (noting the Court "need not consider whether the firearm would have been discovered in the absence of the [unlawful] arrest" and "may [] consider the fact of the firearm's discovery for purposes of determining whether law enforcement would have inevitably obtained [Defendant's] DNA sample."). *Id.* Accordingly, the Court factored in the officers' discovery of the firearm when it concluded that Defendant's DNA was admissible. *See Wrensford IV,* 2019 WL 7134416, at *8 (concluding that the officers' recovery of Defendant's DNA was inevitable because the Virgin Islands Police Department "had a routine procedure to seek a DNA warrant for an identified murder suspect *where there was a recovered firearm*" (emphasis added)). Even if the Court were to conclude, in addressing the instant Motion, that the firearm is the suppressible fruit of Defendant's unlawful arrest, such a ruling could not retroactively affect the Court's *Wrensford IV* holding because arguments that are not raised contemporaneously are waived. *See Seifert v. Pennsylvania Hum. Rels. Comm'n*, 301 F. App'x 194, 196-97 (3d Cir. 2008). In any event, as discussed below, the Court concludes, *inter alia*, that the firearm is *not* the fruit of Defendant's unlawful arrest.

a hearing on the instant motion, and the Court finds that no such hearing is necessary because the existing record is sufficient.[5]

## II.     APPLICABLE LEGAL PRINCIPLES

### A.   The Exclusionary Rule

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. A police officer who stops, searches, or arrests someone without the proper justification violates that constitutional protection. To remedy such violations, the Supreme Court adopted the exclusionary rule, under which evidence may be "suppressed" at trial. *Weeks v. United States*, 232 U.S. 383, 292 (1914); *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

The exclusionary rule "encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (cleaned up). However, not every Fourth Amendment violation triggers the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 906 (1984) ("Whether the exclusionary sanction is appropriately imposed in a particular case is . . . 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" (quoting *Illinois v. Gates*, 462 U.S. 213, 223 (1983))). As a preliminary matter, in order for the exclusionary rule to apply, the constitutional violation must be the "but-for cause" of the discovery of evidence. *Segura v. United States*, 468 U.S. 796, 815 (1984) ("[O]ur cases make clear that evidence will not be excluded . . . unless the illegality is at least the 'but for' cause of the discovery of the evidence."). In other words, "[s]uppression of evidence as 'fruit of the poisonous tree' is

---

[5] Three hearings were held on Defendant's First Motion to Suppress: on January 17, 2014 (Dkt. No. 106); June 26, 2014 (Dkt. No. 194); and September 17, 2019 (Dkt. No. 388).

only justified if 'the challenged evidence is in some sense the product of illegal governmental activity.'" *United States v. Miller*, 267 F. App'x 152, 154 (3d Cir. 2008) (quoting *Segura*, 468 U.S. at 815 (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980))); *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (observing that the relevant question is whether, "granting establishment of the primary illegality, the [challenged evidence] has been come at by exploitation of that illegality[.]").[6]

Moreover, "but-for causality is only a necessary, not a sufficient, condition for suppression." *Hudson v. Michigan*, 547 U. S. 586, 592 (2006). Even a "but-for cause . . . can be too attenuated to justify exclusion." *Id.* (citing *United States v. Ceccolini*, 435 U.S. 268, 274-75 (1978)). Accordingly, even where illegal conduct led to the discovery of evidence, suppression of that evidence is not warranted where the causal connection between the illegal conduct and evidence has "become so attenuated as to dissipate the taint" from the illegal conduct. *Nardone v. United States*, 308 U.S. 338, 341 (1939); *cf. New York v. Harris*, 495 U.S. 14, 19 (1990) ("[T]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality.") In making this determination, the "temporal proximity" between the illegal conduct and the discovery of the evidence, the "presence of intervening circumstances," and "the purpose and flagrancy" of the illegal conduct are all relevant considerations. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975) (the "*Brown* factors").

---

[6] The doctrines of inevitable discovery and independent source embody the recognition that illegal government activity does not serve as a but-for cause of the discovery of derivative evidence where that evidence was obtained—or could have been obtained—despite the illegal activity. *See Murray v. United States*, 487 U.S. 533, 535 (1988) (independent source doctrine); *Nix v. Williams*, 467 U.S. 431, 443-44 (1984) (inevitable discovery doctrine).

### B.  Standing

"A defendant must have standing to invoke the Fourth Amendment's exclusionary rule." *United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011). For a defendant to have standing to challenge the validity of a search or seizure of property, he must personally have a "reasonable expectation of privacy" in that property.  *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010). A defendant lacks such an expectation of privacy in property that he has voluntarily abandoned. *United States v. Fulani,* 368 F.3d 351, 354 (3d Cir. 2004). As such, he lacks standing to challenge an unlawful search or seizure of the same. *Abel v. United States*, 362 U.S. 217, 241 (1960). Conversely, a defendant retains a reasonable expectation of privacy in property that he has *involuntarily* abandoned. *United States v. Merritt*, 293 F.2d 742, 745-46 (3d Cir. 1961). He therefore maintains standing to challenge the validity of a search or seizure of such property. *Id.*

Ultimately, the voluntariness of a defendant's abandonment of property "is largely a question of intent," which, "in turn, is a question of fact." *United States v. Minker*, 312 F.2d 632, 634-35 (3d Cir. 1962) (citations omitted). "A court must determine from an objective viewpoint whether property has been [voluntarily] abandoned," *Fulani,* 368 F.3d at 354, and proof of a defendant's intent to abandon property must be established by "clear and unequivocal" evidence, which "may be inferred from words spoken, acts done, and other objective facts," *United States v. Thomas*, 423 F. App'x 199, 204 (3d Cir. 2011) (internal quotations and citations omitted).

Under the doctrine of "forced abandonment," abandonment "may be involuntary, and thus invalid, when it results directly from police misconduct, such as an illegal search or seizure, deceit, or, perhaps, a pattern of harassment." *United States v. Moody*, 485 F.2d 531, 534 (3d Cir. 1973); *see also United States v. Coggins*, 986 F.2d 651, 653 (3d Cir. 1993) ("[W]hen the abandonment of property is precipitated by an unlawful seizure, that property also must be excluded."). Conversely,

as the Supreme Court explained in *California v. Hodari D.*, the Fourth Amendment is not implicated when a defendant abandons property prior to his unlawful seizure. 499 U.S. 621, 629 (1991); *see also United States v. Rivera*, 441 F. App'x 87, 90 (3d Cir. 2011) (finding the defendant voluntarily abandoned backpack where he discarded it prior to his seizure).

## III.   DISCUSSION

There are two questions before the Court. The first is whether Defendant voluntarily abandoned the firearm so as to relinquish his standing to challenge its inclusion in evidence. *Fulani,* 368 F.3d at 354. The second is whether the firearm is the fruit of Defendant's unlawful arrest so as to potentially warrant its suppression. *Segura*, 268 U.S. at 804.

Here, Defendant's abandonment of the firearm indisputably preceded not only his unlawful *de facto* arrest but also his lawful seizure. Under these circumstances, the Court finds that there is clear and unequivocal evidence that Defendant voluntarily abandoned the firearm and therefore lacks standing to challenge its inclusion in evidence. The Court further finds that even if Defendant had standing to bring this challenge—which he does not—the facts here compel the conclusion that the firearm is not the fruit of Defendant's unlawful *de facto* arrest, and thus Defendant's challenge fails on the merits.

### A. Standing

Based on the testimony received at the first suppression hearing in this matter, Officer Cruz's interaction with Defendant began as follows. Initially, while driving his vehicle, Officer Cruz spotted Defendant "really close" to a bush with his back to Officer Cruz. (Dkt. No. 194 (Cruz. Tr.) at 41:7-8, 43:23-44:1). At this time, Officer Cruz could not see Defendant's hands, and he ordered Defendant to show him his hands. *Id.* at 42:2-3, 47:10-12. Defendant did not immediately comply and appeared "hesitant" to show his hands. *Id.* at 41:17-18, 45:6-7, 124:2-7. Officer Cruz

then drew his firearm and again ordered Defendant to show his hands, at which point Defendant turned around in a "slow, deliberate manner" and showed Officer Cruz his hands. *Id.* at 45:14-21, 126:10-15. It is at this point—when Defendant complied with Officer Cruz's command—that Defendant was first seized by Officer Cruz within the meaning of the Fourth Amendment. *Torres v. Madrid*, 141 S. Ct. 989, 999 (2021) ("A seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement.").

It is clear that Defendant was not in possession of the firearm at the time he was seized by Officer Cruz. At no time during his interaction with Defendant did Officer Cruz see Defendant holding a gun. (Dkt. No. 194 (Cruz. Tr.) at 126:18-20). Further, after Defendant complied with Officer Cruz's instruction—thereby revealing that he was not holding a firearm—Officer Cruz then handcuffed Defendant and asked him if he had any weapons, to which Defendant responded that he had (only) a knife in his front pocket. *Id.* at 48:13-23. Officer Cruz subsequently asked Defendant whether he had "anything else" and Defendant represented that he had (only) keys and a wallet. *Id.* at 132:14-23. After removing these items, Officer Cruz frisked Defendant—a frisk that revealed no firearm. Undeer these circumstances, it is clear that Defendant's abandonment of the firearm preceded his seizure and was therefore voluntary. *Rivera*, 441 F. App'x at 90; *Hodari D.*, 499 U.S. at 629.

Moreover, even if Officer Cruz's seizure of Defendant began when Officer Cruz first drew his firearm—before Defendant complied with his instructions and turned around—the result would be the same. Under this scenario, it is conceivable that Defendant abandoned the firearm *after* being seized, because Officer Cruz could not see Defendant's hands until he turned around. (Dkt. No. 194 (Cruz. Tr.) at 42:2-3). Nonetheless, the doctrine of "forced abandonment"—which would render the abandonment involuntary—would be inapplicable. Under the doctrine of forced

abandonment, it is the *illegality* of police conduct, and not the bare fact of a seizure, that strongly militates in favor of a finding that a defendant's subsequent abandonment of an item was involuntary. *See, e.g., Coggins*, 986 F.2d at 653 ("[W]hen the abandonment of property is *precipitated by* an *unlawful* seizure, that property also must be excluded." (emphases added)); *United States v. Beck,* 602 F.2d 726, 729-30 (5th Cir.1979) ("While it is true that a criminal defendant's voluntary abandonment of evidence can remove the taint of an illegal stop or arrest . . . it is equally true that for this to occur the abandonment must be truly voluntary and not merely *the product* of *police misconduct*." (emphases added)); *United States v. Wilson*, 953 F.2d 116, 127 (4th Cir. 1991) (holding the defendant's abandonment of drugs was involuntary, and suppression of drugs warranted, where defendant's abandonment was "clearly the *direct result* of the *illegal* seizure" (emphases added)).

This Court previously determined that Officer Cruz's initial seizure of Defendant—a *Terry* stop—was lawful. *Wrensford I*, 2014 WL 3907021, at *9. That finding was not disturbed by the Third Circuit and the Court adopts the same finding here. *See Wrensford II*, 866 F.3d at 93 (affirming the Court's holding in all respects except for the lawfulness of Defendant's arrest). Thus, even if Defendant somehow abandoned the firearm once he had been seized by Officer Cruz, no unlawful seizure precipitated that abandonment so as to give rise to the inference that his abandonment of the firearm was involuntary.[7]

Accordingly, the Court finds that Defendant voluntarily abandoned the firearm. As such, Defendant does not have a reasonable expectation of privacy with respect to the challenged

---

[7] The Court notes that Defendant's prior interaction with Officer Mendez on the night in question does not alter the Court's conclusion because—as the Court previously found and reaffirms here—Officer Mendez's seizure of Defendant—also a *Terry* stop—was lawful. *Wrensford I*, 2014 WL 3907021, at *8.

property. *Fulani*, 368 F.3d at 354. He therefore lacks standing to challenge the seizure of the firearm. *Abel*, 362 U.S. at 241. The Court's finding in this regard is a sufficient and independent basis upon which to deny Defendant's Second Motion to Suppress.

### B. Causation

Even if Defendant had standing to raise the instant challenge regarding the firearm—which he does not—the Court concludes that the firearm does not constitute the fruit of Defendant's unlawful arrest. In support of his argument that the firearm was a "direct result of," and "would not have been discovered but for," his illegal seizure, Defendant maintains that "the search for the firearm immediately succeeded the arrest of [Defendant]," and that "Officer Cruz admits that he and other officers decided to search the area where [Defendant] was found and arrested." (Dkt. No. 425 at 8-11). Defendant's argument fails.

Contrary to Defendant's contention, it does not necessarily follow from the mere fact that the officers' discovery of the challenged evidence followed unlawful police activity that the unlawful activity was a cause—let alone the but-for cause—of the officers' discovery of that evidence. Here, there is no indication that Officer Cruz and his colleagues searched the area in which they discovered the firearm *because* of the fact that an unlawful arrest commenced there. Nor is there any indication that the transportation of Defendant from that location by the police and his subsequent placement in a cell—which is what the Third Circuit found constituted Defendant's unlawful *de facto* arrest, *Wrensford II*, 866 F.3d at 87—served as the basis for the search. To the contrary, Officer Cruz testified that he and his colleagues searched the area where he "met" and "made contact" with Defendant based on a belief that there should be a firearm given that the officers had discovered spent rounds and cases in the rear of the truck. (Dkt. No. 194 (Cruz. Tr.) at 73:5-21). In other words, Officer Cruz testified that the officers searched the area where

Defendant was found—that is, where Officer Cruz effected a lawful stop of Defendant. That Defendant's unlawful arrest subsequently commenced at that same location—with his transportation to the police station—is ultimately irrelevant because that unlawful arrest lacks any causal relationship to the discovery of the firearm. Thus, it cannot be said that the officers' discovery of the firearm was "in some sense the product of illegal governmental activity," *United States v. Crews*, 445 U.S. at 471, or came about "by exploitation of that illegality," *Wong Sun*, 371 U.S. at 488.

Defendant's arguments to the effect that the taint upon the firearm had not dissipated by the time officers recovered it—particularly given the temporal proximity of Defendant's unlawful *de facto* arrest and the officers' discovery of the firearm—are therefore beside the point. (*See* Dkt. No. 425 at 8-12 (making arguments with respect to the *Brown* factors). As the Supreme Court has emphasized, "attenuation analysis is only appropriate where, as a threshold matter, courts determine that the challenged evidence is in some sense the product of illegal governmental activity." *Harris,* 495 U.S. at 19. As discussed above, this Court has not so found.

In view of the foregoing, the Court finds that the firearm is not the fruit of Defendant's unlawful arrest. Suppression of the firearm would therefore not be warranted even if Defendant had standing.

14

## IV.    CONCLUSION

Because the Court concludes that Defendant does not have standing to challenge the admission of the firearm in evidence and that, in any event the firearm is not the fruit of Defendant's unlawful arrest, the Court will deny Defendant's Second Motion to Suppress (Dkt. No. 425).

An appropriate Order accompanies this Memorandum Opinion.

Date:   February 6, 2023                                       _____/s/_____
                                                              WILMA A. LEWIS
                                                              District Judge